UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) ) ) Plaintiff, ) ) ) v. ) ) ) ANGELO A. ALLECA, SUMMIT ) WEALTH MANAGEMENT, INC., ) SUMMIT INVESTMENT FUND, LP, ) ASSET CLASS DIVERSIFICATION ) FUND, LP, and PRIVATE CREDIT ) OPPORTUNITIES FUND, LLC, ) ) Defendants. ) _____ ) | CIVIL ACTION FILE NO. 1:12-CV-3261-WSD |

## RECEIVER'S FIRST INTERIM REPORT

Robert D. Terry, the Receiver appointed by this Court by Order dated September 21, 2012, files this First Interim Report to describe his initial findings, the work remaining to be done, and the assets and liabilities discovered thus far.

**Procedural and Factual Background**

1. On September 18, 2012, the United States Securities and Exchange Commission ("SEC") filed an application for an injunction and other equitable relief, alleging that Angelo Alleca ("Alleca"), Summit Wealth Management, Inc.

("Summit") and three investment funds that had been created by Alleca (the "Alleca Funds") violated and were likely to continue to violate Sections 17(a)(1)-(3) of the Securities Act of 1933, Section 10 of the Securities Exchange Act of 1934, and Sections 206(1),(2) and (4) of the Investment Advisers Act of 1940.

2.  On September 19, 2012, this Court granted the SEC's application and entered an Order freezing assets and granting other relief.

3.  On September 21, 2012, the SEC sought the appointment of a receiver for Summit and the Alleca Funds. The Court appointed Robert D. Terry, of Page Perry, LLC, as Receiver.

4.  Throughout this report and subsequent reports, the Receiver will refer to the September 19 Order, as the "Freeze Order" and the September 21 Order as the "Receivership Order."

## Initial Assessment

5.  Immediately after his appointment, the Receiver contacted the Summit office located at 150 Perimeter Center West, Suite 115, in Atlanta, Georgia. A meeting with the employees of the Atlanta office was arranged for later that afternoon, and most employees of other offices attended the meeting by teleconference.

6.      Alleca did not attend the meeting[1], nor did three administrative employees in the Atlanta office whose work schedules had ended for the day.

7.      At the meeting, the Receiver, and two members of Page Perry, who served as counsel, explained the meaning of the imposition of a receivership and asked for the employees' cooperation during the course of the receivership.  The Receiver requested that all employees come to work as usual on the following Monday, September 24.

8.      At the initial meeting, the Receiver learned that one licensed employee had resigned his position from Summit that afternoon. During that meeting, the Receiver's counsel also began taking the steps with the management of the building housing the Summit Atlanta office to change locks and otherwise secure the space.

9.      On Saturday, September 22, the Receiver met for several hours with Carrie Mistina, Summit's Chief Financial Officer, and he and his counsel began the task of identifying and analyzing the financial affairs of Summit and the Alleca Funds, along with the operations of Summit. In addition, the Receiver inspected the contents of the office to determine the location and contents of physical files, as well as furniture and equipment.

---

[1] Alleca's attendance was neither requested nor desired.  He has so far been cooperative with the Receiver during the investigation.

10. During the subsequent weeks, the Receiver continued to interview Summit's employees in an effort to learn not only how Summit operated, but also whether the employees were aware of the facts underlying the allegations in the SEC's complaint. In addition, the Receiver has interviewed Alleca for several hours, as well as other third parties with knowledge of Summit's operations.

11. The Receiver's initial investigation and analysis indicates that Summit and Alleca had, essentially, two operations – a registered investment adviser whose operations were relatively transparent to its employees, and which were ostensibly compliant with applicable regulations, and a second operation involving the Alleca Funds which, while largely sold to Summit clients with the knowledge of Summit employees, were managed by Alleca personally and, it appears, largely offsite.[2]

**The RIA Operations**

12. As of September 21, Summit was an SEC-registered investment adviser with 3 offices in which advisory operations were conducted – Atlanta, San Antonio, TX and Beverly Hills, CA.

13. In addition to having registered advisors, the Atlanta office also houses most of the firm's administrative staff, and shares space with an accounting firm from whom Summit purchased advisory accounts in 2008.

---

[2] These determinations are preliminary. As with all of the initial conclusions and impressions which have been drawn to date, the Receiver continues to gather facts in order to ascertain all of the parties who may bear responsibility for investor losses.

Case 1:12-cv-03261-ELR   Document 25   Filed 10/22/12   Page 5 of 18

14. The San Antonio office has 7 employees, of whom 3 are registered, 3 are support staff, and one is a tax accountant.

15. The Beverly Hills office had three employees, one of who was registered and two were support staff.

16. In addition, Summit maintained staff in three other locations. One employee was maintained as a "personal assistant" for Alleca, working out of an office Alleca owned personally in Buffalo, New York. Two employees and a part-time consultant, performed legal and accounting duties in an office in Chicago, Illinois, which had formerly housed advisory staff, in addition. Finally, another part-time information technology consultant worked remotely from Orlando, Florida, but the firm had no office there.

17. Except for a part-time accounting staff member in Chicago and the information technology consultant in Orlando, all of the Summit staff members were salaried employees.

18. Summit has owned several other offices over the years. The Summit growth model seems to have been to acquire existing advisory operations and accounts, physically relocating those businesses to the main office if in Atlanta, and acquiring existing offices if in another state. In recent years, several offices - which had been acquired only one to two years before – were sold. Offices in Chicago,

Illinois, Phoenix, Arizona, Orlando and Naples, Florida, and Alexandria, Virginia fit into this pattern.

19.     Because of the loss of several offices in recent months, it appears to the Receiver that the overhead maintained by the firm is excessive for the operation's size.

20.     The employees working at Summit were actually "leased" employees of Oasis Outsourcing.  That relationship has ended, and employees are now employed by Summit.

21.     At the time of the Receivership Order, the assets under management in all of Summit's office were approximately $400,000,000.  However, during the week of the Freeze Order and the Receivership Order, as the news of the SEC action became public, some clients began to remove their accounts and to terminate their relationships with the Summit employees who had been advising them. That client departure has now slowed, although some attrition is still occurring, both naturally and also because of adviser departures.

22.     Without exception, current employees appeared to be surprised about the SEC's allegations that the Alleca funds were fraudulent.

## The Alleca Funds

25.     As indicated in the SEC's complaint, Alleca began creating independent funds as early as 2003. Three such funds appear to have been ultimately created: Summit Investment Fund, LP, ("SIFLP"), Asset Class Diversification Fund, LP ("ACDF") and Private Credit Opportunities Fund, LLC ("PCOF") (collectively, the "Alleca Funds").

26.     The employees were uniformly aware of the Alleca Funds' existence.  Many of their clients had invested substantial sums in the Alleca Funds, although it appears that the total client monies invested did not exceed 8% of the firm's assets under management.

27.     However, the current employees appear to have had no significant involvement in the design, creation or management of the Funds. The sales activity for the Funds was typically initiated by Alleca, often with letter or telephone calls to clients, sometimes followed up with advisor contact.

28.     The office in Atlanta, including Alleca's personal office, contains scant physical on relating to the Funds, other than records of individual clients' subscriptions. Alleca has indicated that he has no additional information, and that he no longer has possession of the computer on which much of the information resided, that computer having previously become inoperable and disposed of.

29. Although the Receiver continued to gather information about the Funds, including some indication that sales may have begun earlier than previously thought, it appears that the three Funds, collectively, raised well over $20,000,000.

30. According to Mr. Alleca and the employees, some investors in the Funds have had their investments partially redeemed, and many investors received distributions purporting to be returns generated by the Funds. At this point, no accurate data exists about these redemptions and distributions, but the Receiver believes that, when an accounting of the Funds and Summit's financial information is completed, a reasonably accurate assessment will be possible.

31. TDAmeritrade, custodian of most of Summit's clients' accounts, has revalued the Alleca Fund's valuations to zero because of its inability to ascertain an accurate valuation from their manager (Alleca).

## Detroit Memorial Partners

32. In addition to the Alleca Funds, many Summit clients invested in an entity called Detroit Memorial Partners, LLC ("DMP").

33. DMP was formed in Michigan in late 2007 for the purpose of holding an equity interest in another entity which was created to own 28 cemeteries being sold out of a Michigan state receivership. The individual who created DMP was a former business associate of Alleca's, Mark Morrow.

34. Morrow appears to have also been involved in at least one of the Alleca Funds.

35. During late 2007 and early 2008, high-interest promissory notes issued in the name of DMP began to be sold to Summit clients. More notes were sold in 2009 and 2010, and again in 2012. In total, it appears at this stage of the investigation that over $15,000,000 of DMP notes were sold to Summit clients.

36. Many of the notes were supposed to have matured by now. The notes sold in the earlier years of sale are in default, and scheduled interest payments have not been paid in several years.

37. Other than as entities facilitating the sale of the DMP notes, it is unclear what exact role Alleca played in their creation, and what role, if any, Alleca has played in the management of DMP, but the Receiver's investigation into these issues continues. It appears that monies from at least one of the Alleca Funds may have been used to fund interest payments on the DMP Notes, and other entanglements between the financial affairs of Summit, Alleca and DMP may have existed.

38. The Receiver is aggressively pursuing the destination of Summit clients' funds which were invested into DNP directly through the Notes, as well as funds of the Alleca Fund investors which may have benefitted DMP.

## Custodians

39.     At the time of the Receivership Order, approximately 39% of customers' assets were maintained in accounts at TDAmeritrade Institutional, with the bulk of the remaining accounts being at Schwab.

40.     On the afternoon of September 21, after the Freeze Order was entered and shortly before the Receivership Order was entered, TDAmeritrade suspended access to accounts identified with Summit, meaning that Summit advisers could not view or effectuate activity in those accounts on behalf of their customers.

41.     Although TDAmeritrade restored access on Monday, September 24, many investors received letters from TDAmeritrade informing them of the access suspension on that day and the following day.  The letters had been sent the previous Friday, just prior to the appointment of the Receiver.

42.     On Monday, the Receiver sent a letter to Summit customers who had received the TDAmeritrade letter, informing them that access had been restored, and TDAmeritrade sent a similar letter.

43.     In response to the Freeze and Receivership Orders, Schwab also temporarily interrupted access to its custodied accounts by Summit advisers, but access was similarly promptly restored.

44. The Receiver has become aware of no misappropriation or other loss (other than typical market losses) of assets in any custodied accounts, other than the reduction of value of the Alleca Funds and the DMP Notes.

## Liquid Assets

45. Immediately after his appointment, the Receiver met with the Chief Financial Officer of Summit and determined that she was aware of only a single operating bank account.

46. On September 25, the Receiver opened a bank account at Fidelity National Bank.

47. The Receiver contacted the bank where Summit maintained that operating account, Bank of North Georgia ("BNG"), and transferred the approximate balance of $10,000 to the Receivership account at Fidelity. In addition, an automated loan payment of $8,763 from that bank account was deducted by the bank on the day of the withdrawal. The Receiver and BNG have agreed that those funds will be held in escrow, pursuant to Paragraph IX of the Receivership Order, until their ownership can be determined.

48. From documents obtained from TDAmeritrade relating to investors' purchases of the Alleca Funds and the DMP Notes, the Receiver has identified four additional banks into which client funds were deposited in connection with those

11

investments. Subpoenas for relevant records have been served on each of those banks.

49. The Receiver believes it is likely that, as the investigation proceeds, additional bank accounts with activity related to the Receivership Entities will emerge. However, it is not expected that those accounts will contain significant, if any, assets.

50. Summit continues to operate as a registered investment adviser. However, as a result of customer attrition due to the uncertainty arising as a result of the news surrounding the Freeze and Receivership Orders, as well as two advisors leaving the firm, fee income is substantially reduced.[3]

51. Advisory fees were collected after the end of the third calendar quarter totaling $ 291,968. Of these fees, $ 193,060 were fees for services performed for the previous quarter, and $ 98,908 were advance fees for services to be performed in the fourth quarter.[4]

52. In addition, fees were also below previous levels because of the Receiver's decision to forgo fees from clients who had purchased any of the Alleca Funds, in that they will almost certainly have a claim against the Receivership Estate, not

---

[3] In addition to the departure of the previously mentioned advisor on the day of the Receivership Order, the sole licensed advisor in the Beverly Hills office resigned on October 2.

[4] Advance fees are held in a separate receivership account, and moved to the operating account only when earned.

only for the asset itself, but also for fees collected on the overvaluation of those assets for up to several previous years.[5]

## Value of Offices

53. The accounts and relationships at Summit's office represent significant assets which may be able to be sold for substantial sums, as well as reduce the operating expenditures of the Receivership. The Receiver is currently discussing potential sales with several interested parties.

## Sale of Beverly Hills Office

54. On October 2, the adviser located in the Beverly Hills office suddenly resigned. He apparently notified customers immediately of his departure. Although the Receiver and his counsel are considering their legal options in the situation, the departure caused an immediate loss of client accounts to begin.

55. On October 12, the Receiver concluded a sale of the Receivership's title and interest in the California offices accounts to CLA Advisors, an advisory firm with offices in Chicago and Los Angeles, for an amount which will equal approximately 100% of the average annual revenue the purchaser is able to obtain from those offices over the next three years, which he estimates will be between $100,000 and

---

[5] Investment advisors, including Summit, typically bill clients based on a percentage of their assets under management. Fees are typically assessed on a quarterly basis. For example, an account with $100,000 of managed assets, paying a fee of 1% annually, will be assessed a fee of $250 each quarter. If the $100,000 account valuation is later determined to have been overstated, the fees charged will have been incorrect. The Receiver determined that to charge those clients fees would be inappropriate given the circumstances.

$300,000.  Given the fact that the advisor who was servicing the accounts was no longer present, the Receiver believes that is an appropriate measure of the office's current value.

## Additional Assets

56.     This receivership is still very young.  Indications of potential assets continue to come to the Receiver's attention.

57.     Alleca owns two pieces of property, a house (used as an office) in Buffalo, New York, and a residence in Duluth, Georgia.

58.     The Buffalo building has been listed for sale with a Buffalo real estate firm for approximately two years.  Last week, the agent has reported that an offer has been received, and after a counter-offer approved by the Receiver, a tentative contract has been agreed which will result in a sales price of $150,000.  After paying a $92,000 mortgage lien, a brokerage commission, and other closing costs, the property sale is expected to net approximately $45,000. At the appropriate time, the Court's approval will be sought to lift the asset on Alleca for the limited purpose of allowing the closure of the sale.  Alleca has indicated, both in the Receiver's interview and through counsel, that he will not object to an assignment of the proceeds to the Receivership estate.

59. Based upon his initial investigation, the Receiver believes that the Duluth property has little or no equity, and will likely not seek or assert any interest in that property.  The Receiver has not yet ascertained whether the furnishings and other property in the Duluth home have value.

60. Summit owns at least two promissory notes arising from the sale of accounts in the Chicago and San Antonio offices.  The San Antonio note is based upon income to be derived from the accounts sold and is therefore of indeterminate value at this point, although counsel for its maker has indicated that it will be paid when due, later this year. Some evidence indicates that the Chicago note, with a remaining principal value of $873,000, may be the subject of a purported assignment to a third-party.  The Receiver has concluded that the note is the property of the Receivership estate and has so notified the payor.

61. Although the lack of complete records has hindered the immediate determination of the existence of other assets, Alleca appears to hold at least one promissory note arising from a previous transaction of a sale of accounts which, if not already the property of the Receivership estate, may be the subject of a request to Alleca that it be assigned to the estate.

62. The Receiver has begun identifying (and will continue to identify) individuals and entities who wrongfully received substantial client funds from

Alleca and the Alleca Funds, and will pursue return of those funds and appropriate damages, including through litigation if the likely benefit substantially exceeds the likely cost.

63. The Receiver will evaluate other potential third-party claims against other individuals and entities whose actions may have wrongfully harmed Summit or the Receivership, and will file suit if the likelihood of success justifies the expected cost.

64. Summit has several insurance policies, including errors and omissions coverage, directors and officers liability coverage, and general liability policies, which may provide coverage for some of the losses incurred by Summit and its investors, as well as offset the cost of legal expenses the receivership estate incurs. The Receiver and his counsel are currently reviewing those policies and notifying the carriers of potential claims.

## Liabilities

65. Because finding and securing assets is so important in the early weeks of a receivership, the Receiver has not yet made identification of liabilities a priority, although he is aware of several liabilities. The Receivership is also the defendant in two lawsuits brought against Summit prior to the Receivership Order, which the Receiver is defending. He anticipates being able to give the Court a more

complete list of receivership liabilities, as well as an updated litigation status, in the next interim report.

66. Rent for Summit's offices was not paid for the month of September, 2012, and other trade payables exist from the period immediately prior to the institution of the Receivership. These unpaid trade payables total approximately $165,000.

67. The final automated payroll withdrawal for the leased employees of Oasis on September 15, 2012, was returned for insufficient funds, in the amount of $110,000, which remains unpaid.

68. Earlier in 2012, Alleca executed a short sale of Apple stock in the TDAmeritrade Summit trading account, which resulted in a loss of approximately $211,000 and a margin debt to TDAmeritrade, which remains unpaid.

69. As a result of acquisitions of the Beverly Hills and a portion of the Atlanta offices, Summit gave secured promissory notes to those sellers, which notes have remaining balances of approximately $600,000 and $100,000, respectively.

70. Another unsecured promissory note to a seller, in the principal amount of approximately $814,000, is the subject of one of the lawsuits mentioned above.

71. The largest category of liabilities of claims of investors in the Alleca Funds and, possibly, the DMP Notes. The Receiver and his team are currently compiling a list of those investors who are known to the Receiver through their

TDAmeritrade custodial accounts, and will pursue additional information as it becomes available as a result of pending bank subpoenas.  In addition, the Receiver has requested documents from servicing agencies for the Alleca Funds which may indicate yet additional investors.

72.	At the appropriate time, the receiver will present to the Court a proposed claims process in an effort to ascertain any additional claims which may exist.

## Continuing Work

73.	The Receiver and his team continue to search for and secure assets of the receivership.

74.	The Receiver expects to file his next interim report in approximately 60 days.

Respectfully submitted this 22nd day of October, 2012.

										s/ Robert D. Terry
										Georgia Bar No. 702606
										Receiver

PAGE PERRY, LLC
1040 Crown Pointe Parkway
Suite 1050
Atlanta, GA 30338

770-673-0047