IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>ANGELO A. ALLECA, SUMMIT WEALTH MANAGEMENT, INC., SUMMIT INVESTMENT FUND, LP, ASSET DIVERSIFICATION FUND, LP, and PRIVATE CREDIT OPPORTUNITIES FUND, LLC<br><br>Defendants. | Civil Action No.<br>1:12-CV-3261 |

## RECEIVER'S APPLICATION FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES AND BRIEF IN SUPPORT

Robert D. Terry, the Receiver, files this Application seeking this Court's approval to pay the Receiver's fees and expenses and his attorneys' fees and expenses for the period beginning with his appointment on September 21, 2012, and ending December 31, 2012 (the "Time Period"), and in support of his Application shows:

During the Time Period, the Receiver focused his efforts on establishing the Receivership entity, taking control of, stabilizing, analyzing and managing the

continuing business activities of Summit Wealth Management, Inc. ("Summit"), beginning the process of identifying assets belonging to Summit and the other Receivership Defendants, beginning and substantially completing the process of selling the operating assets of Summit and eliminating operating expenses, and beginning the claims process.

## PROCEDURAL AND FACTUAL BACKGROUND

1.  On September 18, 2012, the U.S. Securities and Exchange Commission ("SEC") filed an application for a temporary restraining order and other equitable relief, alleging that Angelo A. Alleca ("Alleca"), through Summit, a federal-registered investment adviser and three funds created by Alleca (the "Funds") (collectively, Alleca, Summit and the Funds may be referred to as the "Receivership Defendants"), fraudulently raised approximately $17 million from investors who purchased interests in the Funds and operated a Ponzi scheme resulting in the loss of those funds.

2.  On September 19, 2012, this Court granted that application and entered an Order ("the *Order*") freezing assets, prohibiting the destruction of documents, and granting other relief.

3. On September 21, 2012, the Court, upon application of the SEC, entered an Order appointing Robert D. Terry of Page Perry, LLC, as Receiver. The Receiver designated Page Perry, LLC as counsel to the Receiver.

## REQUEST FOR COMPENSATION

4. By this Application, the Receiver asks the Court to approve payment of the fees of the Receiver and reimbursement of the expenses incurred for the Time Period.

5. By this Application, the Receiver asks the Court to approve payment of the fees of $199,924.50 and reimbursement of the expenses of $8,908.94 incurred by the Receiver and other lawyers and staff at Page Perry, LLC for the Time Period.

6. By this Application, the Receiver asks the Court to approve payment of the fees of $10,244.50 and expenses incurred of $440.85 for the law firm of Berger Harris for the Time Period. A detailed invoice for Berger Harris is attached as Exhibit "E".

7. By this Application, the Receiver asks the Court to approve payment of the fees of $1.020.00 for the firm of DowLohnes PLLC incurred for the Time Period. A detailed invoice for DowLohnes PLLC is attached as Exhibit "F".

8. Pursuant to the SEC Receivership Billing Instructions the SEC's Standardized Fund Account Report ("SFAR") as of the most recently concluded calendar quarter is attached as Exhibit "A" to this Fee Application.

9. Also pursuant to the SEC Receivership Billing Instructions, the fee schedule for all professionals and paraprofessionals employed by the Receiver is attached to this Fee Application as Exhibit "B," and the Receiver's Certification as to the information contained in this application is attached as Exhibit "C."

10. As is customary, the Receiver and his team work on an hourly basis, keeping track of the time spent and multiplying those hours by the respective hourly rates, all of which have been discounted from their typical rates to benefit investors.

11. During the Time Period, the Receiver and Page Perry, LLC incurred fees of $199,924.50 for 874.05 hours of work, and incurred case-related expenses of $8,908.94. The Receiver has attached as Exhibit "D1" a detailed invoice from Page Perry, LLC reflecting the time spent, the applicable hourly rates of the Receiver, his counsel, and their associates and legal assistants, and the expenses incurred. The Receiver has attached as Exhibit "D2" a breakdown of the billing for each person employed by Page Perry, LLC.

12. In the aggregate, therefore, the Receiver's team devoted 912.45 hours to the case and is submitting bills for $211,189.00 for that work, yielding a total effective hourly rate for this billing period of $231.45.

## BRIEF IN SUPPORT OF APPLICATION

13. In support of this Application, the Receiver relies upon the factors generally considered by courts in awarding compensation to attorneys for services performed in connection with the administration of a receivership estate. The Fifth Circuit gave us the "Johnson Factors," in <u>Johnson v. Georgia Highway Express, Inc.</u>, 488 F.2d 714 (5th Cir. 1974) and the Eleventh Circuit adopted them in <u>Norman v. Housing Authority of City of Montgomery</u>, 836 F.2d 1292 (11th Cir. 1988). The Receiver addresses each of those factors below.

14. <u>The Time and Labor Required</u>. On the day the Receiver was appointed, the Receiver and several members of his team began their work by taking physical possession of the Atlanta office of Summit (the principal office of the firm and the location of all business and accounting records), meeting with employees and assessing the state of the business and the records. Beginning that weekend, the team interviewed employees and reviewed business records to learn both about the business of Summit as well as the events and transactions that formed the basis for the SEC action. For approximately the next three months, the Receiver was onsite

for the majority of his time at the Atlanta office, and in continuous contact with other offices and personnel, handling the myriad details of managing an operating business as well as beginning the work of tracing investor funds, identifying and evaluating assets of the estate and exploring various options to maximize the estate's value for the benefit of investors. The Receiver immediately began assessing and cutting unnecessary operational costs, while recognizing the necessity of maintaining a functioning investment advisory business in order to maximize its value for sale. Similarly, his counsel was involved in assisting the review of business matters, and assessing and responding to the various legal issues before the receivership.

During the Time Period, while the Receiver and his professionals have had to continue to expend time and effort on this case, and have had to incur expenses, all of them were necessary to discharging the duties of the Receivership. Exhibit "D" details those efforts and those expenses.

15. <u>The Novelty and Difficulty of the Questions.</u> Some of the Receiver's tasks have involved novel and complex factual and legal questions. Indeed, by its very nature, a receivership is unique and complex. This particular receivership has involved the intersection of both an operating investment advisory business, with 20 employees and hundreds of clients spread among three offices, and an

illegitimate multi-year Ponzi scheme, both of which had been operating simultaneously for several years across not only Summit and the other receivership defendants, but also using other businesses created, at least in part, for the apparent purpose of enabling the perpetuation and avoiding detection of the scheme. Unwinding the financial affairs of these entities – a necessary step to determine where investor assets and the fruits of those assets may reside – is by itself a complicated task, made more so against the backdrop of the need simultaneously to operate the "legitimate" side of the enterprise. Finally, after an initial assessment indicated that the business would not be readily saleable as a complete entity due to the diversity of the offices' locations, sizes, structures and client bases, the Receiver and his team undertook to locate potential purchasers for offices and "sub-offices," and negotiated and concluded sales agreements for each office. In one case, with a purchaser who was a to-be-registered investment adviser, this process required the specialized knowledge of state-level investment adviser registration processes and policies possessed by the Receiver and his counsel.

16.   <u>The Skill Requisite to Perform the Service.</u>   Having been Director of the Georgia Securities Division for over 8 years, and having investigated cases involving the kind of offering fraud involved in this case, the Receiver has the skills necessary to the administration of this receivership. In addition, the Receiver

also has experience as a broker-dealer and investment adviser compliance director, as well as practical experience operating a business. In addition, it has become apparent that a key element of this matter will be an understanding of the cemetery business, since over $15,000,000 of Summit client funds were invested in an entity still actively involved in that business, and which entity's financial affairs were intermingled with Summit's and the other receivership defendants. In his position as Director of Georgia's Securities Division, the Receiver was also the principal regulator of Georgia's private cemetery industry for over 8 years. Members of his counsel's law firm also have regulatory and legal experience in complex cases involving financial misdeeds.

17. <u>The Preclusion of Other Employment Due to Acceptance of the Case.</u> Because of the time demands of the Receivership in the first few months of its existence, the Receiver was required to devote almost all of his professional time to the receivership, thus preventing him from performing substantial work for other clients, and necessitating the transfer of work to other lawyers in his firm.

18. <u>The Customary Fee.</u> The Receiver and his professionals respectfully represent that the hourly rates set forth in Exhibit "D" are not only within the range of prevailing market rates in this community for similar services by attorneys and professional employees of reasonably comparable skill, experience, and reputation,

but are actually discounted rates charged for the benefit of investors. The Receiver and his professionals each further represent that these hourly rates are comparable to or less than rates actually billed and paid to attorneys and professional employees of comparable skill, experience, and reputation in cases of like nature before this Court. In the event of an objection to any or all of the hourly rates charged by any of the attorneys or professionals identified in Exhibit "D1," the Receiver will present direct evidence and/or opinion evidence of charges by attorneys and professional employees under similar circumstances. Otherwise, the Receiver respectfully asks the Court to take judicial notice of the prevailing market rates in this legal community for similar services by attorneys and professional employees of reasonably comparable skill, experience and reputation, and rely upon its own expertise to determine that the rates charged by the attorneys and professional employees identified in Exhibit "D" are reasonable.

19.   <u>Whether the Fee is Fixed or Contingent.</u> The fees of the Receiver and his professionals are fixed, insofar as they are based upon the fixed hourly rates described above, and all the matters described in this petition have been undertaken on that basis. Although the Receiver believes that certain matters which may be instituted in the near future may be more appropriately undertaken on a contingent fee basis, the Receiver will raise that possibility with the Court if and when he

believes such an arrangement may be appropriate for a specific matter. Pursuant to the terms of the Receivership Order, the payment of professional fees is subject to Court approval.

20. <u>Time Limitations Imposed by the Client or Other Circumstances.</u> Because a significant aspect of this Receivership is a search for money and other assets, time is critical. The investors in this case are anxious to have at least some of their funds, if recoverable, returned as soon as possible, and the Receiver is mindful of this demand in moving this case forward as quickly as possible. The most critical element of the first few months of the Receivership was the disposition of the operating business as quickly as possible, which resulted in a cash infusion to the receivership as well as downstream or future cash payments, as well as a cessation of the expenses required to continue the business's operation, which was necessary to maintain as much of its value as possible prior to sale.

21. <u>The Amount Involved and the Results Obtained.</u> This case involves cumulative investments of more than $30 million, concealed through the use of multiple entities and over two dozen bank accounts over several years. During the period covered by this Application, the Receiver and his team have dealt with the following significant matters:

    a.    wound down a mortally injured advisory business and secured contracts for the sale of its component parts;[1]

    b.    began investigative and legal work for the return of assets wrongfully conveyed by Alleca for inadequate consideration;[2]

    c.    began the investigative and legal work tracing investor and Summit assets through over two dozen bank accounts and 10 different entities;[3] and

    d.    began the claims process, including communicating with numerous clients regarding the Summit situation.

22.    <u>The Experience, Reputation and Ability of the Attorneys.</u>  The Receiver and many of the lawyers in his firm who serve as his counsel devote a substantial amount of their practice to securities law, representing defrauded investors against those who have abused their trust, and, in some cases, represented registered entities in compliance matters. The Receiver has more than thirty years of experience in securities law and business representation and is well-respected in the legal community.

---

[1] Contracts for sales of offices or "suboffices" were entered into for aggregate purchase prices, payable partially in cash but primarily through "earnouts" over time, estimated to total approximately $700,000.

[2] These assets include two promissory notes payable to Summit in the approximate aggregate amount of approximately $950,000, but which were purportedly assigned to third parties by Mr. Alleca in 2012 for low or illusory amounts, as well as an operating business of undetermined value into which large cash infusions were made but which was then purportedly sold to third parties for an undetermined amount.

[3] In addition to uncovering myriad cash transfers, without apparent basis or consideration, among numerous entities, this work has revealed heretofore unknown funds transfers among Summit and its funds and third parties, including Detroit Memorial Partners and some of its affiliates.

23.   <u>The Undesirability of the Case.</u>  The case is not undesirable.

24.   <u>The Nature and Length of the Professional Relationships.</u>  The Receiver became associated with Page Perry, LLC in September, 2011. In addition, he previously practiced law with J. Steven Parker, a partner at Page Perry, and worked with him when he was Enforcement Director at the Georgia Securities Division. Page Perry and its attorneys have excellent reputations, especially in matters related to securities law and litigation.

25.   <u>Awards in Similar Cases.</u>  Based on their collective experience, the Receiver and the professionals working with him believe that the fees requested in this case are consistent with fees awarded in similar cases in this district and elsewhere.

26.   The Receiver has submitted the attached invoices to the SEC for their review and approval.  The SEC indicated to the Receiver that it had no objection to payment of the invoices.

WHEREFORE, the Receiver, on behalf of himself, and his law firm, asks this Court to approve all of the fees and expenses described herein and authorize the immediate payment of same to the extent that the Receiver determines funds are available to do so.[4]

---

[4] Current funds in the Receivership's operating account are approximately $190,000. In addition, the Receiver anticipates receiving additional revenue in April and subsequent months from payments due from previous sales of assets. The Receiver is also investigating and will be pursuing claims anticipated to result in significant additional funds to the Receivership estate. Although the cessation of business operations, termination of all employment

Respectfully submitted this 19th day of March, 2013.

                                                            /s/ Robert D. Terry  
                                                            Robert D. Terry  
                                                            Georgia Bar No. 702606  
                                                            Receiver

PAGE PERRY, LLC  
1040 Crown Pointe Pkwy  
Suite 1050  
Atlanta, GA 30338  
(770) 673-0047  
(770) 673-0120 – facsimile  
bterry@pageperry.com

---

relationships and the satisfaction of tax liabilities associated with those operations and employment means that the Receivership has few, if any, ongoing expenses, it is the Receiver's intention to maintain a sufficient cash reserve after payment of any fees and expenses authorized by the Court in the event that unanticipated expenses arise.

## CERTIFICATE OF SERVICE

I certify that the foregoing was prepared with one of the font and point selections approved by the Court in LR 5.1B. I further certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notice of electronic filing to counsel of record.

This 19th day of March, 2013.

_____
Robert D. Terry
Georgia Bar No. 702606
Receiver

PAGE PERRY, LLC
1040 Crown Pointe Pkwy
Suite 1050
Atlanta, GA 30338
(770) 673-0047
(770) 673-0120 – facsimile
bterry@pageperry.com