UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>ANGELO A. ALLECA, SUMMIT WEALTH MANAGEMENT, INC., SUMMIT INVESTMENT FUND, LP, ASSET CLASS DIVERSIFICATION FUND, LP, and PRIVATE CREDIT OPPORTUNITIES FUND, LLC,<br><br>Defendants. | CIVIL ACTION FILE NO.<br><br>1:12-CV-3261-WSD |

## RECEIVER'S SECOND INTERIM REPORT

Robert D. Terry, the Receiver appointed by Order of this Court dated September 21, 2012, files this Second Interim Report to describe his findings, the work remaining to be done, and the assets and liabilities discovered thus far.

**Procedural and Factual Background**

1.  On September 18, 2012, the United States Securities and Exchange Commission ("SEC") filed an application for an injunction and other equitable relief, alleging that Angelo Alleca ("Alleca"), Summit Wealth Management, Inc.

("Summit") and three investment funds that had been created by Alleca (the "Alleca Funds") violated and were likely to continue to violate Sections 17(a)(1)-(3) of the Securities Act of 1933, Section 10 of the Securities Exchange Act of 1934, and Sections 206(1),(2) and (4) of the Investment Advisers Act of 1940.

2. On September 19, 2012, this Court granted the SEC's application and entered an Order freezing assets and granting other relief.

3. On September 21, 2012, the SEC sought the appointment of a receiver for Summit and the Alleca Funds. The Court appointed Robert D. Terry, of Page Perry, LLC, as Receiver.

4. On November 21. 2012, the Court modified the September 21 Order through by the entry of the Proposed Modified Order Appointing Receiver.

## Concluding Business Operations

5. The revelations about Angelo Alleca's activities, and the true nature of the Alleca Funds, together with the ongoing default status of Detroit Memorial Partners promissory notes sold to Summit clients, continued to have a significant, negative effect on customer trust in Summit and its advisors throughout the fall. Many customers in both the Atlanta and San Antonio offices were terminating their accounts from the firm and ending their relationships with their advisors. This pattern continued throughout the fall of 2012.

6.     It became apparent soon after the inception of the receivership that it was not likely that Summit would be able to continue as an ongoing operation, even under different ownership, because of its geographical dispersal, high cost structure, lack of any consistent investment approach across its client base and the negative goodwill associated with its name.

7.     By far, the most significant assets of Summit were intangible - the existing, yet declining, base of advisory account relationships between customers and advisors who had signed covenants not to compete in their employment contracts. Prospective purchasers of those consisted of other investment advisors seeking a future income stream.  The value of that income stream for any given account, and therefore the value of the account relationship, is dependent upon the size of the account, the strength of the relationship between the advisor and the likelihood that the client relationship will continue to exist in the future. In other words, there was little or not marketable value for those accounts serviced by advisors who were unwilling to become associated with the firm acquiring those accounts.

8.     The Receiver decided to seek purchasers for the remaining accounts as quickly as possible in order to maximize value and end the expense drains upon the receivership assets.  Inasmuch as there did not appear to be ready purchasers for the entirety of the accounts, the Receiver began to contact possible  purchasers and

entertain inquiries from firms and others interested in acquiring accounts and the services of certain advisors.

9. Potential purchasers were understandably cautious in their assessment of the value of the Summit accounts. Ultimately, advisory clients are completely in control of the firm they choose to advise them, so there was understandable reluctance by potential purchasers to pay large sums to acquire accounts whose successful transfer was speculative.

10. Furthermore, the saleability of accounts is highly dependent upon the relationship of the advisor and the customer. Federal privacy regulations prevent the sale of customer lists without the sale of the corresponding accounts, and the account sale ultimately requires the consent of the customer.

11. After several sets of preliminary discussions and subsequent negotiations, the Receiver sold the rights to the bulk of the remaining account relationships of the firm (following the sale of California accounts as described in the First Report), to three firms.

12. Rights to Atlanta accounts primarily associated with Rebecca Phillips and David Sammons were sold to Divergent Equity Management, Inc., a firm based in Florida interested in creating an Atlanta presence. The terms of the sale included a cash component ($50,000), as well as an "earnout," payments for the next two

calendar years based upon a percentage of revenue generated from accounts which are successfully transferred to the firm. It is estimated that the estate will ultimately receive an amount equal to ¾ of 1% of the annual revenue from transferring accounts, or approximately $300,000.

13. Atlanta accounts associated with Scarlott Cagle, which represented a smaller number and value of accounts, were sold to Wealthcare Capital Management, an advisory firm with presences in Richmond, Virginia and Atlanta. The terms of the sale were similar in structure to the DEM sale, with a cash component and a downstream earnout. As with the DEM sale, the estimate of value to be ultimately received is ¾ of 1% of the transferring accounts' annual revenue, or approximately $100,000.

14. Accounts in the San Antonio office, which also experienced a disproportionately significant impact from Detroit Memorial Partners and Private Credit Opportunities Fund investments, as well as furniture, fixtures and equipment owned by Summit and located there, were sold to Cypress Investment Partners, a newly-created Texas-registered investment advisor, created by one of the Summit employees in the San Antonio office, Steven Parker. Mr. Parker had become associated with Summit in the past year and was therefore not present when the toxic investments were sold in the San Antonio office. The purchase

price for the San Antonio assets was $125,000, representing approximately 40% of estimated annual revenues, which was paid in cash, and a possible additional amount of $35,000, based on account valuation at the end of 2013.

15. In addition, furniture, fixtures and equipment of the Atlanta and Chicago office, consisting primarily of relatively low-quality composite desks, credenzas, chairs and conference tables have been sold to wholesale furniture dealers in those cities for $3,300. A few pieces from the Atlanta office with possibly more substantial value, together with computers and other non-leased equipment from the Atlanta office, have been stored and will be sold individually or through consignment.

## The Bank Accounts

16. The Receiver and his team have been engaged in the review of 28 bank accounts and other records, primarily obtained through subpoena. It has become increasingly apparent that the Ponzi scheme and the intermingled financial activities of the Summit entities and others were broad in their scope and duration.

17. To date, records of most of the 28 bank accounts show evidence of having received investor funds, either directly or indirectly after having passed through one or more other accounts. These 28 accounts are or were owned by 13 different entities. While the receipts and dispersals of funds in a few of those accounts was

appropriate (such as initial deposits of investor funds into properly denominated accounts identified on subscription documents and operating income received by one of Summit's operating accounts), the movement of funds otherwise was, in many cases, highly irregular.

18. For example, it appears that in excess of $1,000,000 has been transferred to Summit Capital Holdings, Inc., an entity which appears to at one time have been controlled by Mr. Alleca but which now is said by Mr. Alleca to be controlled by Mark Morrow, the manager of Detroit Memorial Partners.

19. As a further example, substantial funds were transferred to two other entities controlled by Mr. Alleca: Thermold Design and Development, Inc., a manufacturer and distributor of multi-round gun magazines owned, at least at one time, by Mr. Alleca; and Excelsior Distribution, LLC, a now-defunct entity apparently created by Mr. Alleca to distribute cash-play games to bars and other establishments in New York State, but also used as a putative investment vehicle for one of the Alleca funds.

20. While many transfers to third parties have been described by Mr. Alleca as loan repayments, the Receiver is continuing to investigate whether those loans were actually made and the nature of their terms and conditions.

21. Although many of these money transfers may appear to have ended in a "dead end," it does appear that some transfers may have landed with individuals and entities with assets, from whom recoveries might be possible if it is determined that such transfers were without value or are otherwise actionable.

22. It also appears evident that a significant portion of the transfers among the various funds, and from non-receivership defendants to receivership entities, were for the purpose of paying investors in some funds, particularly the Summit Investment Fund, and, to a lesser extent, Detroit Memorial Partners, both interest on and capital returns of their investments.

23. For example, accounting work done to date reveals that the vast majority of over $10,000,000 of withdrawals from the Asset Class Diversification Fund, representing the amount of investments made in that fund, were matched with immediate deposits into the Summit Investment Fund Account. Those deposits were in turn used to repay investors in Summit Investment Fund.

24. In contrast, funds coming into the Private Credit Opportunities Fund were used for more diverse purposes. A substantial amount of PCOF funds were clearly used for purposes related to Detroit Memorial Partners, although it is unclear at this time whether they were used for operating expenses, contributions to Detroit Memorial Partners' subsidiary, investor redemptions, or other purposes. Other fund

were used for purposes and delivered to recipients, possibly including investors in other funds, that the Receiver is still working to identify.

25. In sum, it appears that the total amount of investments received by all of the Alleca Funds and Detroit Memorial Partners will have exceeded $40,000,000, although net investor losses will undoubtedly be less than that amount because of aforementioned "redemptions" of some investments.

26. In addition to the specific examples mentioned above, to the extent any investors have to date received a return on their investments, either in part or in whole, those returns did not emanate from profits produced internally by the funds but, were, in fact, fruits of the Ponzi scheme. The receivership has made substantial progress in assembling a list of investors who have had their investments previously satisfied by comparing information from several sources: 1) investor records produced as part of the claims process; 2) bank records showing direct wire transfers and checks payable to investors; 3) custodian records; and 4) advisor notes.

27. The final accounting of movements of investor and Summit funds among all of the various entities is not yet complete. Indeed, additional destinations of funds have continued to be discovered as accounts along the trail of money are received in turn and analyzed. The Receiver continues to analyze the movement of funds in

an effort to determine the entities against which it might be reasonable to pursue actions to recover assets properly belonging to the receivership estate and, therefore, to investors, as well as to produce an independent reckoning of claims against the receivership estate.

### Detroit Memorial Partners

28. As reported previously, in addition to the Alleca Funds, many Summit clients invested in an entity called Detroit Memorial Partners, LLC.

29. Detroit Memorial Partners was formed in Michigan in late 2007 for the purpose of holding an equity interest in another entity, Midwest Memorial Partners, LLC, ("Midwest") which was created to own 28 cemeteries being sold out of a Michigan state receivership. The individual who remains the putative manager of Detroit Memorial Partners is a former business associate of Mr. Alleca's, Mark Morrow.

30. The other owner of Midwest is Westminster Capital, LLC, which does not appear to have previously had a connection with Summit or Mr. Alleca. Midwest continues to operate the cemeteries.

31. In addition to the movements of funds described above, the Receiver's analysis of bank information received to date has so far revealed that an aggregate of several millions of dollars from at least two of the three defendant funds were

transferred to Detroit Memorial Partners, in addition to the proceeds from more than $15,000,000 of Summit clients' direct investments in Detroit Memorial partners.[1] Substantial funds have also been transferred from Detroit Memorial Partners to the Summit defendant funds and to other entities.

32. There have also been movements of money directly to Morrow from various entities involved in the overall scheme. The Receiver continues to investigate these transfers.

33. In addition to Morrow, four individuals claim to have equity interests in Detroit Memorial Partners separate and apart from the debt interests held by the noteholders. Detroit Memorial Partners has had several "capital calls" for its equity investors during its existence. It appears that some of these calls were funded from the transfers from the Alleca Funds. The Receiver is continuing to investigate the manner in which Detroit Memorial Partners was formed and capitalized.

34. Two of the equity owners of Detroit Memorial Partners have filed two separate actions in Delaware Chancery Court, one against Summit and Mr. Alleca, and the other against Mr. Morrow, alleging that the three defendants committed fraud in failing to notify the plaintiffs of the existence of the substantial note obligations against Detroit Memorial Partners. They have sought relief in the form

---

[1] There also was a direct transfer of $100,000 from the Asset Class Diversification Fund to Midwest Memorial Group.

of setting aside the interests in the investor notes. The action against Summit and Mr. Alleca is currently stayed pursuant to this Court's Modified Order.

35. It appears that the assets of Midwest Memorial Group are substantial, and that Detroit Memorial Partners' position in that case means that it may ultimately own a 49% stake in properties worth many millions of dollars. In addition, Midwest Memorial Group is pursuing a lawsuit in Michigan against a brokerage firm which was involved in the management of the assets of the predecessor to Midwest in the cemetery business. A recovery in that action could likewise inure to the benefit of Detroit Memorial Partners and, therefore, to its creditors, including the holders of the notes sold through Summit.

## Additional Assets

36. In the First Report, the Receiver noted that two properties were owned by Alleca, a commercial building in Buffalo, New York and a house in Duluth, Georgia.

37. The Buffalo property was listed with a Buffalo real estate firm for approximately two years. In December, the property was sold. Mr. Alleca had previously assigned the net proceeds of the sale to the Receivership. After the existing mortgage, taxes and closing costs were paid, the sale of the property netted the Receivership $30,539.

38. After further investigation, the Receiver believes that the Duluth property has little or no equity, and will likely not seek or assert any interest in that property.

39. When Summit sold a portion of its Chicago office in August, 2011, it received a promissory note with an original value of $975,000 from Studio Investments, the purchaser (the "Studio Note"). The remaining value at the time of the commencement of the Receivership was approximately $873,000. In 2012, the note was the subject of an assignment to a third-party, in satisfaction of an obligation to the third party by an entity owned by Mark Morrow, which Summit purported to have assumed. It is the Receiver's belief that the assumption of the obligation, as well as the transfer of the Studio Note, were without consideration and were void as to Summit. The Receiver so notified the payor under the note and, accordingly, the first payment due under the note after the commencement of the Receivership, $81,250, was paid into the Receivership's escrow account on October 31, 2012, where it is being held pending the resolution of the dispute regarding its ownership.

40. In addition, there exists another promissory note, estimated to be valued at approximately $130,000, arising from the sale of a previous office in Virginia, which note Alleca assigned, on behalf of Summit, to a former employee of Summit

in exchange for a payment of $30,000. The Receiver has notified the holder of that note that the assignment is considered to be void as a fraudulent conveyance. Receiver's counsel is in discussions with the assignee in an effort to reach a resolution of the dispute regarding the validity of the assignment.

41.   The Receiver will continue to identify individuals and entities that may have wrongfully received either investor funds or assets of the Receivership entities, and will pursue return of those funds and damages as appropriate, including through litigation if the likely benefit substantially exceeds the likely cost.

42.   The Receiver will evaluate other potential third-party claims against other individuals and entities whose actions may have wrongfully harmed Summit or the Receivership, and will file suit if the likelihood of success justifies the expected cost.

43.   Summit has several insurance policies, including errors and omissions coverage, directors and officers liability coverage, and a fidelity bond, which may provide coverage for some of the losses incurred by Summit and its investors, as well as offset the cost of legal expenses the receivership estate incurs. The Receiver and his counsel have notified the carriers of potential claims against those policies.

44. The carriers have, in turn, notified the Receiver that they will contest coverage under the policies, primarily because they contend the policies were procured fraudulently. The Receiver's counsel are continuing to discuss those issues with counsel for the carriers.

## Claims

45. The Receiver has created a claims form package to be used for any potential claimant against Summit and the other receivership entities, and has distributed that package to approximately 1,500 former clients of Summit[2] and 50 possible trade creditors, identified from Summit's accounting records as well as contacts made to the Receiver. In addition, the Receiver has caused the packages to be distributed to other persons who he believes may have claims against the Receivership estate.

46. To date, the Receiver has received approximately 250 investor claims, totaling approximately $23,000,000. The amounts of claims related to each of the Alleca Funds and to Detroit Memorial Partners submitted to date are:

| | |
|---|---|
| Asset Class Diversification Fund, LP | $ 2,956,000 |
| Private Credit Opportunities Fund, LLC | $ 5,946,356 |
| Summit Investment Fund, LP | $ 1,737,366 |

---

[2] It appeared, based upon all information that had been gathered so far, that the vast majority of all investor claims would be coming from persons who had been clients of Summit at the time of their investments in the Alleca Funds and Detroit Memorial Partners.

       Detroit Memorial Partners, LLC       $ 12,305,200

While most of these claims represent principal investment amounts, some claimants have also included amounts which had been reflected on statements as earnings on their investments. Of course, those amounts were not based on actual investment returns within the "funds," but appear to have been created to provide an appearance of legitimacy.

47. Other than to attempt to obtain clarifying information when confusing or inconsistent claims are submitted, the Receiver has not yet taken any steps to verify claims other than those which correspond to customer account statements the receiver has been able to obtain.

48. Claims forms continue to be submitted daily, so the Receiver anticipates that the total claim amount will be substantially larger than the $23,000,000 in investor claims received so far.

49. In addition to the investor claims, the Receiver anticipates that approximately $200,000 of trade creditor claims will be submitted, excluding future rent from terminated leases, in addition to as much as $3,000,000 of claims from entities who may assert the existence of loans and similar obligations.

50. In sum, the Receiver anticipates claims of investors and other creditors totaling as much as $35,000,000.

## Other Matters

51.     Prior to the creation of the Receivership, Summit filed a lawsuit against a former advisor who it accused of violating his employment agreement with Summit and misappropriating trade secrets. The potential revenue from the account at issue was approximately $12,000 annually. As the case approached trial, the Receiver elected to resolve the case on February 25, 2013, by a payment of $4,000 from the defendant to avoid additional expenses of litigation over a relatively small amount of damages.

52.     The Receiver also resolved a dispute with a previous Summit advisor who had left the firm as the receivership was created. The advisor, who did not have an employment agreement with Summit, and the Receiver had asserted various possible claims arising as a result of the departure and subsequent events. The resolution included mutual releases and an agreement that the Receiver would not object to the advisor retaining approximately 60 account relationships he had while at Summit. The Receiver determined that the potential value of these relationships to the Receiver was minimal given their size and the fact that the advisor's relationship with Summit had already been terminated, that other Summit advisors had no relationships with or knowledge of the clients, and that the legal costs

incident to litigation would have been greater than any potential benefit to the Receivership.

53.   The Receiver and his counsel are continuing to investigate possible claims against an advisor who left the firm approximately ten days after the Receivership began, joining a firm with whom Summit and Mr. Alleca had been negotiating for the sale of his accounts immediately prior to the Receivership's creation, along with others.

## Future Reports

54.   Henceforth, the Receiver will be filing interim reports no less frequently than quarterly, and will file special reports upon the initiation of any litigation or the occurrence of other significant events.

Respectfully submitted this 28nd day of March, 2013.

                                                s/ Robert D. Terry
                                                Georgia Bar No. 702606
                                                Receiver

PAGE PERRY, LLC
1040 Crown Pointe Parkway
Suite 1050
Atlanta, GA 30338

770-673-0047
770-673-0120 (fax)