IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

_____

SECURITIES AND EXCHANGE
COMMISSION,

          Plaintiff,

          v.

ANGELO A. ALLECA, SUMMIT
WEALTH MANAGEMENT, INC.,
SUMMIT INVESTMENT FUND, LP,
ASSET DIVERSIFICATION FUND, LP,
and PRIVATE CREDIT
OPPORTUNITIES FUND, LLC

          Defendants.

_____

Civil Action No.
1:12-CV-3261-WSD

## RECEIVER'S RESPONSE TO COURT ORDER AND SUPPLEMENT TO RECEIVER'S APPLICATION FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES

By Order dated October 10, 2013 [18], the Court ordered the Receiver to provide additional information to enable it to consider the Receiver's Petition for Compensation filed on March 19, 2013 [48].  The Court's Order seeks five categories of information, addressed by the Receiver in Section II below in the order set out by the Court.

**I. Activities for Which the Receiver and his Counsel Seek Compensation**

This Court's Order Appointing Receiver [9] authorized the Receiver to do numerous tasks, the compensation for which is the subject of the Receiver's fee application. Those tasks include, among other things:

(a) To conduct the business operations of the Receivership Estate, including the management and administration of investor funds and accounts, and all other aspects of any business operation. *See* Receivership Order (Docket 9), Section II C.  The Receiver inherited an ongoing investment advisory business in which Summit's approximately investment adviser employees managed the investments of over 500 clients totaling $400 million in assets. Necessarily, the Receiver had as his first priority the continued management of these client relationships and their assets. Of the $208,833.44 in fees and expenses sought in the Receiver's fee application, almost exactly half, or $104,820, were incurred in connection with business operations.[1]

(b) To sell, rent, lease or otherwise hypothecate or dispose of the assets of the Receiver Estate.  *Id.* at II D.  After the Receiver determined that Summit was unlikely to survive as a going concern, the Receiver attempted to market the company as a whole.  When that proved unfruitful, the Receiver and counsel located, negotiated with, and sold segments of

---

[1] See Docket 48-4, pp. 21 – 44. The Receiver's Fee Application contained an itemization of time by category, including "Business Operations" as reflected on those pages.

Summit's operations to third parties in ways that sought to (1) bring revenue to the Estate; (2) preserve the ability of Summit's employees to continue to make a living; and (3) did not force Summit's clients to be without an investment adviser. The Receiver's fee petition includes $30,347.00 in fees and expenses relating to the disposition of said assets.[2]

(c) To defend suits and demands against the Receivership Estate. *Id.* at II E. The Receiver was forced to defend three lawsuits and numerous other legal demands until this Court's Receivership Order was amended on November 21, 2012 enjoining said lawsuits. The costs of defending those claims and demands are included in the business operations figure noted above.

(d) To take custody, control and possession of all Estate assets and property and to pursue claims on behalf of the Estate. *Id.* at II A; E.  The Receiver's petition included fees totaling $34,779.50 for this category of work.[3]

## II.  Responses to the Court's October 10, 2013 Order

The categories of information required by the Court, followed by the responses, are set forth below.

---

[2]  Id., pp. 14-21.
[3]  Id., pp. 2-14.

1. **Accounting of Receivership Income and Disbursements**

a. This category includes the total amounts collected by the Receiver through October 1, 2013, showing the person or entity from whom the amount was collected, whether the collection was the result of a claim asserted or a lawsuit filed by the Receiver, and the date of collection.

The only amounts collected by the Receivership to date have fallen primarily into two categories: (1) advisory fee revenue applicable to the 3rd and 4th quarters of 2012, when the Receiver continued to operate Summit's investment advisory business for the benefit of its customers; and (2) sales proceeds from asset disposition and recovery of funds located and belonging to the estate. A detailed listing of all revenue and sources is contained on Exhibit A hereto.

The Receiver has also received and is holding in escrow the sum of $162,500 that resulted in the assertion of a legal claim by the Receiver which is the subject of the Receiver's currently pending Motion for Approval of Settlement [Docket 66].

b. Each disbursement made through October 25, 2013 for expenses of any kind related to the Receiver's work in this matter.

The vast majority of disbursements made by the Receiver consisted of expenditures relating to the operation of the ongoing business as described in

Section I(a) above. A list of those expenditures by category is shown on Exhibit B. A second category of expenditures consisting of non-ordinary course of business costs associated with the disposition of assets and winding down of Summit's business are shown on Exhibit C. The total of non-operational expenditures for which the Receiver seeks reimbursement is $12,899.27 as shown on Exhibit D. Of that amount, $8,908.94 were incurred prior to December 31, 2012 and thus are included in the Receiver's Fee Petition. *See* Docket 48-4 pp. 53-55.

**2.** **A list, through October 25, 2013, of all claims asserted or lawsuits filed by the Receiver and the amount collected, if any.**

Although claims have been identified, the Receiver has not filed any claims or asserted any lawsuits as of the present date. Rather, the Receiver is attempting to resolve or pursue those claims via processes less costly than litigation. *See* Section II 3 below.

**3.** **A list, through October 25, 2013, of any person or entity against whom a claim is anticipated to be asserted, an estimate of the amount for which each claim will be asserted, and the date by which each claim is expected to be asserted.**

As noted above, the Receiver has received certain assets currently totaling $162,500 as a result of a threatened claim and is holding those assets

in escrow pending court approval of a proposed settlement.  If settlement is approved, the Receiver will receive $81,250 of that amount and may receive an additional $192.725.  If the settlement is not approved, the Receiver must determine whether it is economically feasible to pursue the claim. If the claim is pursued, it will be a claim in the total amount of $893,750 against Beverly Hills Corporation Maintenance Preservation Fund and nominal defendant Studio Investment Management LLC, to have an assignment set aside in order for the Estate to receive future payments extending until April 30 2015, including the amount currently in escrow.  The Receiver anticipates deciding whether or not to pursue said claim within sixty (60) days after an Order ruling on the proposed settlement.

Since January 1, 2013, when the business was closed and most operating assets disposed of, the Receiver's focus has shifted to identifying claims that may be asserted by the estate and attempting to locate assets and claims through the tracing of funds.  After substantial account tracing work had been done, and information about several possible claims subpoenaed and analyzed, it became apparent there would likely be only two significant possible sources of assets for the estate: 1) the estate's claim against Detroit Memorial Partners, LLC for funds contributed to it by one of the funds; and 2) insurance proceeds from policies covering employee liability for losses

incurred by investors.  Therefore, the Receiver has focused his attention on those two possible sources of assets, and is pursuing those claims as efficiently as possible.  These claims are discussed in more detail below.

### Claim against Detroit Memorial Partners

The Receiver's analysis of the multitude of bank accounts into which investor funds flowed and were traced indicated that approximately $7,500,000 of funds which investors contributed to Private Credit Opportunities Fund, LLC, one of the entities under the Receivership, were transferred in several blocks to accounts owned by Detroit Memorial Partners, LLC, ("DMP"). DMP is an entity created and controlled by Mark Morrow that was formed for the purpose of having a 49% ownership interest in another entity, Midwest Memorial Partners, LLC, which acquired 28 cemeteries in Michigan in 2008 and continues to operate them.

On May 13, 2013, the Receiver filed a Motion with the Court seeking approval to hire counsel to file a lawsuit against DMP for the purpose of recovering these funds.  Following the approval of that Motion on May 14, 2013, the Receiver engaged in discussions with counsel in Delaware with a view to retain such counsel to pursue the action against DMP.  The prospective Delaware counsel had a question relating to the Court's Order, and on July 13, 2013 the Receiver asked the Court for such clarification.

On May 30, 2013, the Securities and Exchange Commission ("SEC") filed a lawsuit against DMP alleging securities fraud and seeking a disgorgement of "ill-gotten gains." In addition, the Receiver engaged in discussions with SEC staff regarding whether staff anticipated seeking the appointment of a Receiver or an alternative approach that would have resulted in a means for the Receiver to assert its claim against DMP without the need to pay 30% or 35% of any recovery in attorney's fees.

While the Receiver awaited the Court's response to the question seeking clarification, the SEC filed a Motion for the Appointment of a Receiver on September 24, 2013. If the Court were to grant that Motion, the Receiver believes that a less expensive adjudicatory process for its claim may result.

Midwest recently settled a lawsuit that the SEC has alleged will result in $7,776,363 being paid over to the account of DMP. On August 27, 2013, the Court ordered that the Midwest settlement funds, including the DMP portion, be frozen until further Order.

In addition to these funds, DMP also owns its share of Midwest, which in turn still owns and operates the cemeteries. In the event such cemeteries are marketed and sold, the Receiver believes that additional funds will flow to DMP. It is unknown what that amount may be, but the Receiver

believes that, based upon the distribution provisions of the Midwest Operating Agreement, DMP would ultimately stand to receive not less than $5,700,000 from any such sale, and possibly more.

The Receiver's claim of $7,500,000 against DMP represents approximately 25% of the total claims he believes may exist against DMP, including claims of investors and equity owners. (There may also be unknown claims, but, inasmuch as DMP was formed for a limited purpose and was not an operating company, the Receiver believes those claims may be relatively small.) If the Receiver's claim were to be ultimately accorded equal dignity to the other claims, the Receiver believes the estate might recover as much as $3,500,000 through that process.

As stated above, the Receiver intends to pursue the Detroit Memorial Claim through the Detroit Memorial Receivership, if a receiver is appointed. If a receiver is not appointed the Receiver will resume discussions with counsel an, if counsel can be secured, pursue claims against Detroit Memorial within ninety (90) days of the Court's denial of the SEC's Motion to Appoint Receiver.

**Insurance Claim**

As of the date the Receiver was appointed, Summit had in force an Asset Management Protector Policy of Insurance (the "Policy") issued by

Federal Insurance Company (the "Insurer").  The Policy, in general terms, provides for reimbursement of defense costs and indemnification of liability for certain defined claims arising from covered errors in the rendering of professional advisory services.  The face amount of the Policy is $3 Million. It is an eroding policy, which means the amount available to pay losses decreases by each dollar that is paid in defense costs.

The named insured is National Advisory Services. As a subsidiary of National Advisory Services and a Registered Investment Adviser, Summit is an Insured under the Professional Liability Coverage Part of the referenced Policy.

Summit employed individual investment adviser representatives, all of whom the Receiver contends are Insured Persons under the Professional Liability Coverage Part of the Policy.  The Receiver has undertaken to identify all claims against Summit and/or said employees that might be covered under the policy.  The Receiver's counsel wrote to the Insurer on March 22, 2013 identifying claims of former Summit customers totaling $17,511,193, all of which in the Receiver's view are, or but for the stay would be, losses covered under the Coverage Provision of the Professional Liability Coverage Part of the Policy.  Through counsel, the Insurer has indicated that the claims identified will be disputed as either not covered or

excluded, on the basis of fraud in connection with the application for insurance.  Since the date of that letter, the Receiver has identified over $48 million in Losses and notified the Insurer of said losses on June 25, 2013.

The Receiver has not received a formal response from Federal to either the March 22 or the June 25 letters, but counsel for Federal have been in touch with the Receiver and there has been limited discussions of certain issues. Federal has indicated to the Receiver that it contends that Summit's incremental increases in coverage limits from $1 million to $3 million during the last two years contained misrepresentations in letters submitted to obtain those increases regarding the asserted absence of any circumstances that any person would have reason to suppose might give rise to a future claim.  In addition, Federal has directed the Receiver to the exclusionary provision in those letters, stating, "it is further agreed that if such facts or circumstances exist, whether or not disclosed, any claim or action arising from them is excluded from this proposed coverage."  The Receiver, on the other hand, contends the alleged misrepresentations do not void the coverage increases and that, instead, the Insurer is liable for the entire amount of the Policy.

Federal has also notified the Receiver of other defenses to coverage, including Federal's position that there were material misstatements or

omissions regarding Summit's business operations that materially impacted the underwriting risk.

The Receiver does not concede the validity of Federal's claimed defenses.  Nevertheless, the Receiver recognizes the existence of a bona fide dispute and has explored the pursuit of a settlement with Federal that would, if consummated, result in payment by Federal to the Receivership Estate of an amount the parties may ultimately agree represents a fair compromise of their respective positions regarding coverage and limits of coverage.  In the absence of such an agreement, said issues would only be decided by this court after expensive formal litigation, whether that be commenced by the Receiver, other Insureds, or Federal in the form of a declaratory judgment action.  Because of the number and geographic dispersal of Insureds (the former Summit employees) and potential claimants, the litigation could be fractured and protracted. The Receiver understands that predictability and finality would be important features to Federal of any such proposed settlement.  The Receiver believes that the existence of the receivership presents an opportunity to resolve those issues efficiently to the benefit of both Federal and the creditors of the estate.  This opportunity exists in the form of a court-approved settlement or, in the alternative, a litigation trust.

The Receiver is engaged in negotiations with Federal that would result in payment of an amount less than the full face amount of the Policy and which fairly resolves the Estate's claims in light of the existence of possible grounds for partial rescission, exclusions of claims, or voiding of the policy. In addition to the claim against the policy by the Estate, individual insureds may have claims under the policy that may exceed the amounts for which the Insurer would be liable to the Receiver's Estate, and some of the additional insureds have already been sued in court or arbitration forums in claims that may trigger coverage.  If and when the stay of litigation is lifted, or if this Court appoints a litigation trustee to pursue said claims (*See* pages 17-18 below), many more claims are likely to be filed in amounts that will require, if coverage is established, the payment of defense costs and potentially indemnifications of awards and judgments.

The Receiver's negotiations with the Insurer includes those claims that could be asserted by a litigation trustee on behalf of investors against individual insureds, so that the entire universe of claims being negotiated are all claims that either belong to the Receiver or which could be pursued by a litigation trustee in the context of this receivership. Thus the negotiations include a discussion of defenses belonging to the Insurer against the Estate and a potentially distinct set of defenses belonging to the Insurer against the

additional insureds. In other words, the entire policy limits are at play in the negotiations even though some defenses may result in the Estate claim being more limited than the potential claims of additional insureds. The parties are thus trying to reach a global settlement of the policy.

An essential element of any such global agreement, however, would be Federal's ability to close its books on this Policy through a court order that would bar any additional claim under the Policy.  A majority of the federal judicial circuits allow non-debtor releases under limited circumstances in bankruptcy court.[4]  The Eleventh Judicial Circuit has approved non-debtor releases in that context. *See In re Mumford, Inc.*, 97 F.3d 449, 454, 55 (11th Cir. 1996).  The situation in which non-debtor releases are most likely to be approved are those akin to the present situation, in which an insurance policy constitutes a major asset of the estate and the supervising court seeks to ensure "that the debtor's estate fully realizes upon (and thus equitably distributes the entirety of) a debtor's liability policy proceeds."  See *Supreme Court Validates "Clarified* Manville *Insurance Injunction:  Channeling . . . and So Much More!* 29 No. 8 Bankruptcy Law Ltr. 1 (2009).

---

[4] *In re Drexel Burnham Lambert Group, Inc.* 960 F. 2d 285 (2d Cir. 1992); *In re Continental Airlines*, 203 F.3d 203, 211-14 (3d Cir. 2000); *In re A.H. Robins Co., Inc.* 880 F.2d 694 (4th Cir. 1989); *In re Dow Corning Corp.*, 280 F.3d 648, 657-59 (6th Cir. 2002); *In re Specialty Equip. Companies, Inc.,* 3 F. 3d 1043, 1047 (7th Cir. 1993).

The following cases support the entry of such an order in receivership actions:

1.  *SEC v. Parish*, 2008 U.S. Dist LEXIS 113241 (D.S.C., May 12, 2008).  In that case the Court approved the Receiver's settlement with Charleston Southern University ("CSU"), which employed a professor who operated a Ponzi scheme.  The settlement was conditioned on an order of the District Court enjoining any other claims or suits or prosecution of any previously filed suit against CSU relating to Parish's investment scheme.

The Court emphasized that anti-litigation injunctions were not limited to situations that were "necessary," but also were appropriate where they were "calculated in the court's sound judgment to achieve the ends of justice entrusted to it." *Adams v. U.S.*, 317 U S 269, 273 (1942).

The Court found the proposed settlement fair and approved it, noting among other things that the third-party bar would avoid a "race to the courthouse" and that the recovery by the Receiver would result in a more equitable distribution of funds recovered from CSU than would the prosecution of multiple lawsuits.  The Receiver suggests both of these factors are present in this case, with the added factor that there is a limited amount of funds for which Federal could potentially be responsible to pay.

2.  *Gordon v. Dadante*, 336 Fed. Appx. 540 (6th Cir. 2009).  In that case the Sixth Circuit confirmed a District Court order that approved a settlement by a receiver against a third-party broker-dealer.  The settlement and approval order also barred all claims against that broker-dealer by victims of the Ponzi scheme at issue. Both the District Court and the Court of Appeals rested their conclusions that a bar order was appropriate on the fact that the potential claims by investor victims were substantially without merit.

3. *SEC v. Byers*, 609 F.3d 87 (2nd Cir. 2010).  There the Second Circuit upheld an order of the District Court barring third parties who were creditors of the entity from filing involuntary bankruptcy petitions. The court stressed the importance of anti-litigation injunctions in furthering the goals of the estate in permitting the Receiver to maintain maximum control over the assets of the estate. *Id* at 92-3.

Pursuant to any settlement, Federal would pay a settlement amount into a special trust account created by the Receiver pending court approval of distribution of that amount to Summit's claimants in a manner to be approved by the Court.  In exchange for said payment, the Receiver would agree to move the Court to enter an order permanently barring any future

claims for payment of any loss (defense or indemnity) under the Policy, and directing that the Court retain exclusive jurisdiction over all such claims.

Of course, prior to approving such a bar order or similar mechanism, and therefore prior to entering what would in effect be a release of all future claims under the Policy, the Receiver envisions and would request that the Court would afford all potentially affected persons, including Additional Insureds, an opportunity to object to said order.  Federal's consent to such a settlement, however, would be expressly conditioned upon Court approval and would not be binding if the Court declined to enter into such an order.

The Receiver believes such an agreement would benefit all concerned. While it is not yet clear how the Receiver would propose that the Policy proceeds be distributed, or how the Court would approve those proceeds to be distributed, the proceeds would likely be distributed more equitably than they would be if liabilities were paid only on the basis of the order in which claims are made.  Under a settlement more of the Policy coverage amount would be used to pay investor claims, as opposed to defense costs.  Federal would recognize savings in its own litigation and claims-related expenses in seeking determination of coverage issues. All such issues would also fully and finally be decided in a single proceeding.

The Receiver intends to continue to engage in negotiations with Federal for approximately sixty (60) days or longer if it appears fruitful to avoid having to file a motion for appointment of a litigation trustee.

**Potential Litigation Trust**

If a global agreement is not achieved or approved, then the Receiver will likely propose the establishment of a litigation trust for the efficient pursuit of all claims against Additional Insureds belonging to investors willing to assign their claims to a litigation trustee. All proposed actions by the Receiver would be subject to the review and approval of the Court. Generally speaking, however, courts possess extraordinary equitable powers with regard to the management of the estate, marshaling of assets, and dispositions of claims. One such power is the power to approve, where appropriate, a litigation trust.

A litigation trust is a trust established for the purpose of receiving assignments of investors' claim against third parties.  Such a trust would allow some of those claims to be aggregated for efficiency, subject to personal jurisdiction, venue or other issues that may require the filing of multiple claims.  In any event, the assertion of such claims would trigger defense coverage under the Policy and any resulting judgments would require indemnification, subject to whatever coverage defenses Federal has.

If the Receiver decides to recommend and move for the appointment of a litigation trustee, he intends to do so on or before June 30, 2014.

**Other Potential Claims of the Receivership**

During the pendency of the Receivership, several additional claims have been identified.

The tracing analysis initially indicated that funds had been transferred to an affiliate of Mr. Alleca that was engaged in the manufacture of extended capacity magazines.  The Receiver has subsequently discovered that those funds were subsequently returned to entities controlled by the Estate.

Shortly after the receivership was established, the registered investment advisor representative located in Summit's Beverly Hills, California, office left Summit and joined another firm located in Alexandria, Virginia, which had previously been negotiating with Summit for the purchase of that office's accounts. Many of Summit's clients followed him and established accounts at the other firm.  Discovery conducted to date indicates that a valid claim may exist against the representative and the other firm, although several factors make the claim speculative. Counsel for the Receiver have had preliminary discussions with other counsel regarding representing the Receiver on a contingent basis in possibly pursuing that claim, but the Receiver is hesitant to commit any additional resources to the

pursuit of that claim until and unless a stronger asset base for the Receivership can be established.

The Receiver has also identified two transfers of investor funds totaling $452,000 that apparently were made to a former employee in another business of Mr. Alleca.  The Receiver has subpoenaed information from that individual and is continuing to attempt to collect the information necessary to determine the exact basis of any demand, whether it makes sense to file a lawsuit and, more importantly, whether the funds would be recoverable.

### Other Potential Claims of Investors

The Receiver is aware of at least three instances in which investors are apparently considering pursuing actions against one or more of the brokerage firms that held the funds involved in this matter as custodians. The basis for these actions would presumably be that the custodians regularly presented account statements to their customers which showed the funds at various stated values when, in fact, the funds had no value.  Without alleging that the custodial firms were aware of the scheme, the actions might claim that the firms failed to exercise due diligence or uphold their fiduciary obligations to their customers to investigate the true value of the funds before providing account statements to customers with false valuations.

In the absence of a class action or other potential means though which investor claims along these lines could be most efficiently adjudicated, the Receiver is contemplating proposing the establishment of a litigation trust, similar to the trust discussed above that would provide a means through which investors desiring to do so could assign their claims and have a single entity pursue them on their behalf.

**4.  Attorney's Legal fees and expenses incurred from January 1, 2013 to October 1, 2013**

If a fee petition were to be presented for the nine months following January 1, 2013, the total fees and expenses for Page Perry, LLC, would be $152,215.03, approximately 75% of the amount previously submitted for the three-month operational period.

The Receiver recognizes that his primary purpose, now that business operations have ended, is to establish a fund for the eventual payment to investors and other claimants of losses they have suffered as a result of the actions forming the basis of the SEC's action against Summit.  To the extent that costs are incurred in establishing that fund, claimant recovery is reduced dollar-for-dollar, so it is crucial that the Receiver's and his attorney's time be used efficiently.

The myriad issues that had to be addressed during the operational period of the required the almost fulltime, hands-on dedication of the Receiver, and significant time of his attorneys, especially in the early stages. Those time requirements are now much less.

a. The total amount of hours of services provided from January 1 through October 1, 2013, broken down by the lawyer and his billing rate, with a description of each service performed by each lawyer.

The total hours, including paralegals, are 770.8.  The total amount is further broken down as required by the Court's Order is attached hereto as Exhibit E.

b. The total expenses incurred from January 1 through October 1, 2013, describing each expense and its amount.

The total amount described as required by the Court's Order is $3,987.53 as shown on Exhibit D.

**5.  <u>The Total Additional Recovery Expected to Be Realized.</u>**

The Receiver anticipates recovering and realizing between $2.5 million and $6.5 million from a combination of claims involving DMP, the claims under the E&O Policy, future payments received as a result of the Studio settlement or litigation, plus additional payments received in the form of sales proceeds.

Respectfully submitted this 25th day of October, 2013.


/s/ Robert D. Terry
Robert D. Terry
*Receiver*


PAGE PERRY, LLC
1040 Crown Pointe Pkwy
Suite 1050
Atlanta, GA 30338
(770) 673-0047
(770) 673-0120 – facsimile
bterry@pageperry.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing was prepared with one of the font and point selections approved by the Court in LR 5.1B.  I further certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system that will send notice of electronic filing to counsel of record.

Respectfully submitted this 25th day of October, 2013.


/s/ <u>Robert D. Terry</u>
Robert D. Terry
Georgia Bar No. 702606
Receiver

PAGE PERRY, LLC
1040 Crown Pointe Pkwy
Suite 1050
Atlanta, GA 30338
(770) 673-0047
(770) 673-0120 – facsimile
bterry@pageperry.com