IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>ANGELO A. ALLECA, SUMMIT WEALTH MANAGEMENT, INC., SUMMIT INVESTMENT FUND, LP, ASSET DIVERSIFICATION FUND, LP, and PRIVATE CREDIT OPPORTUNITIES FUND, LLC<br><br>Defendants. | Civil Action No.<br>1:12-CV-3261-WSD |

**Receiver's Fourth Interim Report**

Robert D. Terry, the Receiver appointed by Order of this Court dated September 21, 2012, files this Fourth Interim Report to describe the progress of the receivership and significant events since the previous report.

**Procedural and Factual Background**

On September 18, 2012, the United States Securities and Exchange Commission ("SEC") filed an application for an injunction and other equitable relief, alleging that Angelo Alleca ("Alleca"), Summit Wealth Management, Inc. ("Summit") and three investment funds that had been

created by Alleca (the "Alleca Funds") violated and were likely to continue to violate Sections 17(a)(1)-(3) of the Securities Act of 1933, Section 10 of the Securities Exchange Act of 1934, and Sections 206(1),(2) and (4) of the Investment Advisers Act of 1940.

On September 19, 2012, this Court granted the SEC's application and entered an Order freezing assets and granting other relief.

On September 21, 2012, the SEC sought the appointment of a receiver for Summit and the Alleca Funds. The Court appointed Robert D. Terry, of Page Perry, LLC, as Receiver.

On November 21, 2012, the Court modified the September 21 Order through by the entry of the Proposed Modified Order Appointing Receiver.

**Collections and Disbursements**

The amounts collected by the Receivership to date have fallen primarily into two categories: (1) advisory fee revenue applicable to the 3rd and 4th quarters of 2012, when the Receiver continued to operate Summit's investment advisory business for the benefit of its customers; and (2) sales proceeds from asset disposition and recovery of funds located and belonging to the estate. The total of those two amounts is $ 774,559.63.

The Receiver has also received and is holding in escrow the sum of $162,500 that resulted in the assertion of a legal claim by the Receiver that is

the subject of the Receiver's currently pending Motion for Approval of Settlement.

The vast majority of disbursements made by the Receiver, totaling $535,267.65, have consisted of expenditures relating to the operation of the ongoing business. A second category of expenditures consisting of non-ordinary course of business costs associated with the disposition of assets and winding down of Summit's business, $52,642.68.

As noted above, the Receiver has received certain assets currently totaling $162,500 as a result of a threatened claim and is holding those assets in escrow pending court approval of a proposed settlement. If settlement is approved, the Receiver will receive $81,250 of that amount and may receive an additional $192,725. If the settlement is not approved, the Receiver must determine whether it is economically feasible to pursue the claim. If the claim is pursued, it will be a claim in the total amount of $893,750 against Beverly Hills Corporation Maintenance Preservation Fund and nominal defendant Studio Investment Management LLC, to have an assignment set aside as void in order for the Estate to receive future payments extending until April 30 2015, including the amount currently in escrow. The Receiver anticipates deciding whether or not to pursue said claim within sixty (60) days after an Order ruling on the proposed settlement.

Since January 1, 2013, when the business was closed and most operating assets disposed of, the Receiver's focus has shifted to identifying claims that may be asserted by the estate and attempting to locate assets and claims through the tracing of funds. After substantial account tracing work had been done, and information about several possible claims subpoenaed and analyzed, it became apparent there would likely be only two significant possible sources of assets for the estate: 1) the estate's claim against Detroit Memorial Partners, LLC for funds contributed to it by one of the funds; and 2) insurance proceeds from policies covering employee liability for losses incurred by investors. Therefore, the Receiver has focused his attention on those two possible sources of assets, and is pursuing those claims as efficiently as possible. These claims are discussed in more detail below.

**Detroit Memorial Partners**

The Receiver's analysis of the multitude of bank accounts into which investor funds flowed and were traced indicated that approximately $7,500,000 of funds that investors contributed to Private Credit Opportunities Fund, LLC, one of the entities under the Receivership, were transferred in several blocks to accounts owned by Detroit Memorial Partners, LLC, ("DMP"). DMP is an entity created and controlled by Mark Morrow that was formed for the purpose of having a 49% ownership interest

in another entity, Midwest Memorial Partners, LLC, that acquired 28 cemeteries in Michigan in 2008 and continues to operate them.

As noted in a previous report, in May the Receiver filed a Motion with the Court seeking approval to hire counsel to file a lawsuit against DMP for the purpose of recovering these funds. Following the approval of that Motion, the Receiver engaged in discussions with counsel in Delaware with a view to retain such counsel to pursue the action against DMP. The prospective Delaware counsel had a question relating to the Court's Order, and on July 13, 2013 the Receiver asked the Court for such clarification.

On May 30, 2013, however, the Securities and Exchange Commission ("SEC") filed a lawsuit against DMP alleging securities fraud and seeking a disgorgement of "ill-gotten gains." In addition, the Receiver engaged in discussions with SEC staff regarding whether staff anticipated seeking the appointment of a Receiver or an alternative approach that would have resulted in a means for the Receiver to assert its claim against DMP without the need to pay 30% or 35% of any recovery in attorney's fees.

While the Receiver awaited the Court's response to the question seeking clarification, the SEC filed a Motion for the Appointment of a Receiver on September 24, 2013. If the Court were to grant that Motion, the

Receiver believes that a less expensive adjudicatory process for its claim may result.

Midwest recently settled a lawsuit that the SEC has alleged will result in $7,776,363 being paid over to the account of DMP. On August 27, 2013, the Court ordered that the Midwest settlement funds, including the DMP portion, be frozen until further Order.

In addition to these funds, DMP also owns its share of Midwest, that in turn still owns and operates the cemeteries. In the event such cemeteries are marketed and sold, the Receiver believes that additional funds will flow to DMP. It is unknown what that amount may be, but the Receiver believes that, based upon the distribution provisions of the Midwest Operating Agreement, DMP would ultimately stand to receive not less than $5,700,000 from any such sale, and possibly more.

As noted in a previous report, the Receiver believes that the receivership estate has a claim of approximately $7,500,000 against DMP. This claim represents approximately 25% of the total claims he believes may exist against DMP, including claims of investors and equity owners. (There may also be unknown claims, but, inasmuch as DMP was formed for a limited purpose and was not an operating company, the Receiver believes those claims may be relatively small.) As stated above, the Receiver intends

to pursue the Detroit Memorial Claim through the Detroit Memorial Receivership, if a receiver is appointed. If a receiver is not appointed the Receiver will resume discussions with counsel and, if counsel can be secured, pursue claims against Detroit Memorial within ninety (90) days of the Court's denial of the SEC's Motion to Appoint Receiver.

**Insurance Claim**

As of the date the Receiver was appointed, Summit had in force an Asset Management Protector Policy of Insurance (the "Policy") issued by Federal Insurance Company (the "Insurer"). The Policy, in general terms, provides for reimbursement of defense costs and indemnification of liability for certain defined claims arising from covered errors in the rendering of professional advisory services. The face amount of the Policy is $3 Million. It is an eroding policy, which means the amount available to pay losses decreases by each dollar that is paid in defense costs.

The named insured is National Advisory Services. As a subsidiary of National Advisory Services and a Registered Investment Adviser, Summit is an Insured under the Professional Liability Coverage Part of the referenced Policy.

Summit employed individual investment adviser representatives, all of whom the Receiver contends are Insured Persons under the Professional

Liability Coverage Part of the Policy. The Receiver has undertaken to identify all claims against Summit and/or said employees that might be covered under the policy. The Receiver's counsel wrote to the Insurer on March 22, 2013 identifying claims of former Summit customers totaling $17,511,193, all of which in the Receiver's view are, or but for the stay would be, losses covered under the Coverage Provision of the Professional Liability Coverage Part of the Policy. Through counsel, the Insurer has indicated that the claims identified will be disputed as either not covered or excluded, on the basis of fraud in connection with the application for insurance. Since the date of that letter, the Receiver has identified over $48 million in Losses and notified the Insurer of said losses on June 25, 2013.

The Receiver and counsel for Federal are conducting ongoing discussions of certain issues. Federal has indicated to the Receiver that it contends that Summit's incremental increases in coverage limits from $1 million to $3 million during the last two years contained misrepresentations in letters submitted to obtain those increases regarding the asserted absence of any circumstances that any person would have reason to suppose might give rise to a future claim. In addition, Federal has directed the Receiver to the exclusionary provision in those letters, stating, "it is further agreed that if such facts or circumstances exist, whether or not disclosed, any claim or

action arising from them is excluded from this proposed coverage." The Receiver, on the other hand, contends the alleged misrepresentations do not void the coverage increases and that, instead, the Insurer is liable for the entire amount of the Policy.

Federal has also notified the Receiver of other defenses to coverage, including Federal's position that there were material misstatements or omissions regarding Summit's business operations that materially impacted the underwriting risk.

The Receiver does not concede the validity of Federal's claimed defenses. Nevertheless, the Receiver recognizes the existence of a bona fide dispute and has explored the pursuit of a settlement with Federal that would, if consummated, result in payment by Federal to the Receivership Estate of an amount the parties may ultimately agree represents a fair compromise of their respective positions regarding coverage and limits of coverage. In the absence of such an agreement, said issues would only be decided by this court after expensive formal litigation, whether that be commenced by the Receiver, other Insureds, or Federal in the form of a declaratory judgment action. Because of the number and geographic dispersal of Insureds (the former Summit employees) and potential claimants, the litigation could be fractured and protracted. The Receiver understands that predictability and

finality would be important features to Federal of any such proposed settlement. The Receiver believes that the existence of the receivership presents an opportunity to resolve those issues efficiently to the benefit of both Federal and the creditors of the estate. This opportunity exists in the form of a court-approved settlement or, in the alternative, a litigation trust.

The Receiver is engaged in negotiations with Federal that would result in payment of an amount less than the full face amount of the Policy and that fairly resolves the Estate's claims in light of the existence of possible grounds for partial rescission, exclusions of claims, or voiding of the policy. In addition to the claim against the policy by the Estate, individual insureds may have claims under the policy that may exceed the amounts for which the Insurer would be liable to the Receiver's Estate, and some of the additional insureds have already been sued in court or arbitration forums in claims that may trigger coverage. If and when the stay of litigation is lifted, or if this Court appoints a litigation trustee to pursue said claims, many more claims are likely to be filed in amounts that will require, if coverage is established, the payment of defense costs and potentially indemnifications of awards and judgments.[1]

---

[1] A more complete discussion of the litigation trustee concept is found in the Receiver's Response to Court Order and Supplement to Receiver's Application for Compensation and Reimbursement of Expenses, filed with the Court on October 25, 2013, and available on the Receiver's website, www.swmreceivership.com.

The Receiver's negotiations with the Insurer includes those claims that could be asserted by a litigation trustee on behalf of investors against individual insureds, so that the entire universe of claims being negotiated are all claims that either belong to the Receiver or that could be pursued by a litigation trustee in the context of this receivership. Thus the negotiations include a discussion of defenses belonging to the Insurer against the Estate and a potentially distinct set of defenses belonging to the Insurer against the additional insureds. In other words, the entire policy limits are at play in the negotiations even though some defenses may result in the Estate claim being more limited than the potential claims of additional insureds. The parties are thus trying to reach a global settlement of the policy.

Pursuant to any settlement, the Receiver expects to seek Court approval for a plan under which Federal would pay a settlement amount into a special trust account created by the Receiver pending court approval of distribution of that amount to Summit's claimants in a manner to be approved by the Court.  In exchange for said payment, the Receiver would agree to move the Court to enter an order permanently barring any future claims for payment of any loss (defense or indemnity) under the Policy, and directing that the Court retain exclusive jurisdiction over all such claims.

### Other Possible Claims of the Receivership

The Receiver has also identified two transfers of investor funds totaling $452,000 that apparently were made to a former employee in another business of Mr. Alleca. Recently received information indicates that the funds were transferred to a brokerage account previously unknown to the Receiver. The Receiver has subpoenaed documents from that individual and is continuing to attempt to collect the information necessary to determine the destination of the funds, the basis and person against which any demand might be made, and, more importantly, whether the funds might be recoverable.

### Other Potential Claims of Investors

The Receiver is aware of at least three instances in which investors are apparently considering pursuing actions against one or more of the brokerage firms that held the funds involved in this matter as custodians. The basis for these actions would presumably be that the custodians regularly presented account statements to their customers that showed the funds at various stated values when, in fact, the funds had no value. Without alleging that the custodial firms were aware of the scheme, the actions might claim that the firms failed to exercise due diligence or uphold their fiduciary

obligations to their customers to investigate the true value of the funds before providing account statements to customers with false valuations.

In the absence of a class action or other potential means though which investor claims along these lines could be most efficiently adjudicated, the Receiver is contemplating proposing the establishment of a litigation trust, similar to the trust discussed above in the context of insurance claims, that would provide a means through which investors desiring to do so could assign their claims and have a single entity pursue them on their behalf.

Respectfully submitted this 12th day of November, 2013.

/s/ <u>Robert D. Terry</u>
Robert D. Terry
*Receiver*

PAGE PERRY, LLC
1040 Crown Pointe Pkwy
Suite 1050
Atlanta, GA 30338
(770) 673-0047
(770) 673-0120 – facsimile
bterry@pageperry.com

**CERTIFICATE OF SERVICE**

I certify that the foregoing was prepared with one of the font and point selections approved by the Court in LR 5.1B. I further certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system that will send notice of electronic filing to counsel of record.

Respectfully submitted this 12th day of November, 2013.

/s/ Robert D. Terry
Robert D. Terry
Georgia Bar No. 702606
Receiver

PAGE PERRY, LLC
1040 Crown Pointe Pkwy
Suite 1050
Atlanta, GA 30338
(770) 673-0047
(770) 673-0120 – facsimile
bterry@pageperry.com