IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : : : : |
| Plaintiff, | : : |
| v. | : Civil Action No. : 1:12-CV-3261-WSD : |
| ANGELO A. ALLECA, SUMMIT WEALTH MANAGEMENT, INC., SUMMIT INVESTMENT FUND, LP, ASSET DIVERSIFICATION FUND, LP, and PRIVATE CREDIT OPPORTUNITIES FUND, LLC | : : : : : : : |
| Defendants. | : : |

## Receiver's Fifth Interim Report

Robert D. Terry, the Receiver appointed by Order of this Court dated September 21, 2012, files this Fourth Interim Report to describe the progress of the receivership and significant events since the previous report.

**Procedural and Factual Background**

On September 18, 2012, the United States Securities and Exchange Commission ("SEC") filed an application for an injunction and other

equitable relief, alleging that Angelo Alleca ("Alleca"), Summit Wealth Management, Inc. ("Summit") and three investment funds that had been created by Alleca (the "Alleca Funds") violated and were likely to continue to violate Sections 17(a)(1)-(3) of the Securities Act of 1933, Section 10 of the Securities Exchange Act of 1934, and Sections 206(1),(2) and (4) of the Investment Advisers Act of 1940.

On September 19, 2012, this Court granted the SEC's application and entered an Order freezing assets and granting other relief.

On September 21, 2012, the SEC sought the appointment of a receiver for Summit and the Alleca Funds. The Court appointed Robert D. Terry, of Page Perry, LLC, as Receiver.

On November 21, 2012, the Court modified the September 21 Order through by the entry of the Proposed Modified Order Appointing Receiver.

Since January 1, 2013, when the business was closed and most operating assets disposed of, the Receiver's focus has shifted to identifying claims that may be asserted by the estate and attempting to locate assets and claims through the tracing of funds.  After substantial account tracing work had been done, and information about several possible claims subpoenaed and analyzed, it became apparent there would likely be only two significant possible sources of assets for the estate: 1) the receivership estate's claim

against Detroit Memorial Partners, LLC ("DMP") for funds contributed to it by two of its funds; and 2) insurance proceeds from policies covering employee liability for losses incurred by investors.  Therefore, the Receiver has focused his attention on those two possible sources of assets, and is pursuing those claims as efficiently as possible.  These claims are discussed in more detail below.

**Detroit Memorial Partners**

As noted in previous reports, it has become increasingly clear that many of the transactions and other facts relating to this matter are entangled with the financial dealings of DMP, which is a minority owner of Midwest Memorial Group ("Midwest"), which in turn owns and operates 27 cemeteries in the state of Michigan.

The Securities and Exchange Commission filed an action last year (Civil Action No. 1:13-cv-1817-WSD )(the "SEC DMP Case"), alleging that DMP and its managing member, Mark Morrow, had committed securities fraud in connection in the sale of the promissory notes sold through Summit and seeking remedies for the benefit of the investors in those notes.

Midwest settled a lawsuit (unrelated to this matter or the SEC DMP Case) last year which resulted in $7,776,363 being received by DMP as its

share of those settlement funds. By Order of the Court, in the SEC DMP Case, those funds were placed in escrow and frozen.

On November 22, 2013, the Court entered an Order in the SEC DMP Case appointing Jason S. Alloy, Esq. (the "DMP Receiver") as Receiver for DMP. The Securities and Exchange Commission had requested that such a Receiver be appointed given the conflicting claims of DMP's note holders and its members over DMP's assets.

The Receiver's analysis of the multitude of bank accounts into which Summit-related investor funds flowed and were traced indicated that $7,397,635 of funds that investors contributed to Private Credit Opportunities Fund, LLC, ("PCOF") one of the entities under the Receivership, were transferred in several transactions directly to accounts owned by DMP. In addition, bank records showed that two transfers totaling $545,000 were made from Asset Class Diversification Fund ("ACDF") to DMP.

On February 15, 2014, the DMP Receiver filed an accounting for DMP's financial transactions with the Court indicating that $6,227,625 of PCOF funds were transferred to DMP. In addition, it notes the transfer of $570,000 to DMP from Nottingham Credit Opportunity Fund, and a receipt of $600,000 by DMP from an unknown source. However, the undersigned

Receiver's analysis indicates that the Nottingham Credit Opportunity Fund corresponds to a transfer from the PCOF account managed by the Nottingham Group (a third-party fund administrator), and the $600,000 amount corresponds to a wire transfer identified as originating from another PCOF account.

The DMP Receiver's accounting identified a $200,000 transfer from ACDF to DMP, and a $345,000 transfer was identified as coming from an unknown source. The date of the second transfers is the same as the second ACDF-to-DMP transfer as identified by the undersigned Receiver's work. It appears, therefore, that the Receiver's accounting and the DMP Receiver's accounting also agree with respect to all of the PCOF and ACDF transfers to DMP. The Receiver has communicated with the DMP Receiver regarding these and other items.

In addition to those transfers, both the undersigned Receiver's analysis and the DMP Receiver's analysis show a multitude of transfers between accounts owned by the various entities under the respective receiverships, as well as other entities, for a period of several years. In addition, both analyses reflect that funds from multiple entities were used to pay for returns of investors' investments, without much, if any, regard for the source of those funds.

For example there are instances where funds originating from PCOF investors were funneled through DMP to Summit Investment Fund, and used to pay Summit Investment Fund investors a return of their principal. Other funds originating from PCOF appear to have used to "redeem" DMP investors' notes. Yet other funds originating from PCOF appear to have flowed through DMP and used for as yet unknown purposes, and there are a multitude of example of other such combinations among the various entities.

In addition, the DMP Receiver's accounting, as well as the undersigned Receiver's analysis tracing efforts, identified several other entities not within either receiver's jurisdiction, which were involved in asset transfers from and to entities under both receiverships. For example entities such as "Summit Capital Holdings" and "Summit Capital Trading," believed to have been controlled by Mark Morrow, Angelo Alleca or both, appear to have substantial amounts both transferred to, and received from, both the Summit receivership entities as well as Detroit Memorial Partners.

After additional review, and with the help of the new information developed by the DMP Receiver, the undersigned Receiver is continuing to attempt to resolve as funds tracing questions for which it appears there may be an ultimate net benefit to the receivership estate, and he will work with the DMP Receiver to the same aim.

In addition to the settlement funds held in escrow, DMP also owns a share of Midwest, which in turn still owns and operates its cemeteries. In the event such cemeteries are marketed and sold, the Receiver believes that additional funds would flow to DMP. It is unknown what that amount may be, but the Receiver believes that, based upon the distribution provisions of the Midwest Operating Agreement, DMP would ultimately stand to receive not less than $5,700,000 from any such sale (assuming such a sale produced proceeds in that amount), and possibly more. Pursuant to the DMP Receiver's motion, the Court has recently approved the retention by the DMP Receiver of an accounting firm to assist him in valuing the assets of DMP, principally including its share of the cemeteries owned and operated by Midwest.

Since the Court has appointed the DMP Receiver, it is expected that, pursuant to the Order appointing the DMP Receiver, a claims process will be established. In addition to the claims that might be submitted by the Receiver against DMP on behalf of PCOF and Asset Class Diversification Fund, both of whose funds were transferred directly to DMP, DMP may well have claims against certain of the Summit receivership entities for assets which appeared to have been transferred to them by DMP. In an effort to avoid unnecessary expense to either receivership estate, it is the Receiver's

intention to cooperate fully with the DMP Receiver to mutually assess all of the claims which may exist among the respective estates.

Indeed, the claims process will likely result in a substantial number of claimants filing claims against both estates. The Receiver has received approximately 190 claims from DMP investors, and at least 76 of those investors also are among the claimants for investments one or more of the Summit funds.

At an appropriate time, the Receiver will present to the Court his proposal regarding the evaluation and resolution of claims that may exist against the Summit entities, including those between the Summit entities and DMP. The undersigned Receiver expects to continue to be in communication with the DMP Receiver so that the nature and amount of all of the claims may be determined as completely as possible, and the manner in which the competing claims might be appropriately and equitably resolved for the benefit the claimants in the most efficient manner possible.

**Insurance Claim**

On the date the Receiver was appointed, Summit had in force an Asset Management Protector Policy of Insurance (the "Policy") issued by Federal Insurance Company (the "Insurer").  The Policy, in general terms, provides for reimbursement of defense costs and indemnification of liability for

certain defined claims arising from covered errors in the rendering of professional advisory services.  The face amount of the Policy is $3 Million. It is an eroding policy, which means the amount available to pay losses decreases by each dollar that is paid in defense costs.

The Receiver contends that Summit's investment adviser representatives are included within the definition of "Insured Persons" under the Professional Liability Coverage Part of the Policy.  As previously reported, the Receiver has informed the Insurer that claims far in excess of the policy limits appear to exist and be covered under the terms of the Policy – claims which would likely result in extensive litigation in many courts following the lifting of the litigation stay imposed by the receivership order. Through counsel, the Insurer has indicated that the claims identified will be disputed as either not covered or excluded, on the basis of fraud in connection with the application for insurance, and also has asserted other defenses.

The Receiver does not concede the validity of the Insurer's claimed defenses. Nevertheless, in mutual recognition of the existence of a bona fide dispute, the Receiver and the Insurer have continued to negotiate in good faith since the last report toward a potential global settlement of these issues and the policy.  Demands, offers, and counter-demands have been

exchanged. Both parties have shared information, including the results of their research, in an effort to reach a resolution that is reasonable in light of the disputed factual and legal issues. Discussions are ongoing. Any agreement reached as a result of these negotiations would necessarily be conditioned upon approval of the Court.

**Other Potential Claims by the Receiver**

In the previous report, the Receiver reported on the settlement of a claim the Receiver had asserted to the proceeds of a promissory note Angelo Alleca had previously caused to be assigned to a third party, purportedly to satisfy a preexisting claim by the third party. The Receiver had submitted a Motion to the Court to approve that settlement. The Court has subsequently approved that Motion, and the initial proceeds of the note, which had been held in escrow pending the resolution of the claim, have been disbursed according to the settlement. The Receiver anticipates that the estate will receive additional proceeds in the future from the note payments, pursuant to the settlement.

With information which has been accumulated from several sources, including the DMP Receiver's accounting, the Receiver is currently determining whether sufficient grounds exist to pursue claims against individuals who may have invested in one or more of the Summit-related

funds and received an amount in excess of their aggregate investments in those funds. Initial indications are that a limited number of those situations, referred to as "clawbacks," may exist. The Receiver's interpretation of the current state of the law is that the estate would probably not be entitled to assert a claim against investors who had recovered more than other investors, but less than their total principal investment.

Over the course of the receivership, the Receiver has investigated several other potential claims involving funds which appeared to have been diverted to third parties without adequate consideration, as well as other claims which appeared to possibly exist. The Receiver has obtained information about those various claims through subpoena and otherwise. It would not be a judicious use of the receivership estate's resources to assert claims which, either because of their uncertain factual or legal basis, the ability to establish damages to the estate or because of the small likelihood of satisfaction in the event a judgment were to be obtained, would not result in a net benefit to the estate given the costs of pursuit. Although the Receiver has not conclusively determined that it may not propose to pursue such claims in the future if he obtains additional information he may receive in the future, no such litigation is currently contemplated based upon the information which he has now.

**Other Potential Claims of Investors**

In the previous report, the Receiver reported that he was contemplating proposing the establishment of a litigation trust for the purpose of providing a vehicle to assemble and bring claims on behalf of investors against certain third parties against whom claims may exist. Because of developments in the prospects of class litigation which would pursue those claims, the Receiver believes that such a step is likely no longer indicated. The Receiver believes that the large number of claims, and their similarity, presents an excellent candidate for class litigation.[1]

Since the last report, the Receiver has met with attorneys of two law firms which have expressed an interest in instituting class action lawsuits on behalf of investors against third parties brokerage firms that served as custodians for investors' accounts while they were Summit clients. Both attorneys have substantial experience in class action litigation.  The clients' statements, as compiled and produced by their custodial brokerage firms, reflected valuations of the Summit funds and DMP which are believed to have been provided by Mr. Alleca, or Mr. Morrow, or their designees to these firms or their agents, and were passed on to the clients without investigation.

---

[1] A class action brought against a custodial firm in a Ponzi-scheme case brought in South Carolina in 2007 ultimately resulted in a substantial settlement benefitting certain of the investors. (See Brown v. Charles Schwab & Co., Inc. (D.S.C., No. 2:07-cv-03852-DCN)).

12

Without alleging that the custodial firms were aware of the Summit Ponzi scheme, those actions might claim, among other things, that the firms failed to exercise appropriate due diligence or uphold their fiduciary obligations to their customers to investigate the true value of the funds or other factors relating to the funds before providing account statements to customers containing false valuations.[2]

Throughout the receivership, the Receiver has become aware of several former Summit clients who have indicated an interest in participating as a lead plaintiff in such an action. Accordingly, the Receiver has informed those clients of the identities of the attorneys who have expressed an interest in providing representation for such an action, and will continue to do so. The Receiver has not undertaken to designate or appoint counsel for such actions, and he would likely not be an appropriate party to such an action or actions, if brought. Rather, such actions would likely be brought by one or more plaintiffs seeking class certification.

The Receiver will follow the developments in this area to monitor whether investors' potential claims are being addressed, and thus continuing to preclude the need for a litigation trust.

Respectfully submitted this 14th day of March, 2014.

---

[2] The exact nature of any claims would, of course, be determined by the plaintiffs and their counsel.

/s/ <u>Robert D. Terry</u>
Robert D. Terry
*Receiver*

PARKER MACINTYRE
2987 Clairmont Road
Suite 200
Atlanta, GA 30320
(404) 490-4060
(404) 490-4058 – facsimile
bterry@parkmac.com

**CERTIFICATE OF SERVICE**

I certify that the foregoing was prepared with one of the font and point selections approved by the Court in LR 5.1B.  I further certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system that will send notice of electronic filing to counsel of record.

Respectfully submitted this 14th day of March, 2014.

/s/ Robert D. Terry
Robert D. Terry
Georgia Bar No. 702606
Receiver

PARKER MACINTYRE
2987 Clairmont Road
Suite 200
Atlanta, GA 30320
(404) 490-4060
(404) 490-4058 – facsimile
bterry@parkmac.com