IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

———————————————————
                                                  :
SECURITIES AND EXCHANGE         :
COMMISSION,                                :
                                                  :
            Plaintiff,                         :
                                                  :          Civil Action No.
                        v.                      :          1:12-CV-3261-WSD
                                                  :
ANGELO A. ALLECA, SUMMIT    :
WEALTH MANAGEMENT, INC.,    :
SUMMIT INVESTMENT FUND, LP, :
ASSET CLASS DIVERSIFICATION  :
FUND, LP, and PRIVATE CREDIT   :
OPPORTUNITIES FUND, LLC         :
                                                  :
            Defendants.                      :
———————————————————:

**RECEIVER'S MOTION TO APPROVE
PLAN OF DISTRIBUTION AND MEMORANDUM OF LAW IN SUPPORT**

Robert D. Terry, the Court-appointed Receiver for Defendants Summit

Wealth Management, Inc. ("Summit"), Summit Investment Fund, LP ("SIF"),

Asset Diversification Fund, LP ("ACDF") and Private Credit Opportunities Fund,

LLC ("PCOF" and, collectively with Summit, SIF, and ACDF, the "Receivership

Entities") hereby requests Court approval to distribute certain receivership assets

pursuant to the below-described plan of distribution ("the Plan").  The Receiver

hereby asks the Court (1) to set a date by which all objections to the Plan must be filed and served; (2) to set a date for a hearing to consider the Plan and any objections to the Plan; and (3) to approve that Plan.

## I.    Procedural and Factual Background

The Receivership Entities were funded by investors, ostensibly for legitimate business and investment purposes. Summit was a registered investment advisor operated by Alleca, while SIF, ACDF, and PCOF were private funds into which investor money was ostensibly invested. In 2003, Defendant Angelo A. Alleca began operating a Ponzi scheme relating to the Receivership Entities. For the next nine years, using the Receivership Entities and a variety of other entities owned or controlled by him, as well as entities owned or controlled by other persons and entities acting in concert with him, Alleca raised millions of dollars from unsuspecting investors. Sometimes Alleca paid investors, but he largely used the funds being invested for his own purposes or for purposes unrelated to the Receivership Entities. Alleca often transferred investor funds between Receivership Entities or between one or more Receivership Entity and another entity. SIF, ACDF and PCOF, although formed and operated supposedly for legitimate purposes, were in fact simply tools for Alleca to effectuate his scheme. Using various elaborate efforts to conceal his activities, the fraud went undetected

2

until September 2012.

On September 18, 2012, the Securities and Exchange Commission ("SEC") brought this action against the Receivership Entities and Alleca. Upon motion of the SEC, this Court granted an order freezing the Defendants' assets ("Freeze Order") and a separate order, later modified, appointing Movant Robert D. Terry as receiver for those entities ("Receivership Order").

On May 30, 2013, after additional investigation and inquiry into the activities of Summit and the Receivership Entities, the SEC brought a separate action in this Court against Detroit Memorial Partners ("DMP"), another investment into which Alleca directed Summit clients and others, and its controlling person, Mark Morrow ("DMP Action").[1] On November 22, 2013, the Court appointed Jason Alloy as receiver in the DMP Action.

As a result of their activities in this scheme, Morrow and Alleca were also charged criminally in this district with counts alleging mail fraud and wire fraud with respect to the Receivership Entities and DMP, and conspiracy to commit those acts. *United States of America v. Angelo Alleca and Mark Morrow*, Case No. 1:15-CR-458. Alleca has pleaded guilty to two counts in the indictment --

---

[1] Securities and Exchange Commission v. Detroit Memorial Partners, LLC et al., 1:13-cv-01817-WSD.

conspiracy to commit mail and wire fraud with respect to the Receivership Entities, and conspiracy to commit mail and wire fraud with respect to DMP. Morrow has pleaded guilty to one count of conspiracy to commit wire fraud relating to DMP.

## II.   The Receiver's Work

### A. Initial Assessment and Operations

After being appointed, the Receiver's initial investigation and analysis indicated that Alleca controlled, essentially, two operations.  The first was a registered investment advisor (Summit) whose operations were relatively transparent to its employees and were ostensibly compliant with applicable regulations. As of September 21, Summit was an SEC-registered investment advisor with 3 offices in which advisory operations were conducted – Atlanta, Georgia, San Antonio, Texas and Beverly Hills, California.  Alleca also operated a second operation involving ACDF, PCOF and SIF which, while sold to Summit clients with the knowledge of Summit employees, were managed by Alleca personally and largely away from Summit's various offices.

In addition to the three offices mentioned above, Summit had owned several other offices over the years. The Summit growth model was to acquire existing advisory operations and accounts, physically relocating those businesses to the main office if in Atlanta, and acquiring existing offices if in other states. In the

years prior to the Receiver's appointment, several offices that had been acquired were held only one to two years before they were sold. Offices in Chicago, Illinois, Phoenix, Arizona, Orlando and Naples, Florida, and Alexandria, Virginia fit into this pattern.

After the present case was filed, Summit continued to operate as a registered investment advisor.  However, as a result of customer attrition due to the uncertainty arising as a result of the news surrounding the Freeze Order and Receivership Order, as well as advisors leaving the firm, fee income was substantially reduced beginning in the last quarter of 2012.

On October 2, 2012, the advisor located in the Beverly Hills office suddenly resigned.  The departure caused an immediate loss of all client accounts in that office. The revelations about Angelo Alleca's activities, and the true nature of the Receivership Entities, together with the ongoing default status of DMP promissory notes that had been sold to Summit clients, continued to have a massive, negative effect on customer trust in Summit and its advisors. Many customers in both the Atlanta and San Antonio offices were terminating their accounts and ending their relationships with their advisors. This pattern continued throughout the Fall of 2012.

It became apparent that it was not likely that Summit would be able to

continue as an ongoing operation, even under different ownership, because of its geographical dispersal, high cost structure, lack of any consistent investment approach across its client base and the overwhelmingly negative goodwill associated with its name. The Receiver therefore decided to seek purchasers for the remaining accounts as quickly as possible in order to maximize value and end the expense drains upon the Receivership Assets. Inasmuch as there did not appear to be ready purchasers for the entirety of the accounts, the Receiver began to contact possible purchasers and entertain inquiries from firms and others interested in acquiring accounts and the services of certain advisors.

**B. Collection of Assets**

Upon his appointment, the Receiver also attempted to locate and secure all of the investors' assets, including any assets that had been invested in any of the Receivership Entities. The office in Atlanta, including Alleca's personal office, contained scant physical information relating to SIF, ACDF and PCOF, other than some records of individual clients' subscriptions. Alleca indicated that he had no additional information, and that he no longer had possession of the computer on which much of the information had resided, that computer having previously become inoperable and disposed of.

<u>Cash and Funds on Deposit</u>

Immediately after his appointment, the Receiver met with the Chief Financial Officer of Summit and determined that she was aware of only a single operating bank account containing approximately $10,000. Advisory fees payable to Summit were collected after the end of the third calendar quarter totaling $291,968.  Of these fees, $193,060 were fees for services performed for the previous quarter, and $98,908 were advance fees for services to be performed in the fourth quarter. As required by law, some of the fourth quarter fees were refunded to clients who terminated their contracts with Summit during the fourth quarter.

In April, 2013, the Receiver learned that PCOF held a custodial account at Huntington National Bank.  The Receiver collected the cash reserves from the Huntington account in the amount of $32,000.

<u>Sale of Business</u>

As mentioned above, the Receiver sought purchasers for Summit's offices and their corresponding account relationships. Potential purchasers were understandably cautious in their assessment of the value of the Summit accounts. Ultimately, advisory clients are completely in control of the firm they choose to advise them, so there was understandable reluctance by potential purchasers to pay

large sums to acquire accounts whose successful transfer was speculative. Furthermore, the saleability of accounts is highly dependent upon the relationship of the advisor and the customer. Federal privacy regulations prevent the sale of customer lists without the sale of the corresponding accounts, and the account sale ultimately requires the consent of the customer.

On October 12, 2012 the Receiver concluded a sale of the Receivership's title and interest in the California offices accounts to CLA Advisors, an advisory firm with offices in Chicago and Los Angeles, for an amount equal to approximately 100% of the average annual revenue the purchaser would be able to obtain from those offices over the following three years. The total amount ultimately received by the Receivership as a result of that sale was $30,952.23.

After several sets of preliminary discussions and subsequent negotiations, the Receiver sold the rights to the bulk of the remaining account relationships of the firm to three firms. Rights to Atlanta accounts primarily associated with Rebecca Phillips and David Sammons were sold to Divergent Equity Management, Inc. ("DEM"), a firm based in Florida interested in creating an Atlanta presence. The terms of the sale included a cash component ($50,000), as well as "earnout" payments for the next two calendar years based upon a percentage of revenue generated from accounts which were successfully transferred to the firm.  The

Receivership ultimately received an amount equal to ¾ of 1% of the annual revenue from transferring accounts, or $123,072.25.

Atlanta accounts associated with Scarlott Cagle, which represented a smaller number and value of accounts, were sold to Wealthcare Capital Management, an advisory firm with presences in Richmond, Virginia and Atlanta. The terms of the sale were similar in structure to the DEM sale, with a cash component and a downstream earnout. As with the DEM sale, the estimate of value to be ultimately received was ¾ of 1% of the transferring accounts' annual revenue. The total amount ultimately received by the Receivership was $61,594.97.

Accounts in the San Antonio office, which experienced a disproportionately significant negative impact from DMP and PCOF investments, as well as furniture, fixtures and equipment owned by Summit and located there, were sold to Cypress Investment Partners, a newly-created Texas-registered investment advisor started by one of the Summit employees in the San Antonio office, Steven Parker. Mr. Parker had become associated with Summit in the previous year and was therefore not present when the toxic investments were sold in the San Antonio office.  The purchase price for the San Antonio assets was $125,000, representing approximately 40% of estimated annual revenues, which was paid at closing.

In addition, furniture, fixtures and equipment of the Atlanta and Chicago

office, consisting primarily of relatively low-quality composite desks, credenzas, chairs and conference tables were sold to wholesale furniture dealers in those cities for $3,300.

### Sale of Real Estate

The Receiver determined that Alleca owned two pieces of property, a house (used as an office) in Buffalo, New York and a residence in Duluth, Georgia. The Buffalo building had been listed for sale with a Buffalo real estate firm for approximately two years.  Alleca assigned his equity in the property to the Receivership.  After paying a $92,000 mortgage lien, a brokerage commission, and other closing costs, the sale of the property in December 2012 netted the Receivership $30,539. The Duluth property had little or no equity above its substantial mortgage debt, and the Receiver did not seek or assert any interest in that property.

### Legal Claims

Prior to the appointment of the Receiver, Summit had filed a lawsuit against a former advisor who it accused of violating his employment agreement with Summit and misappropriating trade secrets. The potential revenue from the account at issue was approximately $12,000 annually. As the case approached trial, the

Receiver elected to resolve the case in February 2013, by a payment of $4,000 from the defendant to avoid additional expenses of litigation over a relatively small amount of damages.

Other Receivables

At the time of the Receiver's appointment, Summit also owned at least two promissory notes arising from the sale of accounts in the Chicago and San Antonio offices.  The San Antonio note was based upon income to be derived from the accounts sold and was therefore of indeterminate value, although counsel for its maker indicated that it would be paid when due in 2013. The Chicago note, with a remaining principal value of $873,000, was the subject of a purported assignment to a third-party. The assignment represented a partial satisfaction of a debt incurred by Landmark Investment Company that was assumed by Summit. The Receiver contested the validity of the assumption, and two payments under the Chicago note were, at the Receiver's request, paid into the Receiver's escrow account.  The Receiver and the assignee of the Chicago note, after negotiations, agreed that Summit would receive $273,975 of the remaining balance of the note, including the balance held in the escrow account.

Insurance Claim

On the date the Receiver was appointed Summit had in force an Asset Management Protector Policy of Insurance (the "Policy") issued by Federal Insurance Company ("Federal").  The Policy, in general terms, provided for reimbursement of defense costs and indemnification of liability for certain defined claims arising from covered errors in the rendering of professional advisory services.  The stated limit of liability under the Policy was $3,000,000. Federal, however, notified the Receiver of its position that the Policy was procured by fraud and was therefore void, that if the policy was not void that any claims that could be asserted by the Receiver were excluded or otherwise not covered, and that two-thirds of the limit, or $2,000,000, was foreclosed by false warranties of Summit officers or other acts of fraud or misrepresentation.  The Policy was an eroding policy, which meant the amount available to pay losses would be decreased by each dollar paid in defense costs.

After extensive negotiations, the Receiver and Federal agreed to settle the Receiver's claim against the policy for $1,487,500, subject to Court approval.  On May 16, 2016, the Court approved the settlement and entered a final Order to that effect. The Receiver collected and deposited the settlement funds in June 2016.

Detroit Memorial Partners

As noted in previous reports, many of the transactions and other facts relating to this matter are entangled with the financial dealings of DMP, which was a minority owner of Midwest Memorial Group ("Midwest"). Midwest, in turn, owned and operated 27 cemeteries in the state of Michigan.

The Receiver filed a claim with the DMP Receiver for assets transferred by various Summit entities to DMP during the course of the Ponzi scheme. The Receiver objected to the claim, noting that substantial assets (exceeding the amount of assets transferred to DMP) had been transferred from DMP to entities associated with Summit.

On October 7, 2016, the Receiver filed an objection to the disallowance of its claim against DMP and, in addition, suggested that the two receiverships should be consolidated for purposes of claim determination and distribution.  After a hearing on the matter, on November 8, 2016, the Court entered an Order denying the Receiver's objection, holding that the DMP and Summit receivership estates should be administered separately.

Accordingly, Claimants in this case who presented Claims based on DMP investments had their Claims administered through the DMP Receivership.  Claims related to DMP losses submitted in the present case by Claimants are therefore

13

proposed to be disallowed.  If a Claimant submitted Claims related to both DMP and other Summit Receivership Entities, the fact that their respective DMP Claim is being denied is indicated in Exhibit 1, Schedule B.  Those Claimants who only filed DMP-related Claims with the Receiver and whose Claims are being disallowed are listed on Exhibit 1, Schedule C.

## III.    Assets Available for Distribution

The total cash on hand is currently $1,811,065.[2] The Receiver seeks to distribute approximately 75% of that amount, or $1,360,000, and hold a reserve of $451,065 ("the Reserve"). The Receiver requests the Reserve for the purposes of paying accrued but unpaid expenses of the receivership (including the expenses of the Receiver, his counsel and his accountants), to cover the cost of disposing of Receivership Assets, terminating the Receivership, and other administrative costs. If approved, after taking into account any money received by investors prior to the Receivership, this distribution will represent a minimum recovery percentage among included Claimants of 14% (See, Exhibit 1, Schedule A).

---

[2] This excludes $8,748.35 held in escrow pursuant to an agreement between the Receiver and Bank of North Georgia, the ownership of which is disputed and will be presented to the Court at a later date.

## IV.   Claims Data

After his appointment, the Receiver and his team reviewed 28 bank accounts and other records, primarily obtained through subpoena. It became increasingly apparent that the Ponzi scheme and the intermingled financial activities of the Summit Receivership Entities and others were broad in their scope and duration. For example, records of most of the 28 bank accounts show evidence of having received investor funds, either directly or indirectly after having passed through one or more other accounts. These accounts are or were owned by 14 different entities.

The Receiver also assembled information regarding investors who have had their investments previously satisfied or partially satisfied by analyzing and comparing information from several sources including: 1) investor records produced as part of the claims process; 2) bank records showing wire transfers and checks payable to investors; 3) records of client account custodians; and 4) advisor notes.

In 2013, the Receiver created a Proof of Claim Form to be used for any potential Claimant against Summit and the Receivership Entities, and distributed a package containing that form to all of the approximately 1,500 former clients of Summit and 50 possible trade creditors, identified from Summit's accounting,

customer and vendor records as well as contacts made by the Receiver. In addition, the Receiver caused the Proof of Claim Form to be distributed to other persons who he believed may have Claims against the Receivership estate. The Receiver set a deadline for the receipt of Proofs of Claim of April 30, 2013.

The Receiver initially collected in excess of 400 investor Claims, totaling approximately $44,000,000. In addition to investment-based Claims, there were approximately 18 Claims initially received reflecting amounts dues arising primarily from debt obligations of Summit and trade payables. These Claims totaled $4,276,300. After collection of the proceeds of the Court-approved Settlement with Federal and the Court's denial of the Receiver's claim in the DMP Action, the Receiver's staff undertook to verify all Claims by examining the supporting documents forwarded by each Claimant, comparing that data to bank and account records, and resolving any discrepancies by seeking additional information from various sources, including interviewing the Claimant and the Claimant's representative at Summit.

In late 2016 and early 2017, the Receiver's staff sent a Claim confirmation email or letter to each Claimant, stating the amount of investment and pre-

receivership withdrawals[3] for each Claim and inviting each Claimant to contact the Receiver's staff if the Claimant disagreed with those amounts. Based upon additional information provided to the Receiver during this process, the Receiver modified receivership records regarding some of the Claims. Ultimately, the Receiver proposes to allow total Claims in the amount of $26,210,875.90.

During this same Claim verification process, the Receiver obtained confirmation of contact information for Claimants.  In this process Claimants were requested to confirm valid email and mailing addresses, and other contact information.

## V.    Summary of The Plan and Plan Methodology

Although Summit raised money through the different investment funds, once the money was raised it was commingled between the funds to such extent that it is now not possible to determine the money owned by any particular individual or individual fund.  Accordingly, the Receiver believes that the only equitable approach to use in calculating distribution of Receivership Assets, given this commingling, is to treat all of Summit offerings together for purposes of

---

[3] "Withdrawals" means any Commission, payment of supposed profit, interest, return of principal, and/or other payments received from one or more of the Receivership Entities prior to the Order Appointing Receiver.

distribution. After considering several methods for the treatment of pre-receivership withdrawals, the Receiver has determined that the "Rising Tide" method is the most equitable. Allowed Claims of investors and of trade creditors are proposed to stand on equal footing, and therefore the Receiver proposes no classes of Claims. Under that method, the Receiver will deduct the amount of a Claimant's pre-receivership withdrawals **after** calculating the investor's pro rata share of any distribution. If the result is negative – meaning that the Claimant has already received pre-receivership withdrawals in excess of his or her calculated pro rata share of a distribution – that Claimant will not participate in that distribution, although he or she may participate in later distributions. This method preserves assets for those Claimants who have received nothing thus far and recognizes that some Claimants have already recovered a substantial percentage of their investment. The formula for the calculation of a Claimant's pro rata distribution amount under the Rising Tide method is:

**(amount invested x pro rata multiplier)**

**– pre-receivership withdrawals = distribution amount**

Consider an example with only two investors, each of whom invested $100,000. Investor A has received no withdrawals, but Investor B has received pre-receivership withdrawals totaling $20,000. Assuming a distribution fund of

$40,000, the Rising Tide method would distribute those dollars among the two investors using the following steps:

1.      Calculate a pro rata multiplier by dividing the distribution fund amount by the total allowed Claims of the investors to be involved in this distribution. In this example, the pro rata multiplier is determined to be 20% ($40,000 divided by $200,000).

2.      Multiply each investor's amount invested by the pro rata multiplier. This action results in an initial gross distribution allocation to each investor of $20,000 ($100,000 x 20%). Note that this initial gross distribution amount is the same for each investor in this example because Investor A and Investor B had each invested equal $100,000 amounts.

3.      Determine each investor's net distribution amount by subtracting their respective pre-receivership withdrawals from their gross distribution amounts. Investor A has not yet recovered any of his investment, so no deductions will be made to his $20,000 gross amount.

4.      Re-allocate any remaining funds to be distributed. Because the above steps have distributed only $20,000 of the $40,000 distribution fund total among the two investors, a second round of distribution is necessary to determine the allocation of the $20,000 remainder of the distribution fund. Calculating it in the

same manner as in the first round, the pro rata multiplier for this second round, is determined to be 10% ($20,000 divided by $200,000). This second-round multiplier is then applied to each investor's invested amount to allocate a second-round gross distribution amount of $10,000 to each ($100,000 x 10%). Because neither investor has any pre-receivership withdrawal balance that has not already been offset by a (first round) gross distribution amount, each investor is allocated a $10,000 net distribution of this $20,000 distribution fund remainder in this second round of calculations.

In this simplified example, Investor A's total recovery amount (the sum of pre-receivership withdrawals and distributions) is $30,000 ($0 + $20,000 +$10,000), and Investor B's total recovery amount is also $30,000 ($20,000 + $0 +$10,000). Even if the invested amounts had been different, one can confirm the equitability of this method by dividing each investor's respective recovery amount by his amount invested. In this example, each investor's recovery percentage is the same at 30% ($30,000 divided by $100,000). Table A below summarizes the results of this Rising Tide distribution example.

**Table A**
**Total Recovery Amount (including pre-receivership withdrawals)**

|                               | Investor A | Investor B |
|-------------------------------|------------|------------|
| Pre-receivership withdrawals  | $0         | $20,000    |
| First round distribution      | $20,000    | $0         |
| Second round distribution     | $10,000    | $10,000    |
| Total Recovery Amount         | $30,000    | $30,000    |
| Total Recovery Percentage     | 30%        | 30%        |

**Total Distribution Fund = $40,000**
**Each investor invested $100,000**
**Investor A received no pre-receivership withdrawals**
**Investor B received $20,000 in pre-receivership withdrawals**

The Receiver considered other distribution methods. He considered attempting to trace each investor's specific investment(s), but the defendants' commingling of funds from the various offerings made that approach impossible. "In the original Ponzi scheme case, Cunningham v. Brown, 265 U.S. 1, 44 S. Ct. 424, 68 L. Ed. 873 (1924), the Supreme Court held that 'tracing' fictions should not be used to pursue individual recoveries when a fraud ensnares multiple victims whose funds are commingled. . . . Instead, the Court held that all innocent victims should share equally in the recovered funds because equity demands equal treatment." SEC v. The Infinity Group, 226 Fed. Appx. 217 at 218 (3rd Cir. 2007).

The Receiver considered ignoring withdrawals and other distributions, but

that method would result in a wide disparity of recovery percentages among Claimants and an inequitable windfall to those whose pre-receivership receipts represented a substantial percentage return of their investment amount.  See Commodities Futures Trading Comm'n v. Equity Financial Group, LLC, 2005 WL 2143975 at *24 (D.N.J. Sep. 2, 2005).

Finally, the Receiver considered and rejected the "Net Investment Method," under which investors keep 100% of their withdrawals and still recover their pro rata share of their net investment (investments minus withdrawals). At least two courts have rejected that method, noting the inequitable results it creates. Id. at 25; CFTC v. Hoffberg, 1993 WL 441984 at *2 (N.D. Ill. Oct. 28, 1993).  As an example of this Net Investment Method, consider the two investors described in the Rising Tide example. Under the Net Investment Method, Investor A – whose net investment is 125% of Investor B ($100,000 vs. $80,000) – would receive a 25% greater distribution amount than Investor B ($22,222 vs. $17,778). Because Investor B had already received $20,000 in pre-receivership withdrawals, though, his total recovery amount under this method is still higher than Investor A's total recovery amount ($37,778 vs. $22,222), resulting in a total recovery percentage of 37.8% for Investor B, while Investor A's total recovery percentage would be only 22.2%. Table B illustrates the recovery results for each investor under each method

considered by the Receiver.

**Table B**
**Total Recovery Amount/Percentage (including pre-receivership withdrawals)**

| Method | Investor A | Investor B |
|---|---|---|
| Rising Tide | $30,000 / 30% | $30,000 / 30% Net |
| Investment | $22,222 / 22.2% | $37,778 / 37.8% |

**Distribution Fund = $40,000**
**Each investor invested $100,000**
**Investor A received no pre-receivership withdrawals**
**Investor B received $20,000 in pre-receivership withdrawals**

As Table B shows, the Rising Tide method produces a more equitable

recovery among those included in a distribution, paying distribution amounts first

to those who have thus far recovered nothing from their investments.

The distribution proposed in the Receiver's Plan as set forth on Exhibit 1,

Schedule B will result in distribution payments to 139 of the 289 verified

Claimants.[4] The proposed distribution will bring the minimum recovery percentage

among Claimants to 14%.

The Receiver believes that the Rising Tide method is the most equitable

method of calculating distribution amounts in this case. It strikes a good balance

between those Claimants who invested early and have, therefore, been without

---

[4] If a Claimant is not receiving a distribution then his or her pre-receivership
withdrawals exceed the pro-rata amount of recovery on this distribution.

their money longer, although they are more likely to have received a pre-receivership withdrawal from Summit-- and those investors who invested near the end of the scheme and may have thus far received no withdrawals from Summit.

## VI.     Discussion of Certain Disallowed or Modified Claims

The Receiver's proposed treatment of certain Claims warrant further discussion.

### A. Investor Claims

The proposed distribution for investor Claims is as shown on Exhibit 1, Schedule B.  Three Claims were disallowed in their entirety.[5]  Many Claims incorrectly characterized investment amounts or amounts received by Claimants prior to the institution of the receivership. As described above, adjustments to these Claim amounts have been made after the Receiver's review of documentation and other information from several sources.

---

[5] Claim Number 252, in the amount of $1,235, was for attorney's fees the Claimant said she incurred in connection with her Claim.  Claim Number 388, in the amount of $214.53, was for an amount that did not represent a loss to the Claimant.  Claim Number 467, in the amount of $50,000, was for "market losses" for which no additional evidence or justification was provided, including any evidence of an investment in any of the receivership entities.

**B. Trade Claims**

<u>1. The Meyers Group Claim</u>

The Meyers Group, Inc. filed a Claim for $1,000,000 based upon an unpaid promissory note given by Summit to Claimant upon the purchase by Summit of Claimant's assets. The Receiver determined that the note and related contract did not support the full amount Claimed, but did find evidence to support a Claim in the amount of $814,338, which is the amount of the Allowed Claim.

<u>2. Alexandria Claim</u>

Alexandria Capital, LLC ("Alexandria") asserted a Claim for $100,000 relating to cash it gave to Summit shortly before the Receivership was created, ostensibly as a down payment for an office sale which was never completed and which was actually used by Alleca for a payroll obligation. The Receiver proposes to allow the Claim in full. Said allowance, however, is without prejudice to the Receiver's rights to recover based on Claims against Alexandria or its affiliates, arising from the sale of a previous office in Virginia.

<u>3. Bank of North Georgia Claim</u>

Bank of North Georgia asserted a Claim based on $ 198,340.88 that remained unpaid on a promissory note dated August 25, 2011. The Receiver has

proposed to allow the Claim in full. This allowance is without prejudice to the Receiver's right to retain for the estate disputed sums currently held in escrow as described in footnote 2 above.  Based on the above, the Receiver, therefore, asks the Court to approve his Rising Tide Plan of Distribution, the terms of which are set forth in the following section:

## VII.    Plan of Distribution

### ARTICLE I – DEFINITIONS

All capitalized terms shall have the meanings stated below:

**"ACDF"** refers to Asset Class Diversification Fund, LP.

**"ALLOWED"** refers to the amount of a Claim from which Distributions will be calculated.

**"ALLOWED CLAIM"** means all or a portion of a Claim designated as Verified by the Receiver or a Claim which has been allowed by separate Order of the Court.

**"CLAIMS BAR DATE"** shall mean the date set by the Court for submission of Claims.

**"CLAIM"** refers to any written notice that is received by the Receiver from any Claimant that seeks payment from the Receivership Estate. Claims that do not

conform to the Proof of Claim Form instructions may be considered by the Receiver in his sole discretion, or as otherwise permitted by this Plan of Distribution.

**"CLAIM NUMBER"** refers to the number assigned to a Claim by the Receiver and communicated to each Claimant.

**"CLAIMANT"** refers to any Person who asserts a Claim in this case.

**"CONTESTED CLAIM"** is a Claim to which an Objection is properly presented by the Claimant to this Court and the Receiver.

**"COURT"** refers to the United States District Court for the Northern District of Georgia.

**"DEFECTIVE CLAIM"** means a Claim not submitted in accordance with the Proof of Claim Form Instructions, but does not include Late Claims.

**"DENIED CLAIM"** or **"DISALLOWED CLAIM"** means (1) any Claim or portion of a Claim that the Receiver has rejected in a writing filed with the Court or sent to the Claimant at the address stated on the Claim Form; or (2) any Claim or portion of a Claim which the Receiver deems to be a Defective Claim under the terms of this Plan.

**"DISTRIBUTION"** refers to a payment by the Receiver on an Allowed Claim in accordance with the procedures outlined in this Plan of Distribution.

**"DISTRIBUTION PLAN" or "PLAN" or "PLAN OF DISTRIBUTION"** refers to this Plan of Distribution.

**"INVESTOR"** is a Claimant who invested in one or more Receivership Entity or was a client of Summit.

**"LATE CLAIM"** means a Claim submitted to the Receiver or posted after April 30, 2013.

 **"OBJECTION"** refers to a written document filed by a Claimant with the Clerk of the Court disputing the Receiver's determination of the Claimant's Allowed Claim and/or objecting to this Plan of Distribution.

**"OBJECTOR"** refers to a Person who files an Objection to the Proposed Plan.

**"ORDER"** refers to an Order of this Court.

**"ORDER APPOINTING RECEIVER"** refers to the Orders Appointing Receiver dated September 21, 2012 and the Order Modifying Order Appointing Receiver dated November 21, 2012.

**"PCOF"** refers to Private Credit Opportunities Fund, LLC.

**"PERSON"** means any natural person, corporation, limited liability company, partnership, association, trustee, agent, or other entity of any kind.

**"PROOF OF CLAIM"** refers to the Proof of Claim Form provided by the

Receiver to Claimants to document Claims against Summit and attached to the present Motion as Exhibit 2.

**"RECEIVER"** refers to Robert D. Terry, Receiver, appointed pursuant to the Court's Order Appointing Receiver, and those employed to assist in that mandate.

**"RECEIVER CONFIRMED ELECTRONIC MAIL INFORMATION"** refers to the email addresses confirmed by affirmative responses by Claimants during the Claims verification process that the Receiver engaged in in late 2016 and early 2017, in which Claimants affirmatively confirmed the accuracy of current valid electronic mail addresses.

**"RECEIVER'S WEBSITE"** refers to http://www.swmreceivership.com.

**"RECEIVERSHIP ASSETS"** refers to the assets defined as Receivership Assets in the Court's Order Appointing Receiver.

**"RECEIVERSHIP ENTITIES"** shall mean one or more of the Defendants ACDF, PCOF, SIF and Summit.

**"RECEIVERSHIP ESTATE"** refers to the Receivership Assets that have been or may be collected by the Receiver.

**"RECOVERY AMOUNT"** is the sum of a Claimant's Withdrawals and Distributions.

**"RECOVERY PERCENTAGE"** or **"RP"** is the quotient determined by dividing (a) a Claimant's Recovery Amount by (b) that Claimant's Allowed Claim.

**"SEC"** refers to the United States Securities and Exchange Commission.

**"SIF"** refers to Summit Investment Fund, LP.

**"SUMMIT"** refers to Summit Wealth Management, Inc.

 **"VERIFIED"** is the amount of a Claimant's Claim that the Receiver was able to verify via the records available.

**"WITHDRAWAL"** refers to any Commission, payment of supposed profit, interest, return of principal, and/or other payments received from one or more of the Receivership Entities prior to the Order Appointing Receiver.

## ARTICLE II – CLAIMS REVIEW AND DETERMINATION

**Section 2.01: <u>Discretion of Receiver.</u>**  The Receiver is authorized, in the exercise of his sole discretion after consideration of all available evidence, to determine whether a Claim should be designated as an Allowed Claim and what information, if any, to require before allowing or disallowing a Claim.

**Section 2.02: <u>Filing Requirement.</u>**  Except as otherwise ordered by the Court, on or before the Claims Bar Date, each Claimant should have submitted, via fax, through governmental mail, or by overnight delivery to the Receiver's offices or electronic mail, a properly completed written Claim in a form acceptable to the

Receiver reflecting the amount of the Claim and including supporting documentation requested by the Receiver.  All Claims should have been submitted to the Receiver and not the Court.  Unless waived by the Receiver, in the Receiver's sole discretion and for good cause shown, any Claimant who does not file a properly completed and documented Claim on the prescribed Proof of Claim Form (Exhibit 2) before the Claims Bar Date is forever barred from asserting a Claim against the Receivership Estate or the Receivership Assets.  Any purported submission of a Proof of Claim that is not properly documented or that does not reasonably comply with the Proof of Claim Form instructions may be rejected by the Receiver and treated as if no Proof of Claim had been timely submitted by the Claimant.  The burden is on the Claimant to ensure that his or her Proof of Claim has been properly received by the Receiver and that all requested information has been provided.

 **Section 2.03: <u>Claim Determinations Generally.</u>**  The Receiver has reviewed each Proof of Claim to determine the apparent validity and amount of each Claim.  Each Claimant has the burden of proof to establish the validity, amount, and classification of his or her Claim.  The Receiver has the right to request, and the Claimant is obligated to provide to the Receiver, any additional information and/or documentation deemed relevant by the Receiver. The Receiver

has, in his sole discretion, determined what information, if any, to require before allowing or disallowing a Claim, or determining how a Claim should be classified. The Receiver may also divide a Claim, treating a part of the Claim as an Allowed Claim, and treating the balance as either a Disallowed Claim or reserving a determination with respect to the balance of the Claim.  In determining the amount of an Allowed Claim, the Receiver may consolidate multiple Claims of a Claimant.

Section 2.04: **Further Determination.**  The Receiver has computed for each Claim the amount of Allowed Claim and Withdrawals.

Section 2.05: **Late or Defective Claims.**  The Receiver has no obligation to consider any Late Claim or Defective Claim, but may, in his sole discretion, consider and approve Late Claims or Defective Claims in due course to the extent that consideration of such Claims does not cause unreasonably delay if in the Receiver's opinion, good cause existed for the tardiness or defectiveness of the Late Claim or Defective Claim.

Section 2.06: **Notice of Claim Determination and Hearing Notice.**

The Receiver has prepared the attached Exhibit 1, Schedule B indicating the Receiver's recommendation how each Claim should be paid. The Receiver has emailed and/or mailed, to all Claimants, the present Motion. The Plan of Distribution attached to this Motion represents the Receiver's final determination

with respect to each Claim, and his proposal relating to the distribution to each Claimant.  The Receiver has posted Exhibit 1, Schedule B on his website which includes for each Claim: (i) the Claim Number assigned; (ii) the amount of any Allowed Claim; (iii) the total of any Withdrawals associated with the Claim; and (iv) the proposed distribution amount with respect to any such Claim.  The Receiver will provide notice to those Claimants known to the Receiver by separate mailing or emailing, and by posting on the Receiver's Website, of the hearing date upon which the Court will rule on the Receiver's Claim determinations and Plan of Distribution and hear any Objections.

Section 2.07: **Objection by Claimants.** Any Claimant who is dissatisfied with the Receiver's Claim Determination and/or this Plan of Distribution may file an Objection with the Court. Objections must be filed in writing by the Claimant with the Clerk of the District Court, United States District Court for the Northern District of Georgia, Atlanta Division, Richard B. Russell Federal Building and Courthouse, 75 Ted Turner Drive, Room 2211, Atlanta, GA 30303-3309. Claimant must also send a copy of the Objection to the Receiver's office at 2987 Clairmont Road, Suite 200, Atlanta, GA 30329. Objections must be received by the Court and the Receiver no later than ten (10) business days prior to the hearing date set by the Court. At a minimum, any Objection must contain the following:

(1) A caption setting forth the name of the Court, the names of the plaintiff and defendants, and the case number as noted above;

(2) The name of Claimant, Claim Number, and a description of the basis for the amount of the Claim;

(3) A concise statement setting forth the reasons why the Claim should not be disallowed or modified as set forth in the Plan of Distribution and/or why another distribution method would be more equitable for all Claimants;

(4) All documentation or other evidence of the Claim upon which Claimant will rely in opposing the Claim determination and Plan of Distribution; and

(5) The address(es) to which the Receiver may send Claimant any reply to the Objection.

Claimant may, but is not required to, retain the services of an attorney to file any such Objection. If no Objection is received, the Court may enter an Order allowing or disallowing the Claims as set forth in the Plan of Distribution. Should a Claimant make an Objection to the Distribution Plan, Claimant must be present to defend the Claim on the hearing date set by the Court or the Court may enter the relief requested by the Receiver in the Plan of Distribution.

**Section 2.08: <u>Opportunity to be Heard.</u>** The Court shall hold a hearing, and at the conclusion of such hearing, shall make the final determination for each

34

Claim and Objection of the amount approved for payment and classification(s). An Objector shall have the burden of proof in such hearing. Those Claims approved by the Court shall thereafter be deemed Allowed Claims.

## ARTICLE III – PAYMENT OF CLAIMS

**Section 3.01: <u>Claims Distributions</u>.**   The Receiver is hereby expressly authorized to pay the Claims set forth in Exhibit 1, Schedule B using the Rising Tide method described above with funds from the Receivership Estate in the form of a check made payable to the Claimant and sent by reasonable means to the Claimant using the information listed on the Claim Form or as otherwise confirmed by the Claimant.

**Section 3.02: <u>Payment of Distributions</u>.**   The Receiver shall make the Distributions contemplated in Exhibit 1, Schedule B as soon as practicable, but no later than sixty (60) days after a final Order is entered by the Court approving the Plan of Distribution. Subsequent Distributions may be made, subject to the discretion of the Receiver, when material amounts are available to distribute and/or upon entry of an Order by the Court that resolves any Contested Claims. Such Distributions shall be made in accordance with the terms of this Plan, unless the Court orders otherwise. The Receiver may, at his discretion, make no further Distributions until such time as the Receiver determines that it is appropriate to

make a final Distribution and close the case pursuant to an Order of the Court.

**Section 3.03: <u>Final Distribution</u>.** At such time as all Receivership Assets have been fully administered, all Claims have been resolved by Final Order of the Court, and after approval of a final Receiver's Application for Compensation and Reimbursement of Expenses, if there are any remaining Receivership assets other than the Reserves set forth herein, the Receiver shall make a final Distribution pursuant to the terms of this Plan.

**Section 3.04: <u>Reserve Permitted But Not Required</u>.** The Receiver will make reasonable efforts to notify any and all Claimants pursuant to this Plan of Distribution. The Court expressly authorizes the Receiver to pay Claims according to the terms of this Plan without regard for the possibility that Claims may, with good cause, be presented late. The Court will consider any such Late Claims on a case-by-case basis, but will not expect the Receiver to have accrued Receivership Assets to guard against this possibility. The Receiver may reserve funds for such Claimants. To the extent that the Receiver does reserve funds, the Receiver shall so notify the Court and the SEC, and shall report to the Court and the SEC regarding the Receiver's plan for ultimate disposition of any unused reserved funds. In the event that any additional Claimants do come forward, the procedures herein regarding the Claims process shall apply as to those Claimants.

**Section 3.05: <u>Notice.</u>** By effecting notice of Claim determinations according to the terms of this Plan, the Receiver shall be deemed to have provided reasonable and sufficient notice to all Persons.

**Section 3.06: <u>Payment Effects Release.</u>** If a Claim is paid by the Receiver pursuant to this Plan, then any and all Claims, demands, rights, and causes of action of any nature whatsoever, whether arising at law or in equity, known or unknown, asserted or unasserted, for all damages (whether actual or punitive, known or unknown, latent or patent, foreseen or unforeseen, direct or indirect or consequential, matured or unmatured, and accrued or not accrued), debts, and liabilities of whatever nature that are or could be asserted by the Claimant or any other person against the Receiver or his agents, any defendant, or any Receivership Assets are hereby discharged, released, extinguished, and satisfied. Neither the Receiver nor any Person accepting Receivership Assets from the Receiver shall have any liability to any Person other than the Receiver to return any Receivership Assets used for payment or satisfaction of an Allowed Claim. Neither the Receiver nor any Person acting at his direction shall have any liability in any respect for having paid or otherwise satisfied an Allowed Claim, nor for any other action taken in good faith under or relating to this Plan or arising out of the processing of any Claim, including, but not limited to, any act or omission in connection with or

arising out of the administration of Claims or this Plan or the Receivership Estate

to be distributed hereby. In the event of any claim being made against the Receiver

for such matters, whether or not willful misconduct is alleged, the receiver shall be

entitled to a defense by counsel of his choice, payable as any other professional

expenses under the Receivership, and the provisions of the Order Appointing

Receiver shall apply.

Section 3.07: **Unclaimed Distributions.** Except as otherwise provided

herein, any Person who fails to claim any Distribution within ninety (90) days from

any payment date shall forfeit all rights thereto; subject, however, to any request or

recommendation made by the Receiver for additional time to locate any Person

who may be unaware of a Distribution award because such Person has not received

notice about this Claims process.

Section 3.08: **Disposition of Remaining Receivership Assets.** Should the

Receiver ultimately determine that there exists a surplus of Receivership Assets,

including any reserved funds, in excess of all Claims which have been reasonably

identified and Allowed, the Receiver shall so notify the Court and the SEC, and the

SEC and the Receiver shall seek the Court's approval for final disposition of the

remaining Receivership Assets; provided that the Receiver may distribute

remaining Assets in an amount insufficient to warrant a further distribution (but in

no case greater than $5,000) to the Fair Fund of the SEC.

## ARTICLE IV – PARALLEL AND RELATED PROCEEDINGS

**Section 4.01: <u>Claims of Other Creditors and Actions to Resolve Other Claims or Other Disputes Involving Receivership Property.</u>** To the extent that claims of third-parties are raised with respect to Receivership Assets in any other action or proceeding, "no action for equitable relief instituted by the Commission pursuant to the securities laws shall be consolidated or coordinated with other actions not brought by the Commission, even though such other actions may involve common questions of fact, unless such consolidation is consented to by the Commission." 15 U.S.C. §78u(g). Furthermore, there shall be no right of intervention by any Claimant in this action, unless consented to by the SEC.

**Section 4.02: <u>Interpleader – Receiver as Stakeholder.</u>** The Receiver is hereby expressly authorized to receive and to hold separate and apart from other Receivership Assets, any assets tendered voluntarily to the Receiver by any Person in the same fashion as would the Clerk of the Court in a case where assets are interpled or otherwise deposited into the registry of the Court and to refrain from commingling such assets with Receivership Assets otherwise available for distribution under this Plan. The Receiver is authorized to settle out of such assets any claims thereto. The Receiver is further authorized to apply to this Court for a

determination as to the ownership of any such assets and to join any parties necessary to effect such a determination.

## ARTICLE V – RETENTION OF JURISDICTION

**Section 5.01:** <u>**Exclusive Jurisdiction.**</u> This Court has had jurisdiction since September 18, 2012, and shall continue to retain exclusive jurisdiction over the Receiver, the Receivership, and all Receivership Assets. Accordingly, in determining whether a Claim or any portion thereof is an Allowed Claim, the Receiver may, but shall not be required to, consider (nor shall the Receiver be subject to) any judicial determination rendered by any court, tribunal, agency or authority whatsoever (other than this Court) as to any Receivership Assets from and after September 18, 2012, unless this Court directs otherwise. No action taken by or against the Receiver with regard to any pending matter in any other court shall be deemed to have terminated, limited, reduced, waived, or relinquished this Court's exclusive jurisdiction.

**Section 5.02:** <u>**Continuing Jurisdiction.**</u> This Plan and the Order approving this Plan are not, and are not intended to be, and therefore shall not be deemed to be, either a final adjudication of this matter or a termination, limitation, reduction, waiver, or relinquishment of this Court's exclusive jurisdiction with regard to all Receivership Assets and all matters in controversy in this case. This Court shall

continue to have and retain exclusive jurisdiction over all matters existing or arising in this Receivership or related in any way thereto, including, but not limited to, all matters relating to approving or denying Claims, making Distributions on Approved Claims, and locating, recovering and settling Claims, and liquidating Receivership Assets. Furthermore, this Court, upon the request of the Receiver or the SEC, or upon its own motion, may make further modifications to this Plan or the Order approving this Plan, including, but not limited to, modifications which may affect the Receiver's determination with respect to, or payment of, any particular Claim, or the amount of any particular Distribution.

## VIII.    Conclusion

The Receiver asks the Court to approve the above-described Plan of Distribution and to set a date to consider and hear any Objections to the Plan.   A proposed Order Setting Filing Deadlines and Hearing to Consider the Receiver's Proposed Plan of Distribution and Any Objections to that Proposed Plan is attached hereto as Exhibit 3. A proposed Order Approving the Receiver's Plan of Distribution is attached hereto as Exhibit 4.

Respectfully submitted this 8th day of June 2017.

/s/ Robert D. Terry
Robert D. Terry
Georgia Bar No. 702606

s/ Pratt Davis
Pratt H. Davis
Georgia Bar. No. 212335
Attorney for Receiver
Robert D. Terry

Parker MacIntyre
2987 Clairmont Road
Suite 200
Atlanta, GA 30329
(404) 490-4060 (phone)
(404) 490-4058 (facsimile)

## CERTIFICATE OF SERVICE

I certify that the foregoing was prepared with one of the font and point selections approved by the Court in LR 5.1B. I further certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notice of electronic filing to counsel of record.

The foregoing was also served on the Summit Claimants who provided Receiver Confirmed Electronic Mail Information (as defined in the proposed Plan), by electronic mail to the electronic mail address confirmed by each Claimant, and by first class mail to all Claimants for whom the Receiver did not receive Receiver Confirmed Electronic Mail Information. The Receiver is maintaining proof of mailing.

This 8th day of June, 2017.

/s/ Robert D. Terry
Robert D. Terry
Receiver

Parker MacIntyre
2987 Clairmont Road
Suite 200
Atlanta, GA 30329
(404) 490-4060 (telephone)
(404) 490-4058 (facsimile)