# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>v.<br><br>ANGELO A. ALLECA, SUMMIT WEALTH MANAGEMENT, INC., SUMMIT INVESTMENT FUND, LP, ASSET CLASS DIVERSIFICATION FUND, LP, and PRIVATE CREDIT OPPORTUNITIES FUND, LLC,<br><br>    Defendants. | 1:12-cv-3261-WSD |

## OPINION AND ORDER

This matter is before the Court on The Meyers Group, Inc.'s ("TMG") Motion for Court Conference [132] and Receiver Robert D. Terry's (the "Receiver") Motion to Modify the Distribution Plan [133].

## I.  BACKGROUND

### A.  The Appointment of the Receiver

On September 18, 2012, the SEC filed its Complaint [1], asserting securities fraud claims against Defendants Angelo A. Alleca ("Alleca"), Summit Wealth Management, Inc ("SWM"), Summit Investment Fund, LP ("SIF"), Asset Class

Diversification Fund, LP ("ACDF") and Private Credit Opportunities Fund, LLC ("PCOF" and together with SIF and ACDF, the "Summit Funds"). The next day, the Court froze Defendants' assets and enjoined Defendants from violating the securities laws. ([7]). On September 21, 2012, the Court appointed Robert D. Terry as receiver for the estate of SWM and the Summit Funds (the "Receivership Entities.") ([9] at 2).

B.   The Receiver's Distribution Plan

On June 6, 2017, the Receiver filed his original plan of distribution ([120], as amended [125], the "Original Plan"), proposing to distribute the receivership assets pursuant to the "rising tide" methodology. Under this allocation method:

> [T]he Receiver will deduct the amount of a Claimant's pre-receivership withdrawals *after* calculating the investor's pro rata share of any distribution. If the result is negative—meaning that the Claimant has already received pre-receivership withdrawals in excess of his or her calculated pro rata share of a distribution—that Claimant will not participate in that distribution, although he or she may participate in later distributions. This method preserves assets for those Claimants who have received nothing thus far and recognizes that some Claimants have already recovered a substantial percentage of their investment.

([120] at 18); see Commodity Futures Trading Comm'n v. Equity Fin. Grp., Inc., No. 04-cv-1512, 2005 WL 2143975, at *24 (D.N.J. Sept. 2, 2005) (discussing the rising tide methodology). "If approved, after taking into account any money received by investors prior to the Receivership, this distribution [plan] will

2

represent a minimum recovery percentage among included Claimants of [14.5%]."
([120] at 14; [125] at 3; [125.1] at 1). On July 17, 2017, the Receiver filed minor amendments to his Original Plan. ([125]).

As of the filing of the Receiver's motion to approve the Original Plan, the receivership had approximately $1,811,065 in cash, of which the Receiver sought to distribute $1,394,736.25 to the claimants. ([120] at 14; [129] at 3). The Receiver further sought to retain the remaining $416,328.75 "for the purposes of paying accrued but unpaid expenses of the receivership (including the expenses of the Receiver, his counsel and his accountants), to cover the cost of disposing of Receivership Assets, terminating the Receivership, and other administrative costs." ([120] at 14; [129] at 3).

  C. <u>The September 19, 2017, Hearing</u>

On September 19, 2017, the Court held a hearing on the Receiver's Original Plan, his Motion for Special Distribution, and Alexandria Capital's Objection to the Original Plan. Only the Receiver and his counsel attended the hearing. The Receiver told the Court that his proposed Original Plan should be modified (the "Modified Plan") to ensure that claimants are treated consistently. (Plan of Distribution Hearing Transcript (Sept. 19, 2017) ("Tr.") at 3). Specifically, the Receiver sought to cancel his proposed distributions to TMG and the Bank of

North Georgia ("BNG").[1]

The Original Plan proposed distributing $123,829.67 to TMG and $28,722.08 to BNG. ([125.1] at 6). Both claims are based on promissory notes under which Defendants agreed to pay the TMG and BNG a certain sum of money. (Tr. at 3). Before the Receiver was appointed, Defendants paid some, but not all, of the money owed to TMG and BNG under the promissory notes. The Original Plan reduces the value of TMG's and BNG's "allowed claims"—that is, the amount from which they are entitled to a 14.5% recovery—by the amount of the partial payments they previously received. ([125.1] at 6). The Receiver argued at the hearing that, to conform to his treatment of other claimants, the partial payments should be deemed "pre-receivership withdrawals" rather than amounts by which the "allowed claims" are reduced. The Receiver stated that, if the partial payments constitute pre-receivership withdrawals, TMG and BNG are not entitled to any distributions because they previously received more than 14.5% of the value of their promissory notes. (Tr. at 3-4, 7-8, 10). The Receiver asked the Court to approve the Original Plan except for the proposed distributions to TMG and BNG.

The Receiver provided further information about TMG to illustrate the basis

---

[1] Claimant 485 is the Bank of North Georgia. (Tr. at 8). The Receiver has not disclosed the identity of Claimant 470 but it appears to be The Meyers Group, Inc. (See [120] at 25; Tr. at 7 (referring to Claimant 470 generally as an "entity")).

of his request.  He stated that, in 2010, TMG sold several brokerage accounts to Defendants for $1,221,582.  Defendants agreed to pay this purchase price in three installments of $407,194.  Defendants made the first payment but defaulted on the remaining payments required under the promissory note.  The Original Plan reduces TMG's $1,221,582 claim by $407,194, the amount of the payment that TMG previously received from Defendants.  This produces an allowed claim of $814,338, from which the Original Plan proposed to distribute at least $118,086, or 14.5%, to TMG.  (See [120] at 25; [125]).  The Receiver argued at the hearing that the allowed claim should be the full price of the promissory note, $1,221,582, and that the $407,194 payment previously received by TMG should be deemed a pre-receivership withdrawal.  Because that prior payment ($407,194) exceeds 14.5% of the allowed claim ($1,221,582), the Receiver argued that TMG is not entitled to receive a distribution.

D. <u>The September 21, 2017, Order</u>

On September 21, 2017, the Court issued an order [131] (the "September 21 Order") granting the Receiver's Motion to Approve Plan of Distribution but ordering the Receiver to withhold distributions to TMG and BNG.  The Court further ordered that the Receiver file a formal motion to modify the Original Plan in order to allow TMG and BNG sufficient notice and opportunity to be heard.

5

The Court admonished that if TMG or BNG failed to respond by October 26, 2017, the Court may determine not to make a distribution to them.[2]

   E.   The Motions

On October 4, 2017, TMG filed its Motion for a Court Conference. ([132]). TMG seeks a Rule 1 conference to request (1) a stay of the September 21 Order to allow TMG more time to object to the Modified Plan; (2) discovery prior to objecting to the Modified Plan; (3) leave of court to file an action against the Receiver for breach of fiduciary duty; and (4) a court-ordered settlement conference.

On October 5, 2017, the Receiver filed his motion to modify the Original Plan. ([137]). In seeking Court approval for its Modified Plan, the Receiver repeated his position that a more equitable approach to TMG's and BNG's distributions would be to calculate their allowed claims as the amount of their original notes, as opposed to their original notes minus payments received prior to the appointment of the Receiver. Both BNG and TMG would be entitled to a distribution of zero because both claimants have received an amount of pre-

---

[2] As of that date, BNG had not filed an Objection to the Modified Plan. The modification as to BNG's claim is approved.

receivership payments in excess of the rising tide percentage (14.5%) of the allowed claim.

Both motions were briefed simultaneously.

**II.    DISCUSSION**

   A.    <u>Legal Standard</u>

"In equity receiverships resulting from SEC enforcement actions, district courts have very broad powers and wide discretion to fashion remedies and determine to whom and how the assets of the Receivership Estate will be distributed." <u>SEC v. Homeland Commc'ns Corp.</u>, No. 07-cv-80802, 2010 WL 2035326, at *2 (S.D. Fla. May 24, 2010); <u>see</u> <u>SEC v. Elliot</u>, 953 F.2d 1560, 1566 (11th Cir. 1992) ("The district court has broad powers and wide discretion to determine relief in an equity receivership. This discretion derives from the inherent powers of an equity court to fashion relief.") (citations omitted); <u>see also</u> <u>Bendall v. Lancer Mgmt. Grp., LLC</u>, 523 F. App'x 554, 557 (11th Cir. 2013) ("Any action by a trial court in supervising an equity receivership is committed to his sound discretion and will not be disturbed unless there is a clear showing of abuse.") (citation and internal quotation marks omitted). "A distribution plan that is supported by both the SEC and the receiver is entitled to deference from the Court." <u>SEC v. Quan</u>, No. 11-cv-723, 2015 WL 8328050, at *6 (D. Minn.

Dec. 8, 2015), aff'd sub nom. SEC v. Quan, ___ F.3d ___, 2017 WL 3722453 (8th Cir. Aug. 30, 2017); see SEC v. Byers, 637 F. Supp. 2d 166, 175 (S.D.N.Y. 2009) (giving deference to a distribution plan proposed by the receiver and supported by the SEC).

"[N]o specific distribution scheme is mandated so long as the distribution is fair and equitable." Homeland, 2010 WL 2035326, at *2. "[W]hen victims seeking restitution occupy similar positions, a pro rata distribution is preferred." SEC v. Drucker, 318 F. Supp. 2d 1205, 1206 (N.D. Ga. 2004). "Thus, where a victim seeking preferential treatment cannot materially distinguish his situation from that of other victims, a pro rata distribution is recognized as the most equitable solution." Id. at 1207. "A 'rising tide' allocation, which the . . . Receiver proposes here, results in a pro rata distribution of available assets to victims." SEC v. Detroit Mem'l Partners, LLC, No. 1:13-cv-1817, 2016 WL 6595942, at *5 (N.D. Ga. Nov. 8, 2016); see SEC v. Par., No. 2:07-cv-00919, 2010 WL 5394736, at *3 (D.S.C. Feb. 10, 2010) (discussing "pro-rata payments based on the Rising Tide calculation").

    B.    <u>Analysis</u>

        1.    <u>TMG's Motion for a Conference</u>

TMG moves the Court for a "Rule 1 conference" to discuss several requests

that TMG would like heard prior to this Court's approval of the Modified Plan, including a stay of the September 21 Order, discovery into the Receiver's processes, leave of court to bring a negligence action against the Receiver, and a court-ordered settlement conference. This Court's standing order states that "[s]cheduling, discovery, pre-trial and settlement conferences are efficient ways to structure the processing of a case. The Court encourages the parties to request them when counsel believes the conference will promote the goals of Rule 1 of the Federal Rules of Civil Procedure." (Standing Instructions Regarding Civil Litigation, at 3). The goals of Rule 1 are "to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.

The Court finds that a conference will not further the goals of Rule 1 but instead will prolong the administration of the receivership. Formal motion practice is adequate to address the arguments TMG raises in its Motion for Court Conference.

First, TMG argues that the Court should use its inherent power to stay the September 21 Order because its ability to object to the Plan "has been removed." ([132] at 3). But the Court expressly provided TMG with an opportunity to object to the Modified Plan. At the September 19th Plan of Distribution Hearing, the Receiver moved for the modification orally, but the Court stated that TMG and

9

BNG needed proper notice and an opportunity to be heard. The Court instructed the Receiver to file a formal motion to modify his plan as to TMG and BNG, and provided a briefing schedule for TMG and BNG, should they wish to object to the modifications. Further, the Court ordered the Receiver to ensure that TMG and BNG receive a copy of the September 21st Order and a copy of the Receiver's motion to modify the Distribution. The Court made clear that it would approve the plan as to all claimants other than TMG and BNG.

In considering staying the September 21 Order, the Court considers the prejudice to claimants other than TMG. The Court noted in its September 21 Order that its partial approval of the Original Plan allowed claimants other than the TMG and BNG to receive distributions without further delay. The other claimants have waited over five years to recover for their losses related to the underlying Alleca Ponzi scheme. It would be unfair to further delay the recovery of these victims in order to hear TMG's objection. Furthermore, as the SEC points out, "The Receivership will have assets exceeding the value of the recovery that TMG seeks if the Court determines its objections to the Receiver's recently proposed amendment to the distribution plan to be meritorious, especially where the Receivership will have retained assets exceeding the recovery that TMG seeks." ([134] at 2).

TMG also seeks discovery to aid its response to the Receiver's Motion to Modify the Distribution. ([132]). Specifically, TMG seeks discovery into the factual allegations made in the Receiver's original motion to approve its plan of distribution and the current Motion to Modify. TMG states that "[h]ad the Receiver sought to exclude TMG back in June . . . . TMG would have sought discovery from the Receiver on how it calculated the 'pre-receivership withdrawals' and why 2 of nearly 20 'trade creditors' should be treated differently." ([132] at 3-4).

TMG links its purported need for discovery to the absence of affidavits supporting the Receiver's Modified Plan as purportedly required by Local Rule 7.1.A(1), which provides: "If allegations of fact are relied upon, supporting affidavits must be attached to the memorandum of law." The parties dispute the scope and applicability of the Local Rules and whether TMG is a "party" to this action in the traditional sense, thus warranting strict adherence to this Court's Standing Order and the Local Rules. As the Receiver correctly points out, the Local Rules further hold that a court, "in its discretion, may" decline to consider a motion that fails to conform to those rules. Further, as a general principle, "a district court has extremely broad discretion in supervising an equity receivership and in determining the appropriate procedures to be used in its administration."

11

FDIC v. Bernstein, 786 F.Supp. 170, 177-78 (E.D.N.Y. 1992). In the exercise of that discretion, this Court finds that TMG has not stated a sufficient basis to warrant the expense and delay attendant to discovery into the Receiver's work administering the Receivership.

Next, TMG seeks leave of court to file a breach of fiduciary duty action against the Receiver. TMG claims that at the time that it reviewed the Original Plan, it "decided not to bring a negligence action against the Receiver for its incompetence in administering the estate." ([132] ¶ 5). Thus, TMG admits that it had considered bringing suit earlier in the administration of the receivership, but only now raises the issue because it does not like the outcome of the process. Any dispute about the Receiver's administration of the receivership could have been raised at any time. TMG has not set forth a sufficient factual basis for obtaining leave of Court to sue the Receiver for his handling of TMG's claims. Further, TMG's allegations related to the Receiver's sale of the pieces of the Summit business have been previously addressed by the Court. (See [85] at 3). TMG's request for leave to file suit against the Receiver is denied.

Finally, TMG requests that the Court order the Receiver and TMG to engage in a settlement conference. The Court denies this request. TMG is free to contact the Receiver and initiate settlement discussions on its own without court

involvement.

2. The Receiver's Motion to Modify

Under the Modified Plan, the Receiver proposes to calculate TMG's distribution using what the Receiver feels is a more appropriate and equitable measure of TMG's "allowed claim." The Receiver seeks to revise TMG's allowed claim to the amount of the promissory note, $1,221,583, as opposed to $855,107.40 under the original plan, (which consisted of the $814,388 principal balance remaining, plus fees, after one payment). The result of this change is that after subtracting TMG's pre-receivership payment, it would be awarded a distribution of zero because TMG has received an amount of pre-receivership payments in excess of the rising tide percentage (14.5%) of the allowed claim.

TMG objects to this modification. The substance of TMG's objection is the notion that the Receiver "failed to meet its burden" to explain why the SWF estate should be combined with that of the Summit Funds. ([137] at 2-3). It argues that claimants of SMW should be segregated from those of the Summit Funds because SWF's operations were sufficiently separate from the Summit Funds. In other words, TMG claims that the assets of the receivership should be divided into distinct pools, and that assets belonging to or recovered on behalf of SWF should only be used to pay creditors of SWF, while claimants who were investors in the

13

Summit Funds should only be able to recover assets distinctly belonging to each fund. According to TMG, because the pre-receivership payment TMG received on its promissory note was from SWM and not the Summit Funds, it was not a "fruit of the Ponzi scheme." TMG asserts that the purpose of excluding pre-receivership payments is to decrease payments to those that invested voluntarily in the Summit Funds, not trade creditors. TMG also objects that it is improper for the Receiver to group trade creditors with Ponzi scheme victims.

TMG has not sufficiently articulated why, as a trade creditor, it should receive preferential treatment over investor claimants. Indeed, its brief does not cite any authority to support its argument that the Receivership should be divided into distinct pools. Pooling was proper here, especially given that the claims against the Summit Funds are intertwined with the liability of SWF. Here, the Receiver has established that pooling all the funds is the most fair and equitable means of administering the Receivership. See, e.g., SEC v. Founding Partners Capital Management, 2014 WL 2993780, *6 (M.D Fla. 2009) (courts may authorize the treatment of various receivership entities as one substantively pooled estate for the purpose of distribution, upon good cause shown), citing SEC v. One Equity Corp., 2:08–CV–667, 2011 WL 1002702, *1 (S.D. Ohio Mar.16, 2011) (permitting pooling of six receivership entities upon good cause shown).

## III. CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that The Meyers Group, Inc.'s Motion for Court Conference [132] is **DENIED**.

**IT IS FURTHER ORDERED** that the Receiver's Motion to Modify Distribution [133] is **GRANTED**.

**SO ORDERED** this 16th day of November, 2017.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE