IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

SECURITIES AND EXCHANGE          :
COMMISSION,                      :
                                 :
          Plaintiff,             :
                                 :     Civil Action No.
          v.                     :     1:12-CV-3261-WSD
                                 :
ANGELO A. ALLECA, SUMMIT         :
WEALTH MANAGEMENT, INC.,         :
SUMMIT INVESTMENT FUND, LP,      :
ASSET CLASS DIVERSIFICATION      :
FUND, LP, and PRIVATE CREDIT     :
OPPORTUNITIES FUND, LLC          :
                                 :
          Defendants.            :
_____:

## RECEIVER'S SECOND INTERIM APPLICATION FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES

1.     Robert D. Terry, the Receiver for Summit Wealth Management, Inc.

("Summit"), Summit Investment Fund, LP, Asset Diversification Fund, LP and

Private Credit Opportunities Fund LP (the latter three entities collectively referred

to herein as "the Funds"), files this Second Interim Application For Compensation

and Reimbursement of Expenses ("Application"), seeking the Court's approval to

pay the Receiver's professional fees, professional fees of Receiver's counsel and

other staff, and expenses for the five-year period commencing January 1, 2013 and

ending December 31, 2017 (the "Current Application Period").  The format of the

present Application conforms to the SEC's "Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission." The Receiver's counsel submitted a complete copy of this Application to the SEC for its review and has been advised that the SEC has no objection. The Standardized Fund Accounting Report for the receivership is attached hereto as **Exhibit A**.

<u>**INFORMATION ABOUT THE**</u>
<u>**APPLICANT AND THE APPLICATION**</u>
*Billing Instructions § C(1)(a) through (d)*

2.      ***Date the Receiver was Appointed.***  September 21, 2012.

3.      ***Date of the Order Approving Employment of the Applicant.***  The September 21, 2012 Order permitted the Receiver to engage professionals subject only to approval by the Court of any payment of such professionals.  The Receiver engaged the law firm of Page Perry, LLC on September 21, 2012.  On October 16, 2012, the Receiver engaged the Wilmington, Delaware law firm of Berger Harris to defend a litigation matter filed against Summit in the Delaware Court of Chancery. Upon the cessation of business of Page Perry, LLC on November 30, 2013 (due to the death of one of its members), the Receiver engaged Parker MacIntyre, a law firm formed by one of the surviving members of Page Perry. Parker MacIntyre's attorneys had significant involvement with the matter while at Page Perry. The Receiver has utilized the services of Patricia C. Gordon, a Certified

Public Accountant and Staff Accountant to first Page Perry and then Parker MacIntyre, to provide accounting services throughout the period of the receivership.

4.     ***Date Services Commenced and Names and Hourly Rates of All of Applicant's Professionals and Paraprofessionals.*** Page Perry's services commenced on September 21, 2012 and ended on November 30, 2013. Parker MacIntyre's services commenced on December 1, 2013 and continue through the present. Berger Harris's services began on October 16, 2012 and continue through the present. The names and hourly rates of all professionals and paraprofessionals are shown on the Fee Schedule attached hereto as **Exhibit B**.

5.     ***Whether the Application is Interim or Final, and the Dates of Previous Orders on Interim Applications Along with Amounts Requested and the Amounts Allowed or Disallowed, All Amounts of Previous Payments, and Amount of Any Allowed Applications Which Remain Unpaid.*** This is the Second Interim Application for fees and expenses filed by the Receiver, the first such application having been submitted on March 19, 2013 for the period between September 21, 2012 and December 31, 2012 [Doc. No. 48]. The first application was granted by Order dated November 20, 2013 [Doc. No. 85], in which the Court authorized payment to the Receiver of $199,924.50 in professional fees and $8,908.94 in

reasonable expenses, the full amounts requested. All approved fees through December 31, 2012 have been paid to the appropriate service providers.

### CASE STATUS (NARRATIVE)
*Billing Instructions § C(2)(a) through (e)*

6.       ***Amount of Cash on Hand; Amount and Nature of Accrued Expenses; Amount of Unencumbered Funds in the Estate.***  As reflected in the Standardized Fund Accounting Report ("SFAR") attached hereto as **Exhibit A**, the total cash balance of the Receivership at the close of the Current Application Period was $1,813,390.70. Of this amount, a total of $18,692.52 constitutes funds as to which Synovus Bank d/b/a Bank of North Georgia ("BNG") has asserted a lien [Doc. No. 13 and Doc. No. 150]. The Receiver has moved to release said funds to BNG in exchange for a full release of claims. [Doc. No. 150]. There are no accrued, unpaid expenses other than the fees and expenses sought to be paid under this Application. Those fees and expenses are detailed in paragraph 19 below.

7.       ***Summary of the Administration of the Case, Including All Funds Received and Disbursed, and When the Case Is Expected to Close.***

8.       ***Expected Closure Date.*** The Receiver has substantially completed the process of collecting assets. There remain two potential "recoveries" of funds. The first is a recovery against Alexandria Capital, LLC ("Alexandria") which is the subject of a pending civil action before this Court, <u>Robert D. Terry v. Alexandria</u>

4

Capital, LLC, 1:17-CV-03678 (the "Alexandria Case"). The parties to the Alexandria Case have entered into a settlement agreement, subject to Court approval, which approval was requested by Motion filed in the present case on November 20, 2017 [Doc. No. 146]. If approved, the settlement will bring $77,000 into the Receivership Estate. However, the settlement agreement contains a claims bar procedure, which will require notice and hearing, and therefore may take until late 2018 to complete, if approved. The second recovery relates to a life insurance policy with a face amount of $250,000. The Receiver believes that he may be able to secure value for the policy beyond its cash surrender value by July 31, 2018. The Receiver cannot yet estimate the value to the Estate of such a transaction.

9. The Court approved an interim plan of distribution by Order dated September 21, 2017 [Doc. No. 131]. That Order approved distributions to claimants of $1,242,184.50.[1] Additionally, the Court approved a modification to the Receiver's Proposed Plan of Distribution by Order dated November 16, 2017 [Doc. No. 144]. The Receiver has made these interim distributions in the total amount of

---

[1] This amount consists of the amount the Receiver originally sought to distribute ($1,360,000) less the amounts originally proposed to be distributed to Claimants 470 ($123,829.67) and 485 ($28,722.08), plus a special distribution of $34,736.25. The amounts subtracted with respect to Claimants 470 and 485 were the subjects of a Motion to Modify Distribution [Doc. No. 133], which motion was granted by Order of November 16, 2017 [Doc. No. 144].

$1,242,184.50.

10.     The Receiver anticipates incurring modest expenses after the date of this Application, mostly relating to administering the Estate and supervising the distribution process. If this Application is granted in the full amount, approximately $225,000.00 would remain in the Estate. The Receiver believes that before December 31, 2018, the remaining additional assets and recoveries can be collected, the Estate can be wound up, a final distribution can be made to claimants, and the case can be closed.

11.     ***Work Performed During Prior Periods.***  As noted in number 5 above, this is the second application for compensation submitted by the Receiver in this case. The first application was submitted and approved for the period between September 21, 2012 and December 31, 2012. Approximately one-half of the work performed by the Receiver and his retained professionals during 2012 related to the operation of the ongoing investment advisory business of Summit Wealth Management, Inc. ("Summit"), a firm with over 500 clients totaling $400 million in assets. The other approximately one-half of the Receiver's and his staff's time during 2012 were related to tasks that increased the assets of the Receivership Estate, including the sale of Summit's branch offices, or were related to other expenses of administering the estate, such as discovery, defense of lawsuits asserted

against Summit, and fundamental accounting work in anticipation of ultimate distributions.

12.   ***Work Performed During Current Application Period.***  By contrast, nearly all of the work performed by the Receiver and his staff during the Current Application Period has been focused on identifying potential sources of recovery by the Receiver, increasing the Receivership Estate by recovering funds from those sources, establishing a claims process, and developing a plan of distribution to claimants against the Receivership Estate. The Receiver has deferred submitting any applications during the Current Application Period in order to allow for a more complete evaluation by the Court of the value of the services of the Receiver and other professionals considering the benefits achieved for the Receivership Estate and ultimately for creditors. See Norman v. Housing Authority of City of Montgomery, 836 F.2d 1292 (11th Cir. 1988)(adopting factors for determining reasonable compensation listed in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974), including factor of "results obtained"). The Receiver believes that delaying the request for payment was warranted in light of the Court's stated concern in its November 20, 2013 Order regarding "whether the services expended will produce a meaningful final, overall recovery." [Doc. No. 85, p. 5].

13.   As reflected on **Exhibit A**, the Receiver has recovered $2,458,020.37

in total funds for the benefit of the Estate during the Current Application Period. Fees of the Receiver and his staff and professionals sought by the current Application are $337,926.50. Expenses of the Receivership advanced and sought to be reimbursed during the Current Application Period equal $6,648.33. If this Application were to be granted, the amount of total Receiver's and attorneys' fees and expenses, including those from the previous period, would represent approximately 23% of the recovered revenue and assets during the Current Application Period.

14.     The present Application and Brief contains a detailed analysis of the amounts sought to be approved for payment and the explanations of such amounts. The Receiver respectfully suggests that these amounts are reasonable based on all customary factors, including the result obtained for the benefit of creditors, for the reasons more fully addressed in paragraphs 59 through 71 below.

15.     ***Summary of Creditor Claims Proceedings. Description of Assets in the Receivership Estate, Including Approximate or Actual Valuations, Anticipated or Proposed Dispositions, and Reasons for Retaining Assets Where No Disposition is Intended.***  The assets at the close of the Current Application Period comprise the cash balance of $1,813,390.70 plus the value of unliquidated assets. The only unliquidated assets are (a) the claim for damages against Alexandria

Capital, LLC as asserted in the Alexandria Case; and (b) the life insurance policy with a face amount of $250,000. As described in section 7(a) above, a motion to approve settlement of the Alexandria Capital in the amount of $77,000 is pending, and the Receiver anticipates disposing of the insurance policy in exchange for value on or before July 31, 2018.

16. ***Descriptions of Liquidated and Unliquidated Claims Held by the Receiver.*** Other than as described in 8 above, the Receiver is not aware of any additional liquidated or unliquidated claims of material value that have not already been pursued.

## CURRENT AND PREVIOUS BILLINGS
*Billing Instructions § C(3)(a) through (c)*

17. ***Total Compensation and Expenses Requested.*** The Receiver and his team recorded detailed descriptions of time spent on this matter. To arrive at the amounts requested, all time determined to be reasonably necessary or beneficial to the Estate was multiplied by the respective hourly rates of the professionals, all of which have been discounted from their typical rates to benefit investors. The Receiver and his staff deleted certain time from time records and are not requesting compensation for the value of time attributable to or resulting from such deleted time. The time and amounts excluded from this Application are as follows:

| Description | Dates | Time | Amount | Reason for Deletion |
|---|---|---|---|---|
| Work regarding revision of proposed order regarding Federal Settlement | 6/22/2015 through 7/2/2015 | 12.7 | $3596.50 | Court deemed counsel's work unsatisfactory |
| Work regarding modifying plan of distribution and responding to motions filed by trade creditor relating to said modification | 9/21/2017 through 12/31/2017 | 53.8 | $11,967.50 | Modification by Receiver of proposed allowed claim may have caused need for these additional tasks.[2] |
| Total Excluded from Application | | 66.9 | $15,564.00 | |

18.     By this Application, the Receiver asks the Court to approve payment of total professional fees of $337,926.50, consisting of fees of the Receiver and his counsel summarized on **Exhibit C-1** and detailed on **Exhibits C-2** (Page Perry), **C-3** (Parker MacIntyre) and **C-4** (Berger Harris). Attorneys' fees detailed on **Exhibits C-2** and **C-3** are organized by subject consistent with the "Activity Categories" listed in § D(5)(a) of the Billing Instructions, and are arranged chronologically within

---

[2] The trade creditor whose objections led to this additional work has indicated in its filings that it would have filed objections to the original proposed plan of distribution if it had contained the same proposed distribution as ultimately contained in the revised proposed plan. The Receiver is nevertheless excluding this time and these amounts anyway to eliminate the need to resolve that question.

those categories. The total fees attributable to each category, the average hourly fees per category, and the average overall hourly fees for all three law firms are reflected on **Exhibit C-5**. This same information is presented by separate firms on Exhibits **C-6** (Page Perry), **C-7** (Parker MacIntyre), and **C-8** (Berger Harris). The two largest categories of attorneys' fees – Asset Analysis/Recovery and Claims Administration – are further broken down by project on **Exhibit C-9 and C-10**, respectively. In the aggregate for the Current Application Period the Receiver and his staff devoted 1,795.9 hours to the case, yielding a total effective (average) hourly rate for the Current Application Period of $188.16. (See **Exhibit C-5**).

19.     By this Application the Receiver also seeks to recover expenses incurred in the amounts summarized on **Exhibit D-1 a**nd detailed on **Exhibits D-2** (Page Perry); **D-3** (Parker MacIntyre) and **D-4** (Berger Harris).

20.     ***Any amount(s) previously requested, and total compensation and expenses previously awarded by the Court.*** See paragraph 5 above.

21.     ***Total hours billed and total amount of billing for each person who billed time during the period for which fees are requested.*** See Billing Summary for Professionals and Paraprofessionals, attached hereto as **Exhibit C-1**.

## STANDARDIZED FUND ACCOUNTING REPORT
### *Billing Instructions § C(4)*

22.     Attached as **Exhibit A** is a Standardized Fund Accounting Report

("SFAR") for the Current Application Period.

## PRESENTATION OF FEES AND EXPENSES
### *Billing Instructions § D(1) et seq.*

23.    <u>See</u> paragraph 21 above and **Exhibits C-1** through **C-10 and D-1** through **D-4.**

24.    Attached as **Exhibit E** is the Receiver's Certification of the information contained in this Application.

25.    Attached as **Exhibit F** is a proposed Order Granting Receiver's Second Interim Application for Compensation and Reimbursement of Expenses.

## DESCRIPTION OF WORK, ITS NECESSITY AND BENEFIT TO THE ESTATE, AND THE REASONABLENESS OF FEES AND EXPENSES
### *Billing Instructions § D*

26.    The fees and expenses requested herein were incurred in the best interests of the Receivership Estate. The following is a detailed description of the services rendered and fees sought for the Current Application Period, and how they related to services rendered during prior periods.

27.    ***Receivership Activities During 2012.*** During the first three and one-half months following the entry of the Receivership Order (the period covered by the Receiver's initial fee application) the Receiver and several members of his team began their work by taking physical possession of the Atlanta office of Summit (the principal office of the firm and the location of all business and accounting records),

meeting with employees and assessing the state of the business and the records. The team interviewed employees and reviewed business records to learn both about the business of Summit and the events and transactions that formed the basis for the SEC action.

28.     The Receiver's initial investigation and analysis indicated that Summit operated as both a registered investment adviser whose operations were relatively transparent to its employees, and which were ostensibly compliant with applicable regulations, and as a sponsor and manager of the investment Funds. As of September 21, 2012 Summit operated from three offices in which advisory operations were conducted – Atlanta, San Antonio, TX and Beverly Hills, CA. In addition to having registered advisors, the Atlanta office also housed most of the firm's administrative staff, and shares space with an accounting firm from whom Summit purchased advisory accounts in 2008. The Funds were largely sold to Summit clients with the knowledge of Summit employees and were managed by Alleca personally and largely away from Summit's offices.

29.     During 2012, in addition to operating Summit until it could be wound down, the Receiver successfully sold certain portions of Summit's business by transferring to new advisory firms the client relationships that were serviced by certain financial advisors who had been Summit employees. The value of these

relationships were significantly damaged by Alleca's operation of the Ponzi scheme and Summit's association with that scheme. Nevertheless, certain financial advisors successfully migrated their book of business to a new advisor, and the Receivership in turn received significant consideration for the sale of those relationships. These transactions served the equally important purposes of (a) providing continuity of investment management for the Summit clients, whose advisors were not aware of and did not participate in Alleca's scheme; and (b) providing continued employment for those managers.

30.    In addition to operating and ultimately selling portions of Summit's business, the Receiver also began the process of identifying the nature and extent of Alleca's fraud, including identifying the names of potential claimants against the Estate and the amounts they had invested in the Funds. The Receiver engaged in significant discovery during this time, mostly in the form of subpoenas issued to financial institutions such as banks where Summit accounts were held, or to the brokerage firms that purported to track the value of the Funds as held in Summit client accounts. The Receiver also began preliminarily to evaluate potential legal claims that could be brought to recover assets for the Receivership Estate.

31.    Also during 2012 the Receiver sought to acquire information regarding another investment touted by Alleca to many Summit clients, known as Detroit

Memorial Partners ("DMP"). It was unclear what role Alleca played, if any, in the management of DMP, but it was clear that he had been promoting and recommending the investment.

32.     During 2012 the Receiver also identified and valued certain real estate that was owned by Alleca. This consisted of a residence in Duluth, Georgia and another residential property in Buffalo, New York that Alleca used as an office. The Receiver arranged for the Buffalo house to be sold and the net proceeds to be turned over to the Receivership Estate.

33.     During 2012 the Receiver also identified several obligations owing to Summit in the form of promissory notes and also identified potential insurance policies from which assets could potentially be recovered, including an errors and omissions insurance policy issued by Federal Insurance Company.

34.     During 2012 the Receiver also was required to defend certain pending litigation actions that were commenced shortly before the Receivership Order was entered. One such matter was litigation filed by Bruce E. Toll and Douglas Topkis against Summit in the Chancery Court of Delaware. The Plaintiffs sought unspecified damages relating to their investments in DMP, as to which they alleged that Summit and Alleca aided DMP in breaching its alleged fiduciary and contractual duties to the plaintiffs, among other claims. The Receiver retained the Berger Harris

firm to defend the case. Berger Harris conducted preliminary analysis of the claims at the Receiver's request, and dealt with procedural issues surrounding service of the complaint, potential motions to dismiss, and similar tasks. The firm also filed an answer and a motion to stay the case. Due to the efforts of Berger Harris, primarily in mid-2013, the matter was marked as "stayed." Occasional activity required status reports to the Court, but the matter was ultimately dismissed by stipulation on November 22, 2016.

35.   The Receiver closed Summit's investment advisory operations effective December 31, 2012.

36.   ***Receivership Operations Since January 1, 2013 (The Current Application Period).***   The Current Application Period began in January 2013. During that month, the Receiver sent out claims forms to approximately 1,500 current and former known clients of Summit, by which those clients were to have identified investments and submitted written claims against the Receivership Estate relating to those investments. Approximately 50 so-called "trade creditors," including lenders or others who had extended credit to Summit, were similarly notified several weeks later. During the first half of 2013, the Receiver and his staff collected, evaluated, and tracked the claims received. This process often involved detailed follow-up interactions with the claimants.

37.     Continued evaluation of Summit's operations revealed that there were at a minimum 28 different bank accounts into which investor funds were deposited or through which investor funds passed on their way to an ultimate investment destination. The Receiver and his staff continued in 2013 to trace those funds and to use the records of those transactions to evaluate and correct, if necessary, submitted claims.

38.     The Receiver also identified other potential sources of recovery of assets for the benefit of the Receivership Estate. These sources included potential "claw back" claims, or claims of any investors who received more money than they invested. Courts generally permit receivers to claw back profits returned to investors, as opposed to amounts that are merely at or below the amount of their original investments. See U. S. Commodity Futures Trading Comm'n v. Gresham, 3:09-CV-75-TWT, 2012 WL 1606037 (N.D. Ga. May 7, 2012). Unfortunately, the Receiver identified very few investors who received profits, and those that did received relatively small "profits," making it unlikely that the Receiver could institute or successfully claw back claims that would result in a net gain to the estate. That is to say, the Receiver could not reasonably determine that the likely proceeds from asserting said claims would exceed the cost of prosecuting those claims.

39.     The Receiver also learned during 2013 that two substantial promissory

notes in favor of Summit were the subject of competing claims from persons or organizations claiming to hold said notes by assignment. In one such instance, the Receiver notified the alleged assignee, Beverly Hills Corporation Maintenance and Preservation Fund, that the Receiver believed the assignment was void or voidable as a fraudulent transfer. After several weeks of negotiations, the Receiver and the putative assignee entered into an agreement, approved by the Court, by which most of the outstanding balance of the note, in the approximate amount of $274,000 would be paid into the Receivership Estate. The Receiver recovered that amount during the Current Application Period.

40.     The Receiver also notified the claimed assignee of the other promissory note, Carrie Mistina, that he considered the assignment to her as void or voidable as a fraudulent conveyance, and that the Receiver would pursue payment of the note from the debtor, Alexandria Capital, LLC, to the exclusion of Ms. Mistina. Ms. Mistina sought to intervene in this matter, and was permitted to intervene by Order dated March 5, 2015 [Doc. No. 102]. The Receiver submitted briefs on the issue of fraudulent conveyance at that time, and continued to pursue payout from Alexandria Capital. Ultimately, in 2017, the Receiver instituted the Alexandria Case, as to which there is a Motion to Approve Settlement pending that would add $77,000 to the Receivership Estate [Doc. No. 146].

41.     During 2013, although Summit had formally ceased operations, the Receiver continued to wind down Summit's affairs, including by, for example, receiving "downstream" consideration for the sale of the aforementioned offices, while simultaneously examining the potential for filing legal claims that could augment the assets of the Receivership Estate for the benefit of investors who lost money in Alleca's schemes.

42.     In April, 2013 the Receiver learned that Private Credit Opportunities Fund, one of the Funds, held a custodial account at Huntington National Bank. In addition to holding several promissory notes payable to the Fund, there were funds of approximately $32,000 in the account. After investigation, the Receiver determined that the notes were either forged or are otherwise of no value. However, the Receiver collected the cash reserves from Huntington during the Current Application Period.

43.     The Receiver continued to evaluate potential claims against DMP. DMP was formed in Michigan in late 2007 for the purpose of holding an equity interest in another entity, Midwest Memorial Group, LLC, ("Midwest"). Midwest, in turn, was created to own and operate 28 cemeteries being sold by a Michigan state receivership. The individual who remains the putative manager of Detroit Memorial Partners, Mark Morrow, is a former business associate of Mr. Alleca's.

44.    After determining that approximately $7,150,000 of funds from one of the Funds were transferred to Detroit Memorial Partners without any apparent justification or consideration, the Receiver sought and obtained from the Court the authority to secure counsel to pursue such claim on a contingent fee basis. See Order dated May 14, 2013 [Doc. No. 63]. Despite the Court's approval for the Receiver to institute legal proceedings against DMP, in late May, 2013 the SEC filed a lawsuit against Detroit Memorial Partners and its manager, Mr. Morrow, alleging securities fraud in the sale of the notes to the Summit-customer noteholders.  See SEC v. Detroit Memorial Partners, LLC et al., 1:13-cv-01817-WSD (the "DMP Receivership Action"). As a remedy, the SEC sought and obtained the appointment of a Receiver and the Court stayed all potential litigation against DMP. See [DMP Doc. No. 51].  Ultimately, this rendered moot the Receiver's potential pursuit of a damage remedy against DMP. Nevertheless, the Receiver was able to coordinate evidence and information with the DMP Receiver, and to assist Summit clients in submitting and proving claims against DMP. Ultimately Summit clients who invested with DMP received substantial distributions from that receivership. The Receiver also filed a claim in the DMP Receivership Action, in which the Receiver sought to recover, for the benefit of one or more Funds, significant sums transferred from those Funds to DMP, but ultimately the Receiver's claim was overruled by

Order dated November 8, 2016 in the DMP Receivership Action. [DMP Doc. No. 183].

45.    During 2013 the Receiver and his professional staff also identified an Errors and Omissions insurance policy ("Policy") issued by Federal Insurance Company ("Federal") as a potential source of recovery. The Policy, in general terms, provided for reimbursement of defense costs and indemnification of liability for certain defined claims arising from covered errors in the rendering of professional advisory services. The face amount of the Policy was $3 Million. It was an eroding policy, which means the amount available to pay losses decreased by each dollar that was paid in defense costs. The named insured was National Advisory Services. As a subsidiary of National Advisory Services and a Registered Investment Adviser, Summit was also an Insured under the Professional Liability Coverage Part of the Policy.

46.    Summit's employed investment advisers were each Insured Persons under the Policy. The Receiver's counsel wrote to Federal on March 22, 2013 identifying claims of former Summit customers totaling $17,511,193, all of which in the Receiver's view were, or but for the stay would have been, losses covered under the Coverage Provision of the Professional Liability Coverage Part of the Policy. Through counsel, Federal indicated that the claims identified would be

disputed as either not covered or excluded, on the basis of fraud in connection with the application for insurance. After the date of that letter, the Receiver identified over $48 million in Losses and notified Federal of said losses on June 25, 2013.

47.    Also during 2013 counsel for Federal indicated to counsel for the Receiver that it contended that Summit's incremental increases in coverage limits from $1 million to $3 million during the last two years of coverage were obtained by misrepresentations contained in letters submitted to obtain those increases. The Receiver's counsel, on the other hand, contended the alleged misrepresentations did not void the coverage increases and that, instead, Federal was liable for the entire amount of the Policy. Federal also notified the Receiver of other defenses to coverage, including Federal's position that there were material misstatements or omissions regarding Summit's business operations that materially impacted the underwriting risk.

48.    Although the Receiver did not concede the validity of Federal's claimed defenses the Receiver nevertheless recognized the existence of a bona fide dispute and explored the pursuit of a settlement with Federal that would, if consummated, result in payment by Federal to the Receivership Estate of an amount that would represent a fair compromise of the significant issues, subject to Court approval. The Receiver and his counsel were simultaneously preparing to commence litigation if a

settlement could not be reached.

49.     In addition to evaluating direct claims that the Receiver could pursue in his capacity as Receiver, the Receiver also contemplated proposing the establishment of a litigation trust for the purpose of providing a vehicle to assemble and bring claims on behalf of investors against certain third parties against whom claims may exist, including Federal. In 2014, however, except with respect to potential claims against Federal as discussed below, the Receiver determined that such a process could not reliably generate affirmative net recoveries that exceeded the anticipated expenses. The Receiver did provide assistance and support, however, to attorneys from two law firms that expressed an interest in pursuing certain potential claims on a class action basis, which remedy, if successful, would be tantamount to litigation trust relief. The Receiver believed that the large number of claims, and their similarity, presented a viable possible case for class litigation against the broker-dealer custodians who "held" the accounts of Summit's clients. With the assistance of the Receiver, those attorneys did pursue such class litigation, filing a complaint in 2014 in which they alleged that the clients' account statements, as compiled and produced by their custodial brokerage firms, reflected valuations of the Funds and DMP that were provided by Mr. Alleca, or Mr. Morrow, or their designees, without investigation by the custodians. Curry et al. v. TD Ameritrade,

Inc. et al 1:14-cv-01361 (the "Class Action Litigation"). The Class Action litigation was ultimately unsuccessful.

50.     As the negotiation between the Receiver and Federal entered late 2013, the Receiver also included in the discussions the potential claims that could have been asserted against Federal by any litigation trustee that might be appointed in the Receivership. This broadened the scope of Federal's potential liability and enhanced the value of any proposed settlement. This development, however, injected further complexity into the negotiations, as Federal sought to obtain as a part of settlement the Receiver's agreement to a mechanism that would give Federal complete release from any potential claims of the Receiver, the Additional Insured, and any of Summit's clients. Initially this might have taken the form of payment into a special trust account created by the Receiver pending court approval of distribution of that amount to Summit's claimants in a manner to be approved by the Court. In exchange for said payment, the Receiver would agree to move the Court to enter an order permanently barring any future claims for payment of any loss (defense or indemnity) under the Policy, and directing that the Court retain exclusive jurisdiction over all such claims.

51.     The Receiver and Federal reached an agreement as to the amount of a settlement in 2014, but the negotiations regarding the mechanism by which a

complete release satisfactory to Federal could be achieved continued into 2015. In mid-2015, the Receiver and Federal reached agreement and reduced to writing a mutually-agreeable form of settlement, which was submitted to the Court for approval. After notice to all insureds and compliance with certain Court-ordered additional notice provisions, the Court conducted a hearing and thereafter approved the settlement by Order dated October 15, 2015. However, Federal requested modification of that Order, believing that it did not meet the precondition of finality referenced in the settlement agreement. After some additional procedural motions regarding the form of the final order, the Court modified the order approving settlement by Order entered May 16, 2016.  The Receiver received the settlement proceeds, totaling $1,487,500, on June 24, 2016.

52.    During the Current Application Period, the Receiver and his staff continued to communicate with claimants regarding the status of the Receiver's efforts, including through posting updates on the Receiver's website and through emails and phone calls exchanged with claimants. The Receiver and his staff also communicated with the claimants regarding the status of the criminal case brought against Mr. Alleca.

53.    Beginning in the last quarter of 2016, the Receiver's staff undertook to confirm all contact information on file for claimants, and to further review and

evaluate claimants' submitted claims. The contact verification process involved sending emails and, in some cases, letters via regular mail, asking claimants to confirm their contact information. Almost all claimants that were contacted in this manner responded. There were a few claimants who did not respond, but eventually through investigations and phone calls all claimants were located or accounted for.

54.    The Receiver's staff then sent out communications to claimants confirming the basic information about each claimant's claim. This information included the amounts invested, what Fund or Funds were invested in, and the amount of repayments, if any, received by the claimant. Most claimants confirmed this email via a response link or landing page furnished by the Receiver. Others called the Receiver or his staff to seek clarification before confirming the email. In some cases the Receiver learned of additional or different facts and made adjustments accordingly. During this process the Receiver learned of additional records that he had not previously been aware of that contained information regarding repayments to some claimants. After receiving and reviewing that information, the Receiver and his staff completed the process of verifying basic claim information by approximately May 1, 2017.

55.    While the contact information and claim information was being verified, the Receiver and his staff also began work on a proposed plan of

distribution. The Receiver decided to propose that distributions be made using the "rising tide" method. On June 8, 2017, the Receiver filed his proposed plan of distribution and provided notice to the claimants. Numerous claimants called to confirm information as a result of that filing, and the Receiver or his staff spoke with those claimants, confirming the information requested in most cases. In one case, the Receiver learned of omitted information regarding a claim, and as a result the Receiver filed a Motion for Approval of a Special Distribution regarding that Claimant on September 12, 2017 [Doc. No. 129].

56.     No claimants filed objection to the proposed plan. The Court held a hearing on the Receiver's Motion to Approve Plan of Distribution, as amended by the Motion for Special Distribution, on September 19, 2017. The Court thereafter approved the amended proposed plan, with certain exceptions, by Order dated September 21, 2017 [Doc. No. 131]. During the September 19, 2017 hearing, however, the Receiver's counsel notified the court that the claims and accompanying proposed distribution amounts for two business entities that either made loans or extensions of credit to Summit should be modified. The September 21, 2017 Order permitted the Receiver to make amended proposed distributions with respect to those two claimants, which the Receiver did by filing dated October 5, 2017 [Doc. No. 133].

57.     One of those claimants, The Meyers Group, Inc. ("TMG"), filed an objection to the Receiver's proposed treatment of its claim, and also filed other motions including a Motion to Vacate the Court's Order approving the plan of distribution. [Doc. No. 138]. The Receiver has responded to those motions.[3] The Court granted the Receiver's Motion to Modify the Plan of Distribution by Order dated November 16, 2017 [Doc. No. 144].

58.     During 2012 the Receiver received certain funds from a bank account maintained at Synovus Bank, d/b/a Bank of North Georgia ("BNG"). By communications to the Receiver and by filings submitted to the Court, BNG claimed a priority lien on a portion of the funds turned over by virtue of a loan agreement in which Summit granted BNG a security interest in funds on deposit. These disputed funds, totaling $18,692.52, were being maintained by the Receiver with the express agreement that their ownership would be determined by the Court if necessary, and thus they were not considered part of the Receivership Estate and were not part of

_____

[3] Even though counsel for The Meyers Group has indicated in court filings that The Meyers Group would have objected to the original proposed plan of distribution if it had contained the same proposed distribution to TMG as ultimately contained in the revised proposed plan, neither the Receiver nor his retained staff are seeking reimbursements of any attorneys' fees that were recorded or incurred relating to TMG's objections to the revised plan or its Motion to Vacate. Neither the Receiver nor his staff are seeking any reimbursement for the value of time or expenses incurred in connection with filing the proposed modified plan of distribution.

the proposed distribution plan the Receiver submitted in September 2017. During the Summer of 2017 counsel for the Receiver began discussions with counsel for BNG regarding potential settlement of BNG's claim of lien. After researching the issue, the Receiver concluded that the prudent course of action was to agree to pay BNG the disputed amount of $18,692.52, rather than to incur the additional fees associated with submitting the matter to the Court for determination.

59.   ***Rationale Supporting Fees and Expenses Sought.***   In support of this Application, the Receiver relies upon the factors generally considered by courts in awarding compensation to attorneys for services performed in connection with the administration of a receivership estate. The Fifth Circuit gave us the "Johnson Factors," in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974) and the Eleventh Circuit adopted them in Norman v. Housing Authority of City of Montgomery, 836 F.2d 1292 (11th Cir. 1988). The Receiver addresses each of those factors below.

60.   The Time and Labor Required.   The Receiver and his staff have expended 1,790 hours at an average hourly blended rate of $189.09 per hour. The hourly rates of the Receiver's staff were discounted from the professionals' normal rates. Work was consistently assigned to personnel that could perform the work most efficiently. For example, three junior attorneys performed occasional projects at

hourly rates of $75. Much of the work was performed under the Receiver's supervision by paralegals charging either $65 or $75 per hour, in order to keep the effective hourly rates reasonable. The Receiver and his staff have also removed time that they believe was not reasonably incurred for reasons described in paragraph 17 above. The Receiver asserts that the amounts sought in this Application were both reasonable and necessary.

61.   The Novelty and Difficulty of the Questions.   Some of the Receiver's tasks have involved novel and complex factual and legal questions. Indeed, by its very nature, a receivership is unique and complex. Unwinding the financial affairs of Summit and the Funds -- a necessary step to determine where investor assets and the fruits of those assets resided -- was by itself a complicated task. Additionally, in order to recover or preserve assets the Receiver and his staff were required to negotiate settlements with counter parties in matters that created one or more of the following issues: (a) fraudulent conveyance voidable transfers; (b) voidability of errors and omissions insurance; (c) contractual interpretation of E&O policies; (d) procedural avenues for obtaining insurance proceeds in insurance disputes for direct benefit to claimants in receivership; (e) validity and effectiveness of bar orders in receivership; (f) procedural prerequisites for instituting claims as receiver; and (g) multi-jurisdictional procedural issues of receivership actions. In addition, the

Receiver successfully stayed or defended actions by applying statutory or rule-based tools for receivers, including federal common-law doctrines.

62.   <u>The Skill Requisite to Perform the Service.</u>   Having been Director of the Georgia Securities Division for over 8 years, and having investigated cases involving the kind of offering fraud involved in this case, the Receiver possesses the skills necessary to the administration of this Receivership. In addition, members of his counsel's law firm also have regulatory and legal experience in complex cases involving financial misdeeds. The administration of the Receivership was performed by the same legal professionals, one of whom has served as an SEC receiver as recently as 2013, in which he also supervised a complicated distribution scenario.

63.   <u>The Preclusion of Other Employment Due to Acceptance of the Case.</u> Neither the Receiver nor any of this law firm representatives have had to decline employment due to the acceptance of the case.

64.   <u>The Customary Fee.</u> The Receiver and his professionals respectfully represent that the discounted hourly rates set forth on **Exhibit B** are well below the range of prevailing market rates in this community for similar services by attorneys and professional employees of reasonably comparable skill, experience, and reputation and are comparable to or less than rates actually billed and paid to attorneys and professional employees in cases of like nature before this Court. In the

event of an objection to any or all of the hourly rates charged by any of the attorneys or professionals identified in **Exhibit B** the Receiver will present direct evidence and/or opinion evidence of charges by attorneys and professional employees under similar circumstances. Otherwise, the Receiver respectfully asks the Court to take judicial notice of the prevailing market rates in this legal community for similar services by attorneys and professional employees of reasonably comparable skill, experience and reputation, and rely upon its own expertise to determine that the rates charged by the attorneys and professional employees are reasonable.

65.     <u>Whether the Fee is Fixed or Contingent.</u> The fees of the Receiver and his professionals are fixed, insofar as they are based upon the discounted fixed hourly rates described above, and all the matters described in this petition have been undertaken on that basis. However, the Receiver and his staff also undertook substantial work without any assurance that they would be compensated. For example, if the largest settlement included in the matter (with Federal/Chubb) had never been consummated, the Receiver and/or his staff would likely have distributed a considerably larger percentage of remaining Receivership assets to claimants, while being forced to discount even more substantially the fees sought to be reimbursed from the Estate.

66.     <u>Time Limitations Imposed by the Client or Other Circumstances.</u> As

was the case during the prior period, there were a number of matters that were time sensitive, primarily surrounding the task of finding willing buyers for Summit's wounded businesses before their value plummeted to zero. The Receiver also had to conduct a nationwide search for assets as quickly as possible to prevent further dissipation by Alleca or anyone acting in concert with him. These tasks continued into the Current Application Period. Additionally, the Receiver's litigation counsel had to timely identify litigation designed to establish preferences against the Estate and achieve a stay in those matters. This was accomplished in numerous arbitrations and in the Toll/Topkis matter, in which the Receiver was represented by Berger Harris. Finally, the Receiver had to identify and claim against insurance policies in conformity with strict notice provisions in order to remain in position to obtain assets under those policies.

67.     <u>The Amount Involved and the Results Obtained.</u> The ability to sell the advisory relationships of many of Summit's offices was made very difficult, due to the migration of clients and the damage to Summit's name and reputation once the Ponzi scheme came to light. Nevertheless, the Receiver was able to sell certain of those assets for over $400,000, which he contends is an excellent result under the circumstances. Similarly, recovery of the largest sum, $1,475,000 of insurance proceeds, was concluded efficiently and without the need to engage in protracted

and costly litigation, thereby maximizing recovery to the Estate for the benefit of creditors. In achieving a pre-litigation settlement, the Receiver and his staff had to overcome and/or minimize the impact of several potentially valid defenses that could have been asserted by the insurer in a legal action filed to recover the proceeds.

68.    The Experience, Reputation and Ability of the Attorneys.  The Receiver has more than thirty years of experience in securities law and business representation and is well-respected in the legal community. The Receiver and many of the lawyers in his firm who serve as his counsel devote a substantial amount of their practice to securities law, representing defrauded investors against those who have abused their trust, and have also represented registered entities in compliance matters. One of the Receiver's attorneys has himself served as a Receiver in an SEC-instituted matter.[4] Another of the Receiver's attorneys participated directly in regulatory investigation, enforcement actions, and restitution proceedings similar to the present action. All of the Receiver's counsel have excellent reputations in the legal community.

69.    The Undesirability of the Case. The case is not undesirable.

70.    The Nature and Length of the Professional Relationships. The Receiver became associated with Page Perry, LLC in September, 2011 and is now Of Counsel to Parker MacIntyre. In addition, he previously practiced law with J. Steven Parker,

---

[4] SEC v. Coadum Advisors, Inc. et al, 1:2008-CV-0011-ODE (N. D. Ga).

a former member of Page Perry and current Principal of Parker McIntyre, and worked with him when he was Enforcement Director at the Georgia Securities Division.

71.    <u>Awards in Similar Cases</u>. Based on their collective experience, the Receiver and the professionals working with him believe that the fees requested in this case are consistent with fees awarded in similar cases in this district and elsewhere. For example, hourly rates sought in the present Application compare favorably with those charged by professionals in the DMP Receivership, a situation involving many of the same issues and investors. In the present matter, there are many more claimants than in DMP. Also in the present matter, the tracing of funds was equally or more complex than in DMP, given the number of accounts through which Alleca tried to hide investors' funds. The Receiver was not successful in recovering as much funds as the DMP Receiver, but contends that the amount recovered here to date is favorable giving the few sources of recovery, and that the amount expended in order to achieve the recovery was reasonable and necessary.

WHEREFORE, the Receiver, on behalf of himself, and his law firm, asks this Court to approve all of the fees and expenses described herein and authorize the immediate payment of same to the extent that the Receiver determines funds are available to do so.

Respectfully submitted this 10th day of May, 2018.

/s/ Robert D. Terry
Robert D. Terry
Georgia Bar No. 702606
Receiver
bterry@parkmac.com

/s/ Pratt H. Davis
Pratt H. Davis
Georgia Bar. No. 212335
Attorney for Receiver
Robert D. Terry
pdavis@parkmac.com

PARKER MACINTYRE
2987 Clairmont Road, Suite 200
Atlanta, Georgia 30329
(404) 490-4060

## **CERTIFICATE OF SERVICE**

I certify that the foregoing was prepared with one of the font and point selections approved by the Court in LR 5.IB. I further certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notice of electronic filing to counsel of record.

This 10th day of May, 2018.


/s/ Pratt Davis
Pratt H. Davis
Georgia Bar. No. 212335
Attorney for Receiver
Robert D. Terry


PARKER MACINTYRE
2987 Clairmont Road, Suite 200
Atlanta, Georgia 30329
(404) 490-4060
pdavis@parkmac.com